The Honorable Ricardo S. Martinez

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

UTHERVERSE GAMING LLC,

               Plaintiff

       v.

EPIC GAMES, INC.,

             Defendant.

NO. 2:21-CV-00799-RSM-TLF

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (ECF NO. 34)**

**NOTE ON MOTION CALENDAR: SEPTEMBER 10, 2021**

**ORAL ARGUMENT REQUESTED**



## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION..................................................................................... 1

II.     BACKGROUND. ....................................................................................... 3

    A.   TECHNOLOGICAL CONSTRAINTS LIMIT LEGACY VRU SYSTEMS. ............................ 3

    B.   PRIOR SOLUTIONS 'FRAGMENTED' VRUS AND DISRUPTED USER
        EXPERIENCES. ................................................................................... 4

    C.   THE ASSERTED PATENTS ALLOW FOR LARGE SCALE VRU EXPERIENCES. ............... 4

        1.   The MMAP Patents Claim Common Space Experiences in Parallel
            Dimensions. ................................................................................... 4

        2.   The '605 Patent Claims Experiences Across Virtual Worlds. ................... 5

        3.   The Claimed Inventions Ushered in New VRU Experiences. ................... 7

III.    LEGAL STANDARD. .............................................................................. 7

    A.   PATENT ELIGIBILITY INVOLVES A TWO STEP INQUIRY. ...................................... 8

    B.   ALLEGATIONS IN THE COMPLAINT CAN PRECLUDE DISMISSAL. ......................... 9

IV.     ARGUMENT. ............................................................................................ 10

    A.   THE MMAP PATENTS ARE PATENT ELIGIBLE. .................................................. 11

        1.   The MMAP Patents Do Not Claim an Abstract Idea (Step I).................. 11

            a.   The MMAP Patents Solve Technical VRU Limitations............... 12

            b.   Epic Attacks a Strawman—Not the Claims or Complaint. .......... 14

                i.   The Claims Do Not Organize Real-World Activity. ........ 16

                ii.   The Claimed Inventions Do Not Use VRUs as
                    'Tools.' ................................................................. 18

        2.   The MMAP Patents Recite Inventive Concepts (Step II). ....................... 19

            a.   The Claimed Inventions Were Unconventional......................... 19

            b.   The Claims Do Not Preempt VRUs................................... 20

        3.   Epic Raises Fact Issues Outside the Pleadings. ....................... 21



**B.** **THE CLAIMS OF THE '605 PATENT ARE PATENT ELIGIBLE.**................................ 21

    1.    The '605 Patent Does Not Claim an Abstract Idea.................................... 21

        a.    The '605 Patent Solves VRU Limitations. .................................... 21

    2.    The '605 Patent is Not Routine, Conventional, or Well Understood. .............................................................................................. 22

**C.** **IN THE ALTERNATIVE, THE COURT SHOULD GRANT LEAVE TO AMEND.**........... 22

**V.** **CONCLUSION.** ........................................................................................................... 23



## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
     882 F.2d 1121 (Fed. Cir. 2018).................................................................... *passim*

*Alice Corp. v. CLS Bank Int'l*,
     573 U.S. 208, 134 S. Ct. 2347, 189 L. Ed. 2d 296 (2014)............................... *passim*

*Ancora Techs., Inc. v. HTC Am., Inc.*,
     908 F.3d 1343 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018)...................8, 9, 19,20

*Baker v. Riverside County Office of Educ.*,
     584 F.3d 821 (9th Cir. 2009) ...............................................................7, 11

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*,
     827 F.3d 1341 (Fed. Cir. 2016)...................................................9, 19, 20, 21

*Berkheimer v. HP Inc.*,
     881 F.3d 1360 (Fed. Cir. 2018)...............................................................15, 19

*Berkheimer v. HP Inc.*,
     890 F.3d 1369 (Fed. Cir. 2018).................................................................8, 16

*CardioNet, LLC v. InfoBionic, Inc.*,
     955 F.3d 1358 (Fed. Cir. 2020), *cert. denied sub nom. InfoBionic, Inc. v.
     Cardionet, LLC*, 141 S. Ct. 1266, 209 L. Ed. 2d 8 (2021)............................... *passim*

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
     927 F.3d 1306 (Fed. Cir. 2019), *cert. denied sub nom. Garmin USA, Inc. v.
     Cellspin Soft, Inc.*, 140 S. Ct. 907, 205 L. Ed. 2d 459 (2020) .................................8, 9

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
     880 F.3d 1356 (Fed. Cir. 2018)...........................................................................18

*Data Engine Techs. LLC v. Google LLC*,
     906 F.3d 999 (Fed. Cir. 2018)..................................................................8, 16

*DDR Holdings, LLC v. Hotels.com, L.P.*,
     773 F.3d 1245 (Fed. Cir. 2014).........................................................9, 16, 20

*Enfish, LLC v. Microsoft Corp.*,
     822 F.3d 1327 (Fed. Cir. 2016).................................................................9, 15, 18



*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ...........................................................................8, 21

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) ................................................................................23

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016)...........................................................................8, 15

*Morongo Band of Mission Indians v. Rose*,
  893 F.2d 1074 (9th Cir. 1990) ................................................................................22

*PPS Data, LLC v. Jack Henry & Assocs., Inc.*,
  404 F. Supp. 2d 1021 (E.D. Tex. 2019).....................................................................8

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  930 F.3d 1295 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 1108, 206 L. Ed. 2d
  180 (2020) ..........................................................................................................13, 19

*Timeplay, Inc. v. Audience Entm't LLC*,
  No. CV 15-05202-SJO (JCX), 2015 WL 9695321 ..................................................14

*Uniloc USA, Inc. v. LG Electronics USA, Inc.*,
  957 F.3d 1303 (Fed. Cir. 2020)............................................................................8, 9

*Vineyard Investigations v. E.J. Gallo Winery*,
  510 F. Supp. 3d 926 (E.D. Cal. 2021).....................................................................14

*Worlds, Inc. v. Activision Blizzard, Inc.*
  (ECF No. 34 ) ...........................................................................................................17

**Statutes**

35 U.S.C. § 101.....................................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 15(a)(2)............................................................................................22

Local Civil Rule 7(b) ...............................................................................................22

Rule 12 .....................................................................................................................21

Rule 12(b) ................................................................................................................16

Rule 12(b)(6) ....................................................................................................*passim*

Rule 120(a) ..............................................................................................................15

POLSINELLI

1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

1

## I.   INTRODUCTION.

2      Epic Games, Inc.'s motion to dismiss ("Motion," ECF No. 34) eschews the *factual*

3   *allegations* of Utherverse Gaming LLC's complaint ("Complaint," ECF No. 1).  Epic's Motion

4   similarly shuns the *claims* of the Asserted Patents.[1]  Epic does so for a simple reason: to mislead

5   the Court into believing that the claimed inventions in the Asserted Patents are so elementary

6   that they are ineligible for patent protection.  Epic is incorrect and its Motion should be denied.

7      The Asserted Patents are not directed to merely "separating players into multiple copies

8   of a virtual 'space'" as Epic incorrectly alleges.  (ECF No. 34 at 1:15).  The Complaint makes

9   clear that the claims of the MMAP Patents encompass "multiple parallel dimensions or instances

10  within which participants can interact and engage in *common* experiences."  (ECF No. 1 at ¶ 37)

11  (emphasis added).  These multiple parallel dimensions (or instances) "allow for vast numbers of

12  concurrent participants to occupy the same virtual venue and share the same experience."  (*Id.*).

13     Nor does the 'Experience Playback Solution' of the '605 Patent concern the

14  mischaracterized abstraction of "replaying a recording" as Epic suggests.  (ECF No. 34 at 1:24).

15  The '605 Patent instead "facilitate[es] the shared experience of a pre-recorded experience in an

16  interactive virtual world with multiple parallel dimensions"; "[a] user . . . may navigate through

17  the recorded experience and interact with other avatars also participating in the playback of the

18  recorded experience."  (ECF No. 1 at ¶¶ 45, 43 (internal quotation marks omitted)).  That the

19  United States Patent and Trademark Office thus found the claimed inventions of the Asserted

20  Patents patent eligible both before *and after* the Supreme Court's *Alice* decision should come as

21  no surprise.

22     Epic makes the conclusory (and incorrect) argument that all the claims of the MMAP

23  Patents are "virtually identical" and should be adjudicated (and fall) as one.  (*See* ECF No. 34 at

24  4:1-7).  Then, in violation of the Federal Circuit's warning against oversimplifying a claimed

25  ─────────────

26  [1] United States patent numbers 8,276,071 (the "'071 Patent"); 8,812,954 (the "'954 Patent"); 9,123,157 (the "'157 Patent"); and 9,724,605 (the "'605 Patent").  The '071, '954, and '157 Patents are collectively referred to as the "Multi-instance, Multi-user Animation Platform" ("MMAP") Patents.



invention, Epic makes an inapt comparison of the Asserted Patents to bridge games and chess tournaments.  (*See e.g.,* ECF No. 34 at 12:2-10 and 17:1-8).  The claims of the Asserted Patents do not concern "a single presorted hand that is replicated for each table" in a game of duplicate bridge or replicated chess boards.  (ECF No. 34 at 17:5-8).  The claims of the Asserted Patents instead "overcome computer processing and network bandwidth limitations" "allowing for improved computer functionality and an enhanced interactive user experience that facilitates enjoyment of common virtual experiences."  (ECF No. 1 at ¶ 37; *see also id.* at ¶ 45 (concerning the '605 Patent)).

The problems (and solutions) addressed by the claims of the Asserted Patents do not exist in the physical world.  The Asserted Patents concern challenges unique to and that exist only in computer systems hosting online virtual reality universes (VRUs).  The Federal Circuit has found that improvements to computer systems such as these are not abstract ideas.  This Court should follow suit and deny Epic's Motion.

But even if the Court were to hold that the claims of the Asserted Patents touch on an otherwise 'abstract' concept, the Asserted Patents nevertheless remain patent-eligible.  The Utherverse Complaint—all but ignored by Epic's Motion—painstakingly details prior art solutions to VRU capacity constraints that prevented participants from sharing common virtual experiences.  (*See e.g.,* ECF No. 1 at ¶¶ 2, 3, 25, 26, 29, 32, 37, 45, 48, 54, 57).  The claims of the Asserted Patents recite inventive concepts that overcome these challenges and that were neither conventional, routine, nor well understood at the time of invention.  Even Epic characterizes the accused technology at issue as "very lean-forward."  (ECF No. 1 at ¶ 46) (internal quotation marks and emphasis omitted).  Because the allegations of the Complaint must be accepted as true and show that the claimed solutions were not well understood, routine, or conventional at the time of invention—Epic's Motion must be denied.

Epic's Motion also fails for relying upon material outside the pleadings.  Epic raises factual disputes concerning alleged prior art that falls outside the record rather than address the



express factual allegations presented in the Complaint.  These questions of fact are inappropriate for a motion to dismiss; to do so would usurp the province of the jury.  Utherverse's Complaint establishes a more than sufficient *prima facie* claim of infringement of patent-eligible subject matter.  Epic's Motion must be denied.

## II.  BACKGROUND.

The claimed inventions in each of the four Asserted Patents allow "vast numbers of participants to connect with others in virtual computer-generated environments."  (ECF No. 1 at ¶ 1).  The claimed inventions overcome the "significant technical obstacles to bringing multitudes of participants into new virtual worlds," including "computational power," "processing requirements," and "network bandwidth."  (*Id.* at ¶ 2).  These claimed and otherwise unconventional improvements to computer systems that host VRUs are better understood relative such technological constraints.

### A.  TECHNOLOGICAL CONSTRAINTS LIMIT LEGACY VRU SYSTEMS.

Computer processing speed and network bandwidth limit multi-user virtual worlds.  (*See* ECF No. 1 at ¶ 2).  The processing requirements for implementing and rendering each user in a virtual world exponentially increases with each new participant.  (*Id.*; *see also id.* at ¶ 25-27).  When there are only two participants in a virtual world, the VRU system need only account for two perspectives—each participant as it perceives the other.  But when there are *three* participants, the VRU system needs to account for *six* such perspectives; *four* participants will elicit *twelve* perspectives, and so on.  Despite faster and more powerful computers, VRUs remain fundamentally "limit[ed] [by] the number of simultaneous players and their methods of interactions . . . to avoid exceeding the programming, networking, and hardware limitations of the servers and/or clients."  (ECF No. 1 at ¶ 26 (quoting ECF No. 1-4 (the '071 Patent) at 1:53-57)).



**B.    PRIOR SOLUTIONS 'FRAGMENTED' VRUs AND DISRUPTED USER EXPERIENCES.**

Prior solutions sought to address these limitations by replicating virtual areas or scenes through 'instancing.'  (*See generally* ECF No. 1 at ¶¶ 2, 48-54).  A first *instance* would host a fixed number of participants while a second *instance* would host a different fixed set of participants.  (*See e.g.,* '071:1:53-55; 2:15-19; *see also* ECF No. 1 at ¶ 49-50).  But these various instances 'fragmented' the virtual world and prevented participants from sharing common parallel virtual experiences.  (ECF No. 1 at ¶ 2; *cf. id.* at ¶ 53).  Participants of the first 'fragmented' instance existed independent of and could not interact with the users of the second 'fragmented' instance.  Nor could they concurrently experience events taking place in that instance.  These ineffective solutions that prevented participants from sharing in a ***common parallel*** experience are unlike those allowed for and claimed by the Asserted Patents.  (*Id.* at ¶¶ 2, 49, 53).

**C.    THE ASSERTED PATENTS ALLOW FOR LARGE SCALE VRU EXPERIENCES.**

**1.    The MMAP Patents Claim Common Space Experiences in Parallel Dimensions.**

The MMAP Patents claim a variety of improvements to VRU systems.  (*See generally* ECF No. 1 at ¶ 30-37).  These claimed inventions support large-scale, common space experiences across parallel VRUs.  For example, each of the MMAP Patents claim the use of a common space so that objects located in that space might be viewed across parallel dimensions.  (*See e.g.,* '071:19:24-29 (reciting an "object located inside the common space [that] is visible . . . inside each of the plurality of parallel dimensions"); ECF No. 1-5 (the '954 Patent) at 19:15-20 (reciting an "object located inside the common space [that] is visible . . . inside each of the plurality of parallel instances"); ECF No. 1-6 (the '157 Patent) at 18:51-67 (reciting an "object located inside the common space [that] is visible from viewpoints located inside each of the plurality of parallel instances"); *see also* ECF No. 1 at ¶ 36 (concerning the '157 Patent generally)).



The MMAP Patents also recite claims concerning the passage of objects across parallel dimensions, which further enhances the user experiences in parallel VRUs.  (*See e.g.,* ECF No. 1 at ¶ 33).  Through this claimed embodiment, changes to an object in one instance can be replicated to other parallel instances; participants (regardless of their instance) perceive the changes as if they were all present in a single common space.  (*Id.*).  The '071 Patent, for example, recites "a modeled object originating from the common space" and "passing into at least one of the plurality of parallel dimensions."  ('071:19:64-20:2).  The '954 and '157 Patents each recite similar embodiments.  (*See e.g.,* '954:20:54-59 and '157:20:7-12).

The MMAP Patents also recite subject matter pertaining to a multi-dimensional avatar. This multi-dimensional avatar would allow for audience groups to interact with performers over a series of parallel VRUs.  Consider a nightclub in a virtual universe; "participants in multiple dimensions at a nightclub may get into the stage diving line, and then inhabit a single avatar which is then permitted to . . . jump off the stage."  (ECF No. 1 at ¶ 35 (internal quotation marks omitted)).  The '071 Patent specifically claims different embodiments of a multi-dimensional avatar.  (*See e.g.,* '071:20:7-12).  And the '954 Patent recites "an avatar present in multiple ones of the plurality of parallel dimensions" as does the '157 Patent.  ('954:22:689*; see also* '157:20:45-47).

## 2.     The '605 Patent Claims Experiences Across Virtual Worlds.

"The '605 Patent provides another solution . . . to allow for massively populated virtual worlds in which participants can share the same experience without overcrowding."  (ECF No. 1 at ¶ 39).  The '605 Patent recites a particular method of "playing back an experience in a virtual worlds system."  (ECF No. 1-7 (the '605 Patent) at 10:37-38).  That method includes generating an initial "recorded experience file" involving "an initial scene state" and "subsequent changes [at] respective times" relative thereto.  ('605:10:43-47).  The '605 Patent later renders that file "in [a] new instance" whereby "movement within the new instance . . . is limited by objects of the recorded experience."  ('605:60-62).  The claimed '605 Patent methodology allows



1    participants to navigate and interact with an "initial scene state in [a] new instance and render

2    updates to the initial scene state based on the subsequent changes over" time. (ECF No. 1 at ¶ 43

3    (internal quotation marks omitted)). Not only are "objects of the recorded experience" present

4    for interaction but "other avatars also participating in the playback of the recorded experience."

5    (*Id.* at ¶ 43 (internal quotation marks omitted)).

6          The '605 Patent does not encompass the mere "replaying of a recording of a virtual

7    experience" as suggested by Epic. (ECF No. 34 at 1:24). "***Unlike a video recording***, which

8    displays a successive series of images, the method of playing back a recorded experience" in the

9    '605 Patent "allows a user to navigate through the recorded experience ***rather than simply watch***

10   ***a video playback***." (ECF No. 1 at ¶ 40 (emphasis added) (quoting '605:10:14-18)). Nor is the

11   interactive playback experience "limited by a point of view from which the recording was

12   captured." (ECF No. 1 at ¶ 40 (quoting '605:10:21-25)). A participant may "navigate through

13   the recorded experience by changing their position and orientation within the recorded

14   experience," "view objects from any angle that they choose," and despite the "playback of [a]

15   same recorded experience," take part in an experience "***different for all users.***" (ECF No. 1 at ¶

16   40 (emphasis added) (quoting '605:10:25-29)).

17         This unconventional methodology is embodied in claim 2 of the '605 Patent—a claim

18   specifically identified in the Utherverse Complaint. (*See* ECF No. 1 at ¶ 122 *et seq.*). Claim 2

19   recites "movement within [a] new instance" of a VRU rendering the recorded experience where

20   that movement is "limited by objects of the recorded experience." ('605:10:59-62). The

21   recorded experience file encompasses "objects of the initial scene state," "updates to the initial

22   scene state," and corresponding "changes [occurring] over [a] time period." ('605:10:48-53).

23   But because the changes are ***not*** rendered exactly as they appeared during the original

24   experience—and what Epic would otherwise suggest constitutes simple 'replay'—participants

25   can interact with the environment and one another as if they were experiencing the environment

26   ***for the first time***. This claimed embodiment allows for a dynamic, interactive environment



where participants can repeatedly share a common experience anew despite that experience having originally occurred at an earlier time.  (ECF No. 1 at ¶ 41-45).

### 3.    The Claimed Inventions Ushered in New VRU Experiences.

The claimed inventions of the Asserted Patents ushered in the arrival of new and shared experiences in virtual, online worlds as visually exemplified and alleged in the Complaint. These inventions and corresponding experiences allow participants to connect in ways not previously practical or possible.  (ECF No. 1 at ¶ 3).  Epic knows this all too well; the claimed Utherverse inventions have allowed Epic to host concerts by world renowned musical artists Marshmello and Travis Scott and drop trailers for billion-dollar blockbuster movies such as *Star Wars: The Rise of Skywalker.*  (ECF No. 1 at ¶ 5).

Epic's Marshmello concert—publicly labeled by Epic as a "major event" and "not like watching a stream at home"—saw nearly ***11 million*** attendees in the virtual concert universe. (ECF No. 1 at ¶¶ 46, 59).  Epic's series of Travis Scott concerts drove equally massive audience participation.  The Travis Scott events were a unique concert experience "presented at multiple times on multiple days" with more than ***12.3 million*** in attendance at ***just one of those events***. (ECF No. 1 at ¶¶ 129, 136).  The Utherverse's Asserted Patents embody a new era of massive, multi-participant shared events not previously possible.  (ECF No. 1 at ¶¶ 2, 47).[2]  By achieving a critical mass of participants, Epic grew and continues to grow its event user base, which now drives new partnerships and merchandising opportunities.  (*Id.* at ¶¶ 47, 57-65).

## III.    LEGAL STANDARD.

A Rule 12(b)(6) motion requires the Court to accept all facts alleged in the complaint as true; all inferences must be drawn in favor of the non-moving party.  *See Baker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (internal citations omitted). Introduction of material outside the pleadings and subsequent consideration by the Court is

---

[2] The Travis Scott concert is reported to have grossed approximately $20 million from in-event purchases.  (ECF No. 1 at ¶ 65).  These events could not occur at present scale nor be successfully commercialized using legacy VRUs thus evidencing the benefits of the improvements claimed in the Asserted Patents.  (*Id.* at ¶ 2).



improper.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  Fact disputes or considerations "weigh[ing] evidence" and "mak[ing] credibility judgments" are the province of the jury.  *Berkheimer v. HP Inc.*, 890 F.3d 1369, 1370 (Fed. Cir. 2018); *see also PPS Data, LLC v. Jack Henry & Assocs., Inc.*, 404 F. Supp. 2d 1021, 1040 (E.D. Tex. 2019) (adopting the same).

### A.   PATENT ELIGIBILITY INVOLVES A TWO STEP INQUIRY.

"Patent eligibility under 35 U.S.C. § 101 is a question of law, based on underlying factual findings."  *Uniloc USA, Inc. v. LG Electronics USA, Inc.*, 957 F.3d 1303, 1306 (Fed. Cir. 2020). "To distinguish between eligible and ineligible patent claims, the Supreme Court has fashioned a two-step test."  *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1314 (Fed. Cir. 2019), *cert. denied sub nom. Garmin USA, Inc. v. Cellspin Soft, Inc.*, 140 S. Ct. 907, 205 L. Ed. 2d 459 (2020).  The Court must first "determine whether the *claims* at issue are directed to a patent-ineligible concept" and articulate that finding "with *specificity.*"  *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217, 134 S. Ct. 2347, 2354, 189 L. Ed. 2d 296 (2014) (emphasis added).  "[T]his inquiry often turns on whether the claims focus on the specific asserted improvement in computer capabilities" or "a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool."  *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1347 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018) (internal citations omitted).  "If the claims are not directed to an abstract idea, **the inquiry ends.**"  *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016) (emphasis added).

*Only* when the Court *first* finds the claims directed to an abstract idea should the Court proceed to the second step of the *Alice* test.  The second step involves a consideration of "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application."  *Alice*, 573 U.S. at 217.  "This second step is a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself."  *Data Engine Techs. LLC v.*



*Google LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018) (internal quotations omitted).  "The 'inventive concept' may arise in one or more of the individual claim limitations or in the ordered combination of the limitations."  *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016).  "[D]eciding whether claims recite an 'inventive concept,' or something more than 'well-understood, routine, conventional activities previously known to the industry,' may turn on underlying questions of fact."  *Cellspin*, 927 F.3d at 1315 (internal quotations and modifications omitted).

###### B.   ALLEGATIONS IN THE COMPLAINT CAN PRECLUDE DISMISSAL.

"Patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)."  *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.2d 1121, 1126-27 (Fed. Cir. 2018).  Where a "complaint alleges that the claimed combination improves the function and operation of the computer itself," the Court must accept those allegations as true and view all inferences in favor of the patentee. *Id.* at 1127-28. Software claims are routinely found "patent eligible under *Alice* step one when they are directed to improvements to the functionality of a computer or network platform itself."  *Uniloc*, 957 F.3d at 1307.  When "the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity," the claims are not directed to an abstract idea.  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016).   Noteworthy is that "[c]omputers are improved not only through changes in hardware"; "software can [likewise] make non-abstract improvements to computer technology." *Ancora*, 908 F.3d at 1347 (internal quotations and modifications omitted).  Claims that recite improvements "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks" are inventive and patent eligible.  *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).



## IV.   ARGUMENT.

The claimed inventions of the Asserted Patents pass both steps of the *Alice* inquiry. Epic's contrary arguments rely on a flawed and oversimplified characterization of the claims. (*See* ECF No. 34 at 4:21-5:5; 10:2-26; 11:9-12; 12:2-10).  The Asserted Patents are not directed to an abstract idea.

Epic summarily groups each of the MMAP Patents together under the auspices of being 'identical.'  (*Id.* at 4:6-7).  Epic then equates those improperly grouped claims as encompassing the prior art.  (*Id.* at 12:2-10; *see also id.* at 16 n. 4).  Epic thus concludes **all** the claimed inventions of the MMAP Patents are but a simple method of using a computer to organize human activity—grouping virtual players into duplicate environments for population control—and therefore abstract.  (*See* ECF No. 34 at 10:22-11:6).  This is factually, legally, and demonstrably incorrect.  The claims of the '071, '954, '157 Patents *do not* "contain virtually identical claim limitations."  (*Contra* ECF No. 34 at 4:5).  Moreover, none of the claims of the MMAP Patents concern merely grouping players in duplicate environments.  (*Contra id.* at 10:19-11:6).  Epic fails to establish that the claims of the MMAP Patents are abstract.

Epic likewise ignores the language of the '605 Patent claims in oversimplifying the invention as but playing back an "interactive experience."  (ECF No. 34 at 19:20-21).  While Epic acknowledges the "interactive" aspect of the claimed invention, this acknowledgment is later disavowed in characterizing the invention as "simply the idea of displaying the recording to users in multiple instances."  (ECF No. 34 at 19:26-20:1).  Epic makes no effort to ascribe meaningful distinction to 'interactive.'  Epic instead drives home the self-serving conclusion that because the claims may be practiced "in a generic computer environment," the claimed invention is abstract.  (ECF No. 34 at 21:12).  This is incorrect.

As described above, the '605 Patent's claim 2 is more than the act of "replaying . . . a recording of a virtual experience."  (*Compare supra* § II.C.2 *with* ECF No. 34 at 1:24).  Playback of a recorded video is nothing more than the display of a successive series of images.  Claim 2 of



the '605 Patent, however, "allows a user to ***navigate through*** the recorded experience ***rather than simply watch*** a video playback." (ECF No. 1 at ¶ 40 (quoting '605:10:14-18) (emphasis added)). A participant may "navigate through the recorded experience by changing their position and orientation within the recorded experience," "view objects from any angle that they choose", and despite the "playback of [a] same recorded experience" take part in an experience "***different for all users***." (ECF No. 1 at ¶ 40 (quoting '605:10:25-29) (emphasis added)). Claim 2 recites that the "new instance" and its rendered recorded experience are "limited by objects of the recorded experience," "objects of the initial scene state," and "changes [occurring] over [a] time period." ('605:10:48-53). These distinctions are part of providing a ***new*** interactive experience regardless of the number of 'playbacks' of the ***original*** recorded experience. ('605:10:59-62). The '605 Patent unquestionably passes muster under the first step of the *Alice* test.

Should the Court hold that the claims of the Asserted Patents concern an abstract idea under step one of *Alice*, the claims still pass step two; each of the claims of the Asserted Patents recite inventive concepts. Epic fails to establish otherwise; its step two analysis suffers from the same flaws as did its analysis under step one—it ignores the claim language in favor of mischaracterizing the claimed inventions as 'population control' or 'replaying a recording.'

Utherverse's Complaint expressly details that these inventions were not well-understood, routine, or conventional at the time of invention. (ECF No. 1 at ¶¶ 2, 3, 25, 26, 29, 32, 37, 45, 48, 54, 57)). Utherverse's allegations must be accepted as true. *See Barker*, 584 F.3d at 824 (requiring all allegations be accepted as true and inferred in favor of the Plaintiff). Given the foregoing coupled with lack of meritorious contrary argument from Epic, the Motion must be denied.

A.   **THE MMAP PATENTS ARE PATENT ELIGIBLE.**

1.   **The MMAP Patents Do Not Claim an Abstract Idea (Step I).**

Step one of the *Alice* abstract analysis requires the Court to determine "whether the claims focus on a specific means or method that improves the relevant technology or are instead



directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020), *cert. denied sub nom. InfoBionic, Inc. v. Cardionet, LLC*, 141 S. Ct. 1266, 209 L. Ed. 2d 8 (2021) (internal quotation omitted).  The claim language of the Asserted Patents, especially when taken in the context of the factual allegations of the Complaint, confirms the recitation of various specific improvements that allow for instantiation of parallel VRU dimensions, occupation by large volumes of participants, and sharing of specific common experiences across those dimensions.  The MMAP Patents identify prior art VRU systems.  The MMAP Patents recite methodologies that improve upon those prior art systems.  The MMAP Patents, therefore, do not encompass abstract concepts that constitute an ineligible result or effect of an idea.

a.     **The MMAP Patents Solve Technical VRU Limitations.**

The Complaint and MMAP Patents address the technical failings of legacy VRUs.  The Complaint details how "[a]s the number of participants in a world increase, the processing requirements associated with each additional user increases exponentially."  (ECF No. 1 at ¶ 2). Prior art virtual worlds were thus "smaller, fragmented," and populated "with fewer participants" and thereby "less able to support activities that relied on scale"—like the present-day interactive experiences hosted by Epic and illustrated throughout the Complaint.  (*Id.*).  The MMAP Patents affirm the foregoing; solutions employed by legacy VRUs leave participants unable to share common virtual experiences across multiple, parallel instances.  (*See e.g.,* '071:1:46-56).

The MMAP Patents, however, implement systems and methods that allow VRUs to support specific common experiences across parallel instances.  The embodiments specifically alleged in the Complaint allow for a large-scale event (such as a concert or movie premiere) to be experienced within a common space and viewed by participants across instances.  (*See supra* § 2.C.1; *see also* ECF No. 1 at ¶¶ 58-66, 71-72, 75-76, 79-80, 83-84).  The claimed object-passing embodiments allow participants in separate instances to engage with that object regardless of a user being a part of a particular instance.  (*See supra* § 2.C.1).  And the multi-



dimensional avatar embodiments allow avatars to appear in multiple instances.  (*Id.*).  The foregoing systems and methods both heighten and make more realistic the collective shared virtual experience.

Each of these claimed inventions are effectuated through a plurality of parallel dimensions that replicate a modeled three-dimensional space.  (*See e.g.,*'071:18:49-50).  "[A] unique subset of [a] plurality of avatars" are then assigned to "a respective one of the parallel dimensions."  (*Id.* at 18:56-60).  The avatars are then animated by way of "virtual reality data" "to enable clients to output an animated display of a corresponding one of the parallel dimensions and avatars populated therein."  (*Id.* at 18:67-19:3).  The Complaint, too, specifically alleges a "common space" that allows for "visib[ility] from viewpoints located inside each of the plurality of parallel dimensions."  (ECF No. 1 at ¶ 73; *see also* '071:19:24-29).  As a direct result of this specifically claimed methodology, large-scale virtual events allowing for specifically shared experiences in a common space may occur without the detrimental effects of bandwidth and processor power limitations.  (*See also* ECF No. 1 at ¶¶ 67-86, 87-105, and 106-121; '954:19:15-20 and '157:18:51-67 (concerning similar embodiments in the '954 and '157 Patent, respectively)).

The Federal Circuit has clearly stated that claimed inventions that solve technological problems in computing systems—inventions like those claimed here—are not abstract ideas.  *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1301-04 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 1108, 206 L. Ed. 2d 180 (2020) (claims for "a specific technique . . . to solve a technological problem arising in computer networks" are not abstract).  The MMAP Patents each avoid the drawbacks of fragmented prior art dimensions where different users each receive a different user experience.  The MMAP Patents allow for specific common experiences across parallel instances.  The MMAP Patents do so through specifically claimed methodologies and are further alleged in the Complaint.  (*See* ECF No. 1 at ¶ 67-121).  The MMAP Patents are patent-eligible.  Nor do the MMAP Patents merely automate a conventional idea "on a computer"; they cannot—



1  for there is no real-world 'equivalent' to automate.  As the MMAP Patent claims "recite a

2  specific improvement over prior systems"—fragmented virtual spaces encountering processing

3  and bandwidth limitations—the claims realistically be considered an abstract idea.

4          **b.      Epic Attacks a Strawman—Not the Claims or Complaint.**

5          Epic's oversimplifies the claimed inventions of ***all*** the Asserted Patents.  (*See* ECF No.

6  34 at 10:22-24 (concerning the MMAP Patents) and 19:20-21 (concerning the '605 Patent)).

7  Epic also ignores the language of the claims.  (*See id*. at 10:24-11:6 (discussing the ***specification***

8  rather than the claims of the MMAP Patents) and 19:21-20:1 (concerning the ***specification***

9  versus the claims of the '605 Patent)).  And Epic all but ignores the well-pled allegations in the

10  Complaint.  (*See generally* ECF No. 34 (citing no more than *five* times to the ***substance*** of the

11  Complaint)).  Epic is so bold as to even 'rewrite' one of the MMAP Patent claims so that Epic

12  may better allege it to constitute an abstract concept.  (*See* ECF No. 34 at 34:15:1-3 (concerning

13  claim 1 of the '157 Patent)).

14          Having misrepresented the scope of the rewritten claim, Epic further deems that claim

15  "[r]epresentative" of all the MMAP patents.  (*Id.* at 15:1).  Epic's strawman exercise comes full

16  circle by deeming the MMAP Patents collectively abstract and invalid.  (*See e.g., id.* at 15:11-

17  13).  But at no point in this purported 'analysis' (*compare* ECF No. 34 at 15:1-13 *with*

18  '157:18:51-67) does Epic address the actual elements of the claims despite its burden to do so.

19  *See Vineyard Investigations v. E.J. Gallo Winery*, 510 F. Supp. 3d 926, 934 (E.D. Cal. 2021)

20  ("[d]efendant's burden in seeking to dismiss plaintiff's claims based on patent ineligibility is

21  high because the Patent's presumptive invalidity") (citing *CLS Bank Int'l v. Alice Corp. Pty*., 717

22  F.3d 1269, 1304 (Fed. Cir. 2013), *aff'd* 573 U.S. 208, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014);

23  *see also Timeplay, Inc. v. Audience Entm't LLC,* No. CV 15-05202-SJO (JCX), 2015 WL

24  9695321, at * 5 ("in applying § 101 jurisprudence at the pleading stage, the Court construes the

25  patent claims in a manner most favorable to Plaintiff").  And while "Courts ***may*** treat a claim as

26  representative in certain situations," that permission is subject to the caveat that "the patentee . . .



not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) (emphasis added). The present briefing is replete with 'meaningful argument' nor does there exist a stipulation between the parties. Epic's arguments fail as a matter of law.

As a factual matter, the claims recite specific ways to group players into different instances while allowing for and preserving common virtual experiences—a problem heretofore left unsolved. The '071 Patent—as a singular example—does so through the use of modeling replicated parallel dimensions ('071:18:49-55), assigning unique subsets of avatars to parallel dimensions ('071:18:56-62), animating avatars by way of virtual reality data that enables animated displays across parallel dimensions ('071:18:63-19:3), and modeling a common space and objects therein such that they might be viewed across dimensions ('071:19:24-29). Epic does not attempt to address the specifics of the '071 or '954 Patent. And in the case of the '157 Patent, Epic does so only after having re-written the claim per the above. "[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337. Epic knowingly presents such inaccurate descriptions to arrive at its desired conclusion. *See CardioNet*, 955 F.3d at 1371 ("failing to account for the specific requirements of the claims" "is inconsistent with [the Federal Circuit's] instruction that court be careful to avoid oversimplifying" the same). Epic's efforts should result in denial of its Motion.[3]

Epic's arguments ultimately find no support in the record and run counter to controlling law. *See McRO,* 837 F.3d at 1313. Properly understood, the MMAP Patents claim inventions

---

[3] Utherverse's Complaint alleges that Epic has infringed 'at least' the identified claim of each patent asserted. Utherverse has not and did not limit itself to asserting only the four claims mentioned in the four counts. *Cf.* LOCAL PATENT RULE 120(a). Epic similarly fails to account for the other claimed embodiments—including the passing of objects between dimensions and the multi-dimensional avatar—discussed herein, and more specifically, those embodiments as claimed in each of the Asserted Patents.



1    that improve VRU system limitations while preserving specific common experiences across

2    multiple parallel VRU dimensions.  (*See e.g.,* '071:19:27; '954:19:18; and '157:18:15 (each

3    concerning a 'common space' embodiment)).  Epic's arguments are factual disputes about

4    novelty and non-obviousness.  (ECF No. 34 at 16 n.4 and 17:1-8).  Factual disputes are not

5    procedurally proper for consideration under Rule 12(b).  *See Berkheimer*, 890 F.3d at 1370.

6                    **i.       The Claims Do Not Organize Real-World Activity.**

7            Epic analogizes the claimed inventions with activities in the physical world.  (*See* ECF

8    No. 34 at 12:2-17).  This attempt is misplaced.  "It is not enough . . . to merely trace the

9    invention to some real-world analogy."  *Data Engine*, 906 F.3d at 1011.  The purpose of such

10   analogies is to identify when a patent is taking an old practice and claiming the practice done 'on

11   a computer.'  But that is not the case in the present action.  The MMAP Patents address problems

12   that are exclusive to and can only be solved in VRUs.

13           Epic's bridge game and chess board comparisons are the types of analogies rejected by

14   the Federal Circuit in *DDR Holdings*.  The claims in *DDR* concerned generating a hybrid

15   webpage that maintained the 'look and feel' of a host website thereby addressing the problem of

16   retaining website visitors that would otherwise be whisked after from a host's website after

17   clicking on an advertisement and activating a hyperlink.  *See DDR*, 773 F.3d at 1257.  The

18   Federal Circuit dismissed analogies to a "store within a store" noting that any brick-and-mortar

19   practice "did not have to account for the ephemeral nature of an Internet 'location' or the near-

20   instantaneous transport between these locations made possible by standard Internet

21   communication protocols."  *Id.* at 1258.  The Federal Circuit's holding is instructive here.

22           The Asserted Patents claim technological improvements that are unique to VRUs and like

23   *DDR* have no analog in the physical world.  The common space embodiments involve parallel

24   instances in which a certain portion—such as a stage—is the same in every instance.  For

25   example, each instance of a VRU is its own concert venue, but there is a single stage that appears

26   across all instances at one time.  Epic's bridge tournament cannot make one seat at each table a



'common space' whereby one player simultaneously sits at every table playing a single hand regardless of whatever is occurring at each individual table.  Similarly, a real-world chess game cannot span across multiple parallel dimensions to allow for common interactions.  Moving a pawn on one board of a chess tournament cannot cause it to move on every other board across every other parallel dimension because each game is dynamic and random.  Applying the claimed inventions to these analogies leads to nonsensical results thus illustrating the errors of Epic's oversimplifications.

But Epic's misplaced analogies and over-simplifications are knowingly made.  Epic utilizes the foregoing mischaracterizations of the Asserted Patents to invoke the desired outcome and applicability of otherwise inapplicable patent ineligibility decisions.  For example, Epic references a District of Massachusetts decision in *Worlds, Inc. v. Activision Blizzard, Inc.*  (ECF No. 34 at 11:19-21:1).  But *Worlds* involved patents that were, in fact, concerned with 'achieving crowd control.'  (*Id.*).  But the Asserted Patents are wholly unrelated; the Utherverse Patents concern using a common space across multiple parallel instances to allow participants to engage in common experiences across those instances.  (*See e.g., supra* § II.C).  Thus the invocation and comparison of the *Worlds*' 'crowd control' patents has no relevance here—Epic's attempts to suggest otherwise notwithstanding.

Epic's reference to *Barbaro Technologies, LLC v. Niantic, Inc.* from the Northern District of California is equally misplaced.  (*Id.* at 12:11-17).  Creating miniature maps and placing avatars relative thereto was the end sum of the patents in *Barbaro*.  Not so with respect to the Asserted Patents of this action.  (*See e.g., supra* § II.C).  These efforts by Epic emphasize the importance of ensuring a proper correlation of the actual claim language with any characterization of the same.  *See CardioNet*, 955 F.3d at 1370-71 (reversing dismissal based on a characterization of the invention that was "incongruous with the claimed subject matter").



ii.     **The Claimed Inventions Do Not Use VRUs as 'Tools.'**

Patent claims may be deemed abstract when "computers are invoked merely as a tool.'" *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361-62 (Fed. Cir. 2018).  If the use of a computer is simply ancillary—automating a process that could otherwise be done outside a computer—then it is more likely the claims are directed to an abstract idea.  The opposite also holds true; when the computer is not being used as a mere tool, then the claims are not directed to an abstract idea.  *See, e.g., CardioNet*, 955 F.3d at 1370 (reversing a finding of lack of patent eligibility when "[n]othing in the record in this case suggests that the claims merely computerize pre-existing techniques").

A patent's teachings about the benefits it achieves versus earlier inventions is also an important clue whether the claims are directed to an improvement and not an abstract idea.  *See Enfish*, 822 F.3d at 1337 ("[O]ur conclusion that the claims are directed to an improvement of an existing technology is bolstered by the specification's teachings").  The MMAP Patents and Complaint both make clear that the claimed inventions are providing improvements and benefits over the prior solutions employed by legacy VRU systems.  (*See e.g.,* '071:1:48-57; 1:65-2:10; 2:58-67; and ECF No. 1 at ¶ 2).  The claimed inventions allow existing VRU systems to host more participants while permitting those participants to engage in common, interactive virtual experiences from different instances of the virtual venue or world.  These inventions achieve benefits over the conventional virtual world systems by allowing for optimized computer functionality *and* an enhanced interactive common virtual experience.  (*See* ECF No. 1 at ¶ 37).  These allegations sufficiently establish that the MMAP Patent claims are directed to improvements to computing systems and the Court must accept them as true at this stage of the proceedings.

 *See Aatrix*, 882 F.3d at 1128 (reversing dismissal for "concrete allegations regarding the claimed combination's improvement to the functioning of the computer").



### 2.     The MMAP Patents Recite Inventive Concepts (Step II).

Even if the Court were to hold that the MMAP Patents are directed to an abstract idea, the claims recite inventive concepts sufficient to transform them into 'something more' thus warranting a finding of patent-eligibility and consequential denial of Epic's Motion.  "To transform an abstract idea into a patent-eligible application, the claims must do more than simply state the abstract idea while adding the words 'apply it.'"  *SRI Int'l*, 930 F.3d at 1303.  The claims of the MMAP Patents recite specific means of improving VRU systems that were not well understood, routine, or conventional.  Accordingly, Epic's Motion also fails step two of *Alice*.

### a.     The Claimed Inventions Were Unconventional.

"The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that must be proven by clear and convincing evidence.  *Berkheimer*, 881 F.3d at 1368.  "[P]atentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)."  *Aatrix*, 882 F.3d at 1126-27; *see also Bascom*, 827 F.3d at 1352.  The Complaint adequately alleges that the claims contain inventive concepts.  Epic's arguments are the type of fact question that cannot be resolved at this stage of the litigation.

The Complaint alleges legacy VRU systems were incapable of supporting large numbers of participants engaging in a common virtual experience.  Prior solutions did not adequately address the problem because they fragmented virtual worlds thereby disrupting or wholly preventing common virtual experiences across multiple instances.  (*See* ECF No. 1 at ¶¶ 2, 25-29, 46-54).  To illustrate the differences between the claimed inventions and conventional solutions that came before, the Complaint specifically discusses aspects of the patent prosecution history and comments made by the Examiner finding the claimed inventions patentable.  (*Id.* at ¶¶ 48-53).[4]  These "plausible and specific factual allegations that aspects of the claims are

---

[4] Reliance on the prosecution history to demonstrate the improvement over prior solutions is proper.  *See Ancora*, 903 F.3d at 1349 ("The prosecution history reinforces what the patent itself indicates about the change in previous verification techniques for computer security."); *see also CardioNet*, 955 F.3d at 1372-73 (the "court may well consult the . . . prosecution history").



inventive are sufficient" to establish that the claimed methods were not routine, conventional, or well-understood at the time of the invention. *See Aatrix*, 882 F.3d at 1127 ( "concrete allegations . . . that individual elements and the claimed combination are not well-understood, routine, or conventional activity" "**cannot be answered adversely** to the patentee based on the sources properly considered on a motion to dismiss") (emphasis added).

### b.    The Claims Do Not Preempt VRUs.

The concept of preemption is also an important clue in assessing whether claims include "something more" that makes them patent eligible. Whereas a claim that merely recites a result and does not include an inventive concept, a claim that recites a specific "way of achieving it" is patent eligible. *Ancora*, 908 F.3d at 1349. The claims of the Asserted Patents are patent-eligible because they claim ***specific ways to improve VRUs*** thereby making it possible for them to host large numbers of participants in the common online event. *See DDR*, 773 F.3d at 1259 (claims are valid because "they recite a specific way . . . to solve a problem faced by websites on the Internet").

Nor do the claims preempt ***all ways*** of achieving the desired result because ***different claims*** recite ***different embodiments*** of ***different inventions***. The claims make no attempt to preclude all online events or multidimensional engagement amongst participants. The specific scope of specific claims do not more broadly preempt a desired outcome. This demonstrates that said claims are narrower than an abstract idea. *See Bascom*, 827 F.3d at 1350 (upholding validity of claims that do not "preempt all ways of filtering content on the Internet; rather, they recite a specific, discrete implementation of the abstract idea of filtering content").

Epic counters that the MMAP Patents are not specific about how the inventions are achieved because the ***specification*** states they are not limited to a particular hardware or software architecture. (ECF No. 34 at 15:9-11). This argument suffers from the same flaw rejected by the Federal Circuit in *Bascom*. There, the ***district court*** focused on statements in the ***specification*** that an Internet filtering system could be implemented "as any type of code which may be



executed along with database entries." *Bascom*, 827 F.3d at 1349 (internal quotations omitted).
But the ***Federal Circuit*** reversed finding "an inventive concept can be found in the non-
conventional and non-generic arrangement of known, conventional pieces" of the claims, which
otherwise define the invention. *Id.* at 1351. Thus, even if the claimed inventions may be
implemented using conventional software and hardware, the specifically claimed embodiments
nevertheless remain non-conventional arrangements that are patent eligible.

### 3.     Epic Raises Fact Issues Outside the Pleadings.

Epic's improper reliance on materials outside the pleadings underscores that the
Complaint properly alleges patentable subject matter that is neither conventional nor routine. It
is well accepted that citation of material outside the pleadings is improper in a motion brought
under Rule 12(b)(6). *See Lee*, 250 F.3d at 688. Epic nevertheless relies on third-party literature
to support its allegation that sorting players into multiple copies of a game was well known in the
video game art by 2005. (ECF No. 34 at 16 n.4). Based on this third-party reference, Epic
concludes that any use of instancing in a computer is not new and therefore precludes a
patentable invention. (*Id.*).

But even if the Court were to consider this literature (and it should not), Epic's argument
ignores the language of claims, which do not concern simply sorting players. Whether the
claimed inventions are 'new' is not a question for Rule 12 nor application of Section 101. "[The]
novelty or non-obviousness of the invention has little to no bearing on the question of what the
claims are 'directed to'" and the patent eligibility of the same. *CardioNet*, 955 F.3d at 1372.

### B.     The Claims of the '605 Patent are Patent Eligible.

#### 1.     The '605 Patent Does Not Claim an Abstract Idea.

##### a.     The '605 Patent Solves VRU Limitations.

Like the MMAP Patents, the '605 Patent claims an improvement that allows legacy VRU
systems to host large number of participants while preserving common world experiences. (*See*
'605:10:37-63). But Epic mischaracterizes the '605 Patent—as it did the MMAP Patents—as



being "directed to the abstract idea of replaying an interactive experience." (ECF No. 19 at 19:20-21). Epic again disregards claim language as to cast the claimed invention as little more than playing a recording. (*Id.* at 20:7-24). That Epic fails to attack the actual claim alleged in the Complaint speaks similar volumes. (ECF No. 1 at ¶ 124 (asserting claim 2); *but see* ECF No. 34 at 20:7-24 (concerning claim 1)). Epic similarly devotes significant discussion to the specification and figures—but not the claims. (ECF No. 34 at 5:23-7:5). The analysis called for by *Alice* and its progeny is crucial and simply lacking.[5] Epic's Motion should fail as to the '605 Patent.

### 2.    The '605 Patent is Not Routine, Conventional, or Well Understood.

The Complaint (again) makes concrete and specific allegations that the claimed improvements to legacy VRU systems were not routine, conventional, or well understood. (ECF No. 1 at ¶¶ 2, 25-29, 46-54). The '605 Patent is no exception. (*Id.* at ¶ 39). Therefore, and for the same reasons stated above, the claimed invention of the '605 Patent was not routine, conventional, or well understood at the time of invention. (*See supra* at § IV.A.1.b *et seq*). And just as the MMAP Patent claims do not preempt the relevant art, nor do the claims of the '605 Patent. (*See supra* at § IV.A.2 *et seq*).[6]

### C.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT LEAVE TO AMEND.

The Court should freely give leave to amend "when justice so requires." FED. R. CIV. P. 15(a)(2). Courts in the Ninth Circuit apply this policy with "extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990); *Lopez v. Smith*, 203 F.3d 1122,

---

[5] To the extent Epic argues the claim language does not encompass the method as advanced by Utherverse, then there exists a claim construction dispute that precludes resolution at this stage. *See Aatrix*, 882 F.2d at 1125 ("If there are claim construction disputes at the Rule 12(b)(6) stage, we have held that either the court must proceed by adopting the non-moving party's constructions, or the court must resolve the disputes to whatever extent is needed to conduct the § 101 analysis, which may well be less than a full, formal claim construction." (citations omitted)).

[6] The brevity of argument in opposition and concerning the '605 Patent correlates to the paucity of analysis by Epic. Epic bears the burden of making its argument and failed to do so in its moving papers. Utherverse is not obligated to counter an argument not otherwise of record. Nor should Epic be allowed to remedy its failure on reply. *See* Local Civil Rule 7(b).



1127 (9th Cir. 2000) (finding that dismissal with leave to amend should be granted even if no

request to amend was made).  Should the Court hold that the Complaint fails to state a claim

relative Epic's Motion under Section 101, then the Court should permit Utherverse to amend its

Complaint to include additional allegation as to improvements in VRU systems, inventive

concepts, and consideration of claimed subject matter individually and as a whole. *See Aatrix*,

882 F.3d at 1126-30 (reversing dismissal and denial of leave to file second amended complaint).

**V.      CONCLUSION.**

Utherverse respectfully requests that Epic's Motion be denied.  Said Motion ignores the

both the factual allegations of Utherverse Gaming LLC's Complaint and the claims of the

Asserted Patents.  The inventions claimed in the Asserted Patents are not the elementary

abstractions Epic has otherwise set before the Court.  Utherverse has readily countered the

allegations of Epic's Motion and again request that it be denied.


September 1, 2021                          By:     *s/Gary E. Hood*
                                           Gary E. Hood (WSBA No. 26209)
                                           **POLSINELLI P.C.**
                                           1000 Second Avenue, Suite 3500
                                           Seattle, Washington 98104
                                           Tel: (206) 393-5400
                                           Fax: (206) 393-5401
                                           Email: ghood@polsinelli.com

                                           Colby B. Springer (*pro hac vice*)
                                           Barrington Dyer (*pro hac vice*)
                                           Melenie Van (*pro hac vice*)
                                           **POLSINELLI LLP**
                                           Three Embarcadero Center, Suite 2400
                                           San Francisco, California 94111
                                           Tel: (415) 248-2100
                                           Fax: (415) 248-2101
                                           Email: cspringer@polsinelli.com
                                           bdyer@polsinelli.com
                                           mvan@polsinelli.com



Mark Deming (*pro hac vice*)
**POLSINELLI P.C.**
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
Tel: (312) 819-1900
Fax: (312) 819-1901
Email: mdeming@polsinelli.com

Enes Ovcina (*pro hac vice*)
**POLSINELLI P.C.**
1000 Louisiana Street, Suite 6400
Houston, TX 77002
Tel: (713) 374-1600
Fax: (713) 374-1601
Email: eovcina@polsinelli.com

*Counsel for Plaintiff*
*Utherverse Gaming LLC*



POLSINELLI
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 1, 2021, I caused the foregoing document to be electronically filed with the Clerk of the Court via the CM/ECF system, which will send notification of such filing to all counsel of record:

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 1st day of September, 2021, at Seattle, Washington.


*/s/ Gary E. Hood*
Gary E. Hood

