# EXHIBIT A

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Western District of Washington ▼

| | |
|---|---|
| Utherverse Gaming LLC | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No.  2:21-cv-00799-RSM-TLF |
| | ) |
| Epic Games, Inc. | ) |
| _Defendant_ | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:      Amazon Web Services, Inc. c/o Corporation Service Company, Registered Agent Service of Process, 300 Deschutes Way, Ste 208 MC-CSC1, Tumwater, WA 98501

_____
_(Name of person to whom this subpoena is directed)_

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:
See Attachment

| Place:  Polsinelli PC, 1000 Second Avenue, Suite 3500, Seattle, WA 98104 (206) 393-5400 | Date and Time:  06/27/2022 9:00 am |
|---|---|

The deposition will be recorded by this method:    stenographic; video; instant visual display

☑ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:    See Attachment

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    05/26/2022

_CLERK OF COURT_

OR

_____          /s/ Melenie Van
_Signature of Clerk or Deputy Clerk_          _____
                                              _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_   Utherverse Gaming LLC
_____, who issues or requests this subpoena, are:
Melenie Van, Polsinelli LLP, 2049 Century Park East, Suite 2900, Los Angeles, CA 90067
Tel.: (310) 229-1355; Email: mvan@polsinelli.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  2:21-cv-00799-RSM-TLF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* AMAZON WEB SERVICES, INC.

c/o Corporation Service Company, Registered Agent  **on***(date)*    05/26/22    .

☒  I served the subpoena by delivering a copy to the named individual as follows: 

by personally serving to ELLEN JONES, Authorized Personnel

300 Deschutes Way SW, Suite 208          , TUMWATER, WA 98501

at:        1:04 p.m.        **on***(date)*    05/27/22    ; or

☐  I returned the subpoena unexecuted because: 

                                                                                        .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance,  and the mileage allowed by law, in the amount of 

$        40.00        .

My fees are $                for travel and $                for services, for a total of $                .

I declare under penalty of perjury that this information is true.

Date:        06/02/22

                                                                        
*Server's signature*

                CYNTHIA PARTIN                ,  Process Server
                *Printed name and title*      Reg. No.:
                                                        County

EXPRESS NETWORK
P.O. BOX 861057, Los Angeles, CA 90086-1057
(213) 975-9850
*Server's address*

POLSI-0011341.CC

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

**DEFINITIONS**

1.      The terms "you" and "your" shall mean and refer to Amazon Web Services, Inc. and any parent, predecessor, subsidiary, affiliate, successor, member or affiliated entities, past or present, of Amazon Web Services, Inc., and any person or entity, past or present, acting on behalf of Amazon Web Services, Inc. including but not limited to, each of its respective present and former officers, executives, partners, directors, employees, attorneys, agents or representatives.

2.      The term "Plaintiff" means Utherverse Gaming LLC.

3.      The terms "Defendant" refers to and includes Epic Games, Inc., any parent, subsidiary, affiliate or related company thereof, any predecessor-in-interest, and each of Epic Games, Inc.'s present and former officers, directors, members, managers, agents, employees, attorneys, accountants, investigators, economists, auditors, representatives, consultants, or other person acting or purporting to act for or on behalf of Epic Games, Inc.

4.      The phrase "this Action" means the above-captioned lawsuit, *Utherverse Gaming LLC v. Epic Games, Inc.*, Case No. 2:21-CV-0799 (W.D. Wash.).

5.      The term "*Fortnite*" means the online video game(s) developed by Defendant and released since 2017, without limitation to any particular game mode, platform, console, or device.

6.      The term "Accused Products" means the software that when executed on a server enables many *Fortnite* participants to experience the same virtual worlds for virtual social events and concerts such as those described in the Complaint filed in this Action, including but not limited to the *Fortnite*/Marshmello concert of February 2019; the *Fortnite*/Star Wars Event of December 2019; the *Fortnite*/Travis Scott concert of April 2020; and the *Fortnite*/Ariana Grande Concert of August 2021. A copy of the Complaint is enclosed for Your convenience as **ATTACHMENT B**.

7.      The term "Multi-Instance Events" means multi-user gameplay experiences in which the same event occurs in multiple instances of the game, including events created by the Accused Products, and also further including events such as the *Fortnite*/Kaskade Event of March 2021 and the *Fortnite*/Diplo Event of July 2021.

8.      Whenever the word "including" appears, the meaning intended is always "including, but not limited to."

9.      The term "date" means the exact day, month, and year, if ascertainable, or, if not, the best available approximation.

10.     The term "thing" as used herein refers to any tangible object other than a document, and includes objects of every kind and nature, such as prototypes, models, or specimens.

11.     The term "describe" means to set forth a complete and detailed statement of all information, circumstances, and facts that refer to, relate to, reflect, comprise, or bear upon the matter concerning which information is requested.

12.     The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary and in order to make the request inclusive rather than exclusive.

13.     The term "development" means conception, design, research, formulation, testing, modeling, evaluation, manufacture, production, use, or marketing.

14.     The terms "reflecting," "referring," "relating/related," and "concerning" shall be used in the broadest sense and shall mean and include, without limitation, referring to, mentioning, discussing, containing, alluding to, responding to, connected with, commenting on, in respect of, about, regarding, discussing, showing, analyzing, constituting, setting forth and/or evidencing, in any manner whether directly or indirectly, the subject matter of the Request.

15.     The term "role" means function, duty, or capacity.

16.     The phrase "third party" means any person not a party to this Action, including persons residing outside the United States.

17.     The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

18.     The term "document" means any document or electronically stored information as described in Federal Rule of Civil Procedure 34(a). A draft of a nonidentical copy is a separate document within the meaning of this term.

19.     The term "person" means any natural person or business, legal, or governmental entity or association.

20.     When referring to a person, to "identify" means to give, to the extent known, the person's full name, present or last known address, e-mail address, and telephone number, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this paragraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

21.     When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), recipient(s), and to the extent known, the person's full name, present or last known address, e-mail address, and telephone number, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

22.     The use of the singular form of any word includes the plural and vice versa.

## <u>INSTRUCTIONS</u>

In addition to the Federal Rules and governing law, please respond in accordance with the following instructions:

1.      Each request shall be responded to separately and fully, and responsive documents produced accordingly. If a request is objected to, state with specificity the reasons for objection. Any ground not stated with specificity or in a timely objection is waived unless the failure to object is excused by the Court for good cause shown. In the event You serve a proper and timely objection to any request, please respond to all portions of that request that do not fall within the objection.

2.      Documents that respond, in whole or in part, to any portion of the Requests below are to be produced in their entirety, without any alteration and with any and all attachments and enclosures thereto.

3.      These requests call for all documents that are known or available to You, including information in the possession of Your accountant, Your counsel (non-privileged), Your agents, employees, independent contractors, experts, investigator, or any other person employed by You or acting on Your behalf or under Your direction or control.

4.      If the document(s) requested is not reasonably available to You, state what efforts You made to obtain the information, and from what source such document(s) might be obtained, if known to You.

5.      If You are unable to answer any request completely, You are to answer to the extent possible and set forth the reasons for Your inability to answer more fully.

6.      Possession, custody and control do not require that You have actual physical possession; instead, if You have physical control or a superior right to compel production from another, the document must be produced.

7.      If any document requested herein was, but is no longer, in Your custody, control or possession, state with particularity a description of the nature of such document(s) (*i.e.*, letter, memorandum, report, etc.), an identification of the author or preparer, an identification of all recipients, a description of the contents of the documents, the disposition made of each such document, including the date of, method of and reason(s) for such disposition, the name and address, if known, of any person who has seen the document or who now has custody, control or possession thereof, and all efforts and attempts which have been made to locate each document.

8.      Unless otherwise stated, the period covered by these requests shall include any time from September 25, 2012, through and including the date the response (and any supplementation) to each request is given.

9.      If any document requested herein is withheld pursuant to any claim of privilege or protection, You are requested to provide sufficient information to allow an assessment of the applicability of the privilege or protection asserted, including, but not limited to, a description of the nature of the document(s) not produced or disclosed (*i.e.*, letter, memorandum, report, etc.), an identification of the author or preparer, an identification of all recipients, a description of the contents of the documents not produced or disclosed, and the legal ground for the assertion of the privilege or attorney work product protection.

10.     You are hereby requested to produce all electronic and/or magnetic data or media that is responsive to the requests below. In accordance with Federal Rule of Civil Procedure 34(b)(1)(E), Plaintiff requests that the electronically stored information be produced as a load file in the following form:

(a)    E-mails: E-mails shall be produced as electronically Bates-numbered single page TIFF images and corresponding metadata.[1] The content of such e-mails shall be extracted into a searchable data file that will also be produced which is as searchable as in native format. E-mail attachments will be processed as user-created files below.

(b)    Electronic Documents: Except as set forth below, the parties will produce documents as single page TIFF images indicating the location and unitization of the TIFF files. A document file shall also be provided indicating beginning and ending Bates numbers for each document, along with any necessary metadata. The document file shall also include the file paths for OCR or extracted text files included with the production. Excel files shall be produced in native format with slip sheets. Image files (e.g., TIF, JPG, GIF files, etc.) will be produced as electronically Bates-numbered TIFF images and corresponding metadata. Image files may not contain searchable content available for production, but to the extent available, the searchable content of such image files will be extracted into a data file that will also be produced.

(c)    Other data: Certain Document types such as movies, sound files, databases or other file types that do not render acceptable TIFF images should be produced in their native format but should each be assigned a Bates number for tracking purposes.

---

[1] The delivered metadata fields should include at least: Beginning/Ending document numbers, Beginning/Ending Attachment ranges, Document Type, Sent Date/Time, Author/Recipient/CC/BCC (document, file, or e-mail), Subject/Title, Custodian, Attachment Count, File Name, Last Modified Date/Time, Imbedded Comments/Modifications, Company, and Full Text.

11.     To the extent that You assert that any documents requested are not reasonably accessible pursuant to Federal Rule of Civil Procedure 26(b)(2), You should provide Your basis for such claim sufficient for Plaintiff to determine whether such characterization is accurate, and describe the classes of documents withheld including the date such classes of documents were created.

12.     The protective order entered in this case (ECF No. 65) is enclosed for Your convenience as **ATTACHMENT C.**

## DOCUMENTS REQUESTED

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, please produce the following documents:

## REQUEST FOR PRODUCTION NO. 1:

All agreements related to all Multi-Instance Events conducted by You with Defendant, and any communications exchanged between the parties relating to such agreements, including but not limited to the negotiation of such agreements, the exchange of drafts of such agreements, and the money or other compensation (monetary, in kind, or otherwise) received by You as a direct or indirect result of such agreements.

## REQUEST FOR PRODUCTION NO. 2:

Documents related to the conception, creation, design, development, and/or execution of all Multi-Instance Events conducted by You with Defendant.

## REQUEST FOR PRODUCTION NO. 3:

Documents sufficient to identify Your role in the conception, creation, design, development, and/or execution of all Multi-Instance Events conducted by You with Defendant.

## REQUEST FOR PRODUCTION NO. 4:

Documents sufficient to identify the technical infrastructure, tools, and/or services provided and/or utilized by You involved in all Multi-Instance Events conducted by You with Defendant.

## REQUEST FOR PRODUCTION NO. 5:

Documents sufficient to show the organization of the technical infrastructure, tools, and/or services provided and/or utilized by You involved in all Multi-Instance Events conducted by You with Defendant, including but not limited to the relation of the technical infrastructure, tools, and/or services to each other.

**REQUEST FOR PRODUCTION NO. 6:**

Documents sufficient to identify the technical infrastructure, tools, and/or services provided and/or utilized by any third party involved in all Multi-Instance Events conducted by You with Defendant.

**REQUEST FOR PRODUCTION NO. 7:**

Documents sufficient to show the number of unique participants in each of the Multi-Instance Events conducted by You with Defendant.

**REQUEST FOR PRODUCTION NO. 8:**

All device usage logs, access logs, error logs, web server logs, or any other documents that record information regarding all Multi-Instance Events conducted by You with Defendant, including records of session times and durations, lengths of service, and types of services utilized.

**REQUEST FOR PRODUCTION NO. 9:**

All communications or correspondence between You and any third party regarding any and all of the Multi-Instance Events conducted by You with Defendant.

## <u>DEPOSITION TOPICS REQUESTED</u>

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, please appear for deposition on the following topics:

1.      The terms of Your agreement with Defendant related to the Multi-Instance Events conducted by You with Defendant.

2.      The decision to conduct the Multi-Instance Events with Defendant.

3.      Your role in the conception, creation, design, development, and/or execution of the Multi-Instance Events conducted by You with Defendant.

4.      The technical infrastructure, tools, and/or services provided and/or utilized by You involved in the Multi-Instance Events conducted by You with Defendant.

5.      The benefits received by You as a direct or indirect result of conducting the Multi-Instance Events with Defendant.

6.      Participation of users in the Multi-Instance Events conducted by You with Defendant.

# ATTACHMENT B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

Utherverse Gaming LLC,

               Plaintiff,

      v.

Epic Games, Inc.,

              Defendant.

No. 2:21-CV-0799

**COMPLAINT FOR PATENT INFRINGEMENT**

     Plaintiff Utherverse Gaming LLC ("Utherverse Gaming"), hereby brings this action against Defendant Epic Games, Inc. ("Epic") for patent infringement of United States Patent Nos. 8,276,071 (the "'071 Patent"), 8,812,954 (the "'954 Patent"), 9,123,157 (the "'157 Patent"), and 9,724,605 (the "'605 Patent") (collectively, the "Asserted Patents") and alleges as follows:

## I.     INTRODUCTION

    1.     This is a patent infringement case related to technologies that allow for vast numbers of participants to connect with others in virtual computer-generated environments to enjoy common virtual experiences. These inventions were originally developed by Brian and Gary Shuster, two brothers, and their colleague Aaron Burch. They recognized that the Internet could drive virtual shared experiences to connect large groups of remote individuals.

COMPLAINT FOR PATENT INFRINGEMENT – 1
  (Case No. 2:21-CV-0799)

**POLSINELLI**

1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

2.      There were, however, significant technical obstacles to bringing multitudes of participants into new virtual worlds. Multi-user virtual worlds were traditionally limited by, among other things, the computational power required to implement and render each user in a virtual world. As the number of participants in a world increase, the processing requirements associated with each additional user increases exponentially, and can quickly surpass limitations on computer processing speed and network bandwidth. Traditional virtual worlds were consequently smaller, fragmented, with fewer participants, and notably, less able to support activities that relied on scale for successful commercialization. The Shusters and Burch addressed these problems with new inventions, some of which are reflected in the Asserted Patents, and they worked to bring their visions for virtual worlds to life in conjunction with their company, Utherverse Digital.

3.      Utherverse Digital has been at the forefront of creating solutions to the technological problems that plague virtual worlds. The Asserted Patents describe solutions that allow, for example, for virtual worlds to support larger numbers of participants in shared online spaces. For example, by enabling multiple parallel dimensions of the same space or scene, and allowing for specific user avatars, objects, or events to populate those dimensions, the inventors unlocked the potential of computer generated virtual worlds and shared experiences to support dramatically increased numbers of participants despite limitations in computer processing power and bandwidth. The ability to host massively multi-user environments has opened the door to new computer-generated virtual and shared experiences that allows participants to connect in ways that were previously impractical or impossible within the confines of traditional computer-generated virtual worlds.

4.      In 2020, Utherverse Digital assigned all rights, title, and interest in the Asserted Patents to Utherverse Gaming. Utherverse Gaming is an independent company, separate from Utherverse Digital. As a result of that assignment, Utherverse Gaming is the owner of all right, title, and interest in the Asserted Patents.

COMPLAINT FOR PATENT INFRINGEMENT – 2
  (Case No. 2:21-CV-0799)

**POLSINELLI**

1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

5.      The defendant in this case, Epic, is a video game and software developer that publishes games that can be played on a broad array of different platforms and operating systems. Epic's products include popular titles such as *Fortnite*, an online video game available in the United States that allows multiple players to interact in the same virtual world. After finding initial success as a "battle royale" competitive last-man-standing game, *Fortnite* expanded into social events and concerts, including by introducing battle-free spaces with the launch of a "party royale" mode in which participants can "attend concerts, movies, and more." See Epic's Your First Drop Into Party Royale instructions, attached hereto as Exhibit A and Exhibit B. For example, *Fortnite* has hosted concerts by musical artists like Marshmello and Travis Scott, and events like a movie trailer premiere for the Star Wars movie The Rise of Skywalker

6.      More than 350 million participants are registered players of *Fortnite*, with tens of millions of participants collectively logging billions of hours of gameplay each month. To accommodate so many participants in the same virtual world for virtual social events and concerts, Epic uses the inventions claimed by the Asserted Patents. Thus, Epic has and is infringing claims of the Asserted Patents, and as a result has unfairly derived substantial value from the claimed inventions. This case seeks to remedy Epic's infringement of Utherverse Gaming's patent rights.

7.      Epic does not have any rights to the Asserted Patents.

## II.      THE PARTIES

8.      Utherverse Gaming is a Delaware limited liability company with a place of business at 1740 Broadway, 15th Floor, New York, New York, 10019.

9.      Epic is a corporation organized and existing under the laws of the State of Maryland with a place of business at 10400 NE 4th Street Suite 800, Bellevue, Washington 98004.

## III.      JURISDICTION AND VENUE

10.      This action arises under the patent laws of the United States, including 35 U.S.C. § 271 *et seq.*, for Epic's infringement of the Asserted Patents. The jurisdiction of this Court over the

COMPLAINT FOR PATENT INFRINGEMENT – 3
  (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

1    subject matter of this action is proper under 28 U.S.C. §§ 1331 and 1338(a).

2        11.    This Court has personal jurisdiction over Epic because Epic transacted business and

3    committed infringing acts within and directed to the State of Washington including this specific

4    judicial district, and Utherverse Gaming's claims arise from those activities.

5        12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Epic committed

6    acts of infringement in the Western District of Washington and maintains a regular and established

7    place of business in this district.

8        13.    Epic has had a regular and established place of business in Washington state and this

9    judicial district since at least 2012, when Epic opened offices in the greater Seattle area to focus on

10   the development of Unreal Engine 4. In a September 6, 2012, article by gamesindustry.biz, Epic's

11   then-President, Dr. Michael Capps, was quoted as having said, "The proximity to key partners, the

12   density of world-class talent and all the factors that make Seattle an attractive place to live

13   convinced us that it is the perfect locale for Epic's West Coast operation." A true and correct copy

14   of the gamesindustry.biz article is attached hereto as Exhibit C.

15       14.    On information and belief, Epic's Bellevue, Washington office currently employs

16   more than 80 people and continues to hire for online services, augmented and virtual reality

17   products, and Unreal Engine game development software. On information and belief, the Unreal

18   Engine game development software is used in current builds of *Fortnite*. On information and belief,

19   Epic's Washington state operations also include RAD Game Tools. On information and belief,

20   RAD Game Tools are used in current builds of *Fortnite*. Epic also operates other game studios that

21   collaborate and develop content titles with various partners in the Washington state area, including

22   the Tonic Games Group in conjunction with the likes of Washington residents Microsoft and

23   Nintendo.

24

25

26

COMPLAINT FOR PATENT INFRINGEMENT – 4
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

## IV.    FACTS

**A.    Utherverse Gaming's Asserted Patents**

15.    The '071 Patent is entitled "Multi-Instance, Multi-User Animation Platforms" and Utherverse Gaming is the owner of all right, title, and interest in the '071 Patent. The '071 Patent was duly and properly issued by the USPTO on September 25, 2012. The '071 Patent was duly assigned to Utherverse Gaming. The '071 Patent is valid and enforceable. A true and correct copy of the '071 Patent is attached hereto as Exhibit D.

16.    The '954 Patent is entitled "Multi-Instance, Multi-User Virtual Reality Spaces" and Utherverse Gaming is the owner of all right, title, and interest in the '954 Patent. The '954 Patent was duly and properly issued by the USPTO on August 19, 2014. The '954 Patent was duly assigned to Utherverse Gaming. The '954 Patent is valid and enforceable. A true and correct copy of the '954 Patent is attached hereto as Exhibit E.

17.    The '157 Patent is entitled "Multi-Instance, Multi-User Virtual Reality Spaces" and Utherverse Gaming is the owner of all right, title, and interest in the '157 Patent. The '157 Patent was duly and properly issued by the USPTO on September 1, 2015. The '157 Patent was duly assigned to Utherverse Gaming. The '157 Patent is valid and enforceable. A true and correct copy of the '157 Patent is attached hereto as Exhibit F.

18.    The '605 Patent is entitled "Method, System and Apparatus of Recording and Playing Back an Experience in a Virtual Worlds System" and Utherverse Gaming is the owner of all right, title, and interest in the '605 Patent. The '605 Patent was duly and properly issued by the USPTO on August 8, 2017. The '605 Patent was duly assigned to Utherverse Gaming. The '605 Patent is valid and enforceable. A true and correct copy of the '605 Patent is attached hereto as Exhibit G.

19.    The '071, '954 and '157 Patents are part of a family of patents owned by Utherverse Gaming directed generally to multi-instance, multi-user animation platforms (the "MMAP

COMPLAINT FOR PATENT INFRINGEMENT – 5
(Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

Patents"). The MMAP Patents share substantially the same specification. The '157 Patent is a continuation of the '954 Patent, and the '954 Patent is a continuation of a patent that is itself a continuation of the '071 Patent.

20.     The '605 Patent relates to a second family of patents owned by Utherverse Gaming directed generally to playing back an experience in a virtual worlds system.

21.     Collectively, the MMAP Patents and the '605 Patent are referred to herein as the "Asserted Patents."

**B.      The Challenges of Bringing People Together in Virtual Worlds**

22.     Brian Shuster has been inventing new solutions for Internet problems for over twenty years. A Financial Post article from January 13, 2013, says Brian "got in on the ground floor of the Internet, hiring software talent from NASA's Jet Propulsion Laboratory to develop Web-hosting and online advertising systems that became industry standards." After finding success in the traditional world wide web, Brian began working on new "Virtual World Web" experiences that would be "immersive and interactive, with users moving through game-like virtual environments rather than reading static Web pages." A true and correct copy of the Financial Post article is attached hereto as Exhibit H.

23.     Among the inventions created to support the Virtual World Web are the multi-instance, multi-user animation and experience playback solutions described in the Asserted Patents. These inventions overcome the limitations of technology by allowing computer-generated virtual worlds to support larger numbers of participants. By early 2007, "[c]omputer generated virtual environments [had become] increasingly popular methods for people, both real and automated, to interact within a networked system." '071 Patent at 1:22-24. These online environments are sometimes referred to as "virtual reality" or "virtual reality universe" (VRU) environments. *Id*. at 1:31-33.

24.     In virtual reality, "[e]ach player selects an 'avatar,' which may comprise a three-

COMPLAINT FOR PATENT INFRINGEMENT – 6
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

dimensional figure of a man, woman, or other being, to represent them in the VRU environment." *Id.* at 1:37-39. "Players send inputs to a VRU engine to move their avatars around the VRU environment, and are able to cause interaction between their avatars and objects in the VRU." *Id.* at 1:39-42. "For example, a player's avatar may interact with an automated entity or person, simulated static objects, or avatars operated by other players." *Id.* at 1:42-45.

25. "One drawback of the VRU is that, as in the actual world, space is limited by environmental constraints." *Id.* at 1:48-50. "[T]here is a limit on how much modeled space can be occupied at the same time." *Id.* at 2:22-23. "Because VRU users are visible to other users, they occupy space, a portion of the visual field, or both." *Id.* at 2:35-37. Thus, a virtual concert venue, such as a nightclub, may only be able to accommodate a capped number of participants within a fixed area of space within the VRU. *Id.* at 2:39-40. "While the VRU could in theory have a nightclub of enormous dimensions, there would be areas within the nightclub, such as proximate to a stage or proximate to celebrities present therein, which would be very desirable areas to inhabit." *Id.* at 2:40-44. "As a result, whether the area at issue is described as the full night club or the more desirable areas therein, some or the entire nightclub may have less space available for occupancy than there are people who desire to have their avatars occupy it." *Id.* at 2:44-48.

26. As a further problem, "limitations on computer processing speed, network bandwidth, and other factors also limit the number of participants and the richness of environment." *Id.* at 1:50-52. Server capacity may be incapable of simultaneously handling all participants. *Id.* at 1:67-2:1. Client capacity for each participant may also be "insufficient to process and display the data needed for such user's computer to appropriately and adequately render avatars or other representations of the other users, and otherwise construct a complete and accurate representation of the environment." *Id.* at 2:1-6. "Thus, there are limitations on how many avatars, objects, textures and other features can be rendered and animated for each user." *Id.* at 2:56-58. In the nightclub example, "if the dimensions of the nightclub were drawn so that 10,000 avatars could

COMPLAINT FOR PATENT INFRINGEMENT – 7
(Case No. 2:21-CV-0799)

POLSINELLI

1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

simultaneously be accommodated, seen, and interacted with, each user computer would be tasked with tracking, rendering and animating each of 10,000 autonomously controlled avatars." *Id.* at 2:58-63. "Similarly, avatars within the same space, when permitted to communicate with each other, whether via chat, voice over IP, or otherwise, may generate too much content to permit effective communication." *Id.* at 2:58-67. "Accordingly, prior art VRU environments may limit the number of simultaneous players and their methods of interactions for various reasons, including to avoid exceeding the programming, networking, and hardware limitations of the servers and/or clients." *Id.* at 1:53-57.

27.    Other limitations include "the inability to realistically depict multiple users in the same place, the inability of users to walk through the same doorway simultaneously, the inability to exceed occupancy limitations, and similar real world space limitations." *Id.* at 2:31-35.

28.    "It [was] desirable, therefore, to resolve these problems and to provide access for greater numbers of avatars within a VRU space while minimizing undesired experiences for VRU participants, and providing new, more varied and interesting opportunities and experiences for users within the VRU Space." *Id.* at 3:1-6.

**C.    The Asserted Patents Provide Solutions to These Challenges**

29.    The Asserted Patents overcame, among other things, these processing and bandwidth problems, which specifically arose in the realm of computers and are necessarily rooted in limitations of computer technology for online virtual environments. Thus, the claimed inventions of the Asserted Patents are technical solutions to existing technical problems that traditionally prevented achievement of critical mass at large-scale virtual events. When viewed as a whole, the claims of each the Asserted Patents, including as ordered combinations, are not merely a recitation of well-understood, routine, or conventional technologies or components.

**i.    The MMAP Patents Solutions**

30.    The MMAP Patents do not merely use computers as tools. The MMAP Patents

COMPLAINT FOR PATENT INFRINGEMENT – 8
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

describe and claim improvements to computer systems.

31. The MMAP Patents disclose various embodiments that allow for massively populated virtual worlds by providing, for example, "a method, system and apparatus for dynamically establishing and managing multiple instances of a space within a VRU." *Id.* 3:10-12. Such multiple instances may also be referred to as "dimensions." *Id.* at 3:12-13. As described in the specification, "the inventions permit such dimensions to be utilized in a manner that does little or nothing to impair the ability of the VRU to emulate those portions of the real world environment that may be crucial to a positive user experience within a VRU." *Id.* at 3:17-21

32. "[O]nce the occupancy capacity of an area has been met, another attempt to access the area by an additional avatar may trigger creation of a new instance, or dimension, of the area." *Id.* at 3:23-25. The parallel dimension "may be provided by duplication of certain portions of the content within an area, such as, for example, walls and other simulated structural elements, a stage and all participants thereon, or other elements." *Id.* at 3:27-32. Each time a parallel dimension reaches capacity, a new parallel dimension may be generated. *Id.* at 3:36-39. In addition, "[p]arallel dimensions may also be collapsed into fewer dimensions as avatar populations decline." *Id.* at 14:30-31.

33. Different dimensions may be related to one another and able to interact or influence one another in defined ways. *Id.* at 5:3-4. For example, "a defined area or portion of multiple dimensions may be visible to, and/or interact with, other parts or members of the dimensions" *Id.* at 5:24-25. "For example, a stage area may be defined that is visible and audible in multiple dimensions surrounding the stage area." *Id.* 5:26-29. The performer on stage "has a multi-instance presence in more than one dimension." *Id.* at 5:53-55. If the performer "throws an object out of a stage area into a surrounding nightclub, as the object passes a boundary between the stage area and the multi-dimensional nightclub floor, the thrown object may be replicated and appear in each of the Surrounding dimensions." *Id.* at 5:31-35.

COMPLAINT FOR PATENT INFRINGEMENT – 9
 (Case No. 2:21-CV-0799)

POLSINELLI

1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

34.     "[T]he surrounding multi-dimensional areas may influence a common area" *Id*. at 5:36-39. For example, "a performer on a common stage may receive audience feedback from multiple surrounding dimensions." *Id*. at 5:37-39.



FIG. 5

35.     Figure 5 above shows "an exemplary multi-dimensional system" with "a common space (506)" that "may represent, for example, a stage area" across multiple parallel dimensions (502, 504). *Id*. at 11:3-22. The performer (516) is visible to all users in all parallel dimensions. *Id*. 11:58-60. "Some audience groups, or members, may be permitted to interact with the performers and may be selected by any of a number of criteria, including without limitation paid members, early arrivals, random selection, etc." *Id*. at 11:61-64. In another example, participants "in multiple dimensions at a nightclub [may] get into the 'stage diving' line, and then inhabit a single avatar which is then permitted to enter the 'performer' dimension, be seen by all users, and then jump off the stage, disaggregate, and land, each user into his own dimension." *Id*. at 12:10-15.

36.     The claims of the MMAP Patents do not merely recite the receipt, analysis, or transmission of data. Claim 1 of the '157 Patent is an example of one of the inventive solutions



POLSINELLI
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

claimed by the MMAP Patents. It recites:

> A method, comprising: modeling, in a computer memory, multiple parallel instances of a multi-dimensional virtual reality space, each of the plurality of parallel instances replicating the multi-dimensional virtual reality space;
>
> assigning ones of a plurality of modeled multi-dimensional avatars within the computer memory so that each of the plurality of avatars populates a respective one of the parallel instances and each of the plurality of parallel instances is populated by a unique subset of the plurality of avatars, wherein the assigning limits a total number of the plurality of avatars in each of the unique subsets; and
>
> modeling a common space in the computer memory configured in relation to the plurality of parallel instances so that at least one object located inside the common space is visible from viewpoints located inside each of the plurality of parallel instances.

37.    The MMAP Patents therefore overcome the limitations of conventional VRUs by providing for multiple parallel dimensions or instances within which participants can interact and engage in common experiences by way of the solutions described in the MMAP Patents. Multiple parallel dimensions or instances with such solutions allow for vast numbers of concurrent participants to occupy the same virtual venue and share the same experience without overcrowding. The MMAP Patents thereby overcome computer processing and network bandwidth limitations of conventional virtual world systems, allowing for improved computer functionality and an enhanced interactive user experience that facilitates enjoyment of common virtual experiences.

### ii.    The Experience Playback Solution

38.    The '605 Patent does not merely use computers as tools. The '605 Patent describes and claims improvements to computer systems.

39.    The '605 Patent provides another solution that could be used as an alternative to, or in conjunction with, one or more of the solutions of the MMAP Patents to allow for massively populated virtual worlds in which participants can share the same experience without overcrowding. The '605 Patent describes playing back experiences on multi-instance, multi-user animation

COMPLAINT FOR PATENT INFRINGEMENT – 11
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

platforms. In one embodiment, "[i]t is possible to record a state of a VRU environment so that users may log out of the VRU and, upon their return, resume an activity at the point where they left off." '605 Patent at 1:33-35. Example applications include allowing players of a game in a VRU environment to "take a break and return to the same [game] at a later time" or "replay[ing] a scene that occurred in a VRU environment, such as a concert, a wedding or a lecture." *Id.* at 1:35-40.

40.    "Unlike a video recording, which displays a successive series of images, the method of playing back a recorded experience described herein allows a user to navigate through the recorded experience rather than simply watch a video playback." *Id.* at 10:14-18. "[T]he method of playing back a recorded experience allows for users to interact with other users who are also participating in the playback of the recorded experience." *Id.* at 10:18-21. In addition, "unlike video playback, the recorded experience is not limited by a point of view from which the recording was captured." *Id.* at 10:21-25. "Because a user is able to navigate through the recorded experience by changing their position and orientation within the recorded experience, they may view objects from any angle that they choose." *Id.* at 10:25-28. "As such playback of the same recorded experience may be different for all users." *Id.* at 10:28-29.



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400



FIG. 2

FIG. 3

41.     Figure 2 "shows an example arrangement of virtual worlds data." *Id.* at 3:55-6. "The service provider 102 may further maintain worlds 204. Each world 204 may represent a virtual space in which avatars may interact. The service provider 102 may maintain multiple virtual worlds 204, and each virtual world 204 may be operated by different users 104 or administrators of service provider 102." *Id.* at 4:17-22. "Virtual worlds 204 may in turn include scenes 206. Scenes 206 represent virtual locations where users may visit and enter." *Id.* at 4:23-25. "In some situations, it may be desirable to have a single scene [206] available but have avatars enter different copies of that scene. Such copies are implemented by instances 208." *Id.* at 4:37-39. "An instance 208 represents a running version of a scene, and users 104 interact within instances 208 of scenes 206." *Id.* at 4:40-41. "New instances may also be created based on time intervals, avatar user requests, availability of objects within each instance, and so on." *Id.* at 4:54-56. "In one embodiment, an environment may automatically change, or the avatars may be automatically transported, when a threshold event takes place." *Id.* at 4:56-58.

42.     Figure 3 shows another embodiment of the invention where "an example of a scene

COMPLAINT FOR PATENT INFRINGEMENT – 13
 (Case No. 2:21-CV-0799)

POLSINELLI

1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

300 [] has been instantiated by the service provider 102." *Id.* at 5:39-40. "In this example, the scene 300 is a performance venue including a floor 306 and walls 308 and a piano 302 located on a stage 304 that is rendered for display at a user 104." *Id*. at 5:39-43. In addition, "a performer avatar 310 is located on the stage 304 and an audience that includes avatars 312 that surround the stage to view the performance." *Id*. at 5:43-46. For users to interact in a virtual world during playback of the recorded experience, "[t]he service provider 102, or another system component, receives, at one or more processors, data requesting changes to an instance of a scene including at least position and orientation of objects modeled in the scene." *Id*. at 5:25-35. "Data representing the changes is then provided to the one or more users so that an event playing out in an instance of a scene may be experienced in substantially real time by users 104." *Id*. at 5:35-38.

43.     When a new instance is initiated, the service provider renders "for display at a client device, objects of the initial scene state in the new instance and render[s] updates to the initial scene state based on the subsequent changes over the time period." *Id*. at 6:63-65, 7:4-9. "The objects of the recorded experience are displayed in the new scene such that, similar to when the recorded experience was experienced the first time, objects and boundaries of the recorded experience are present." *Id*. at 7:10-13. "A user, by controlling an avatar via a user interface at a client device, may navigate through the recorded experience and interact with other avatars also participating in the playback of the recorded experience." *Id*. at 7:13-17.

44.     The claims of the '605 Patent do not merely recite the receipt, analysis, or transmission of data. Claim 1 is an example of the inventions claimed by the '605 Patent. It recites:

> 1. A method of playing back a recorded experience in a virtual worlds system, comprising:
>
> instantiating, using one or more processors of a server, a new instance of a scene, the new instance being defined by data stored in memory, at least one client device displaying and participating in the new instance;
>
> retrieving a recorded experience file from the memory, the recorded experience file



having been generated by saving an initial scene state and saving subsequent changes and respective times during a time period of the recorded experience;

playing back the recorded experience file by rendering, for display by the at least one client device, objects of the initial scene state in the new instance, including one or more avatars, and rendering updates to the initial scene state based on the subsequent changes over the time period; and

automatically transporting the one or more avatars to a different new instance of the scene, upon occurrence of a threshold event, wherein the threshold event comprises when a maximum capacity of avatars has been reached in the new instance of the scene.

45.    Thus, the '605 Patent also overcomes, among other things, a problem arising in the realm of online virtually words, namely, facilitating the shared experience of a pre-recorded experience in an interactive virtual world with multiple parallel dimensions or instances. In addition to the solutions presented in the MMAP Patents, the '605 Patent presents an additional solution by allowing the instances to share the experiences by way of recording and playing back events in the instance. Both the MMAP Patents and the '605 Patent provide technological solutions that, each utilized alone or optionally in combination with one another, help overcome computer processing and network bandwidth limitations of conventional virtual world systems, allowing for improved computer functionality and an enhanced interactive user experience that facilitates enjoyment of common virtual experiences.

**D.    The Claimed Inventions Were Not Well-Known, Routine, or Conventional**

46.    The claimed inventions were not well-known, routine, or conventional at the time of the invention and represent specific improvements over the prior art and existing systems and methods. The inventiveness of the claimed inventions is reflected in the commercial success Epic has achieved by implementing them, which has allowed Epic and its promotional partners to reach audiences in previously unachievable ways. For example, Epic's co-founder identified the Marshmello concert as a "major event" for Epic. *See* Exhibit I, an excerpt of *Epic Games, Inc. v. Apple Inc.* Trial Exhibit DX-3036.013–.014. Similarly, in a September 2020 Washington Post article, Epic's head of global partnerships described Fortnite's concert events as "***very lean-forward***,

COMPLAINT FOR PATENT INFRINGEMENT – 15
(Case No. 2:21-CV-0799)

POLSINELLI

1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

engaged social experience[s]" that are "not like watching a stream at home or on another platform." https://www.washingtonpost.com/video-games/2020/09/11/fortnite-live-events-planning/ (emphasis added). A true and correct copy of the September 2020 Washington Post article is attached hereto as Exhibit J.

47. In addition to its public statements lauding its concert events, on information and belief, Epic's uses large-scale events to grow its base by expanding into untapped areas such as music, television, and movies. Not only does this increase the number of *Fortnite* users and grow related revenue, but it also creates new revenue streams. For example, according to an April 2020 Washington Post article, prior to Travis Scott's Astronomic concert event, participants were able to "purchase Scott's outfits and emotes." https://www.washingtonpost.com/video-games/2020/04/20/travis-scott-fortnite-concert/. A true and correct copy of the April 2020 Washington Post article is attached hereto as Exhibit K. Consequently, Epic has seen increases in the number of participants using *Fortnite* and growth in related revenue, while its promotional partners have enjoyed increases in audience and sales. These successes are evidence that the claimed technology was not known in the prior art at the time of the invention, let alone well-known, routine, or conventional.

48. Although the bandwidth and space constraints of virtual computer-generated environments were known in the art, the solutions presented in the MMAP Patents and the '605 Patent were not well-known, routine, or conventional at the time of their invention, which is demonstrated by, among other things, the Examiner's description of the state of the art during prosecution of the Asserted Patents and related applications.

49. For example, during prosecution of the application that issued as the '071 Patent, the Examiner cited U.S. Patent No. 6,767,287 ("McQuaid") as prior art. In an office action, the Examiner stated that McQuaid disclosed "assigning ones of a plurality of avatars . . . so that each of the plurality of avatars populates a respective one of the parallel dimensions and each of the



plurality of parallel dimensions is populated by a unique subset of the plurality of avatars so as to prevent over-population of any one of the parallel dimensions by avatars." Exhibit L, Apr. 20, 2012 Office Action at 3. However, as the applicants explained, "McQuaid fails to teach *parallel* dimensions (or parallel instances) in a virtual reality universe. McQuaid merely teaches the use of *unique* instances in a virtual reality universe. Specifically, McQuaid teaches a virtual reality system including a login server, at least one world server and a plurality of area servers that manipulate avatars. The area servers include a processor for running software for administering unique virtual geographic areas within associated virtual worlds." Exhibit M, July 20, 2012 Resp. at 9. "Unique areas are not and do not equate to parallel dimensions; by definition, a unique space is not a duplicate and cannot read on a parallel area generated as a duplicate of an existing space." *Id.* at 10.

50.     As another example, during prosecution of the '157 Patent, the Examiner cited U.S. Patent No. 6,476,830 ("Farmer") as prior art. In an office action, the Examiner described Farmer as "disclos[ing] a system and method for enhancing the user's experience in a multiplayer game" that "teaches . . . limiting the number of avatars that can be present at one time in order to prevent over-crowding of the visual interface." *Id.* at 4.

51.     As another example, during prosecution of the '157 Patent, the Examiner cited U.S. Publication No. 2005/0216853 ("Matsuda") as prior art. In an office action, the Examiner stated that Matsuda "teaches an aura (world) having a predetermined radius that is formed around a pilot avatar (avatar of a particular user) and one or more drawn avatar (avatar of another user) and one or more objects (such as pictures, a robot, an electronic pet, etc.), wherein the system limited the number of objects in an aura, which may be set in advance." *Id.*

52.     As another example, during prosecution of the '157 Patent, the Examiner cited U.S. Patent No. 8,026,918 ("Murphy") as prior art. In an office action, the Examiner stated that Murphy "discloses a system and method for controlling communications with proximate avatars in a virtual would (abstract). Murphy teaches selection criteria for selecting predetermined interests in

COMPLAINT FOR PATENT INFRINGEMENT – 17
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

neighboring avatar selection, wherein only the neighboring avatars that meet the criteria are presented to the user in response to the discovery of other avatars. Murphy explains that the user may specify the proximity-specific attributes to avoid overpopulating a list or group by setting the limit on the number of avatars by using a 'maximum number of discovered avatars' setting section." *Id.* at 5-6.

53.     During prosecution of the '157 Patent, the Examiner stated certain cited prior art references "fail to teach or suggest a method for modeling multiple parallel instances of a multi-dimensional virtual reality space, each parallel instance replicating the multi-dimensional virtual space; assigning a modeled multi-dimensional avatar so that each avatar populates a respective parallel instance and each parallel instance is populated by a unique subset of avatars, wherein assigning modeled avatars limits a total number of avatars in each unique subset; and modelling a common space in relation to the plurality of parallel instances to make one or more objects located inside the common space visible from viewpoints located inside each parallel instance." *Id.* at 6. The same Examiner made similar remarks in allowing claims from the application that issued as the '954 Patent. *See* Exhibit N, Dec. 24, 2013 Office Action at 6.

54.     Despite the documented existence of problems with bandwidth and space constraints, the Examiner determined for at least these reasons set forth above as well as those more thoroughly discussed in the prosecution history of the Asserted Patents, that it was not well-known, routine, or conventional to utilize the solutions presented in the MMAP Patents and the '605 Patent.

**E.     Epic's Infringement of the Asserted Patents**

55.     Epic infringes claims of the Asserted Patents by making, using, offering for sale, selling and/or importing software in the United States that utilize the claimed multi-instance, multi-user animation and/or experience playback solutions of the Asserted Patents.

56.     For example, Epic operates *Fortnite*, an online video game that was originally released in 2017. *Fortnite* is available in three distinct game mode versions that otherwise share the

COMPLAINT FOR PATENT INFRINGEMENT – 18
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

same general gameplay and game engine UE4: *Fortnite Battle Royale*, *Fortnite Save the World*, and *Fortnite Creative*, of which *Battle Royale* is the foundational iteration. *Fortnite* had an audience of more than 125 million players in May 2018 with estimates of having earned over US $1 billion by July 2018 through micro-transactions. As of March 2019, *Fortnite* had drawn nearly 250 million players. More recent reports estimate the number of participants in excess of 350 million players.

57.     *Fortnite* relies on software that is capable of handling a large number of connections to the same server while still retaining high bandwidth and rendering a large open in-game world. *Fortnite* encompasses a plurality of three-dimensional parallel dimensions that are replica of a common virtual world, with multiple avatars. Whenever *Fortnite* has a large-scale event, such as a concert or dance party, that occurs on all game servers where all players log on concurrently to view, upon information and belief, multiple parallel dimensions are used because, as shown below, *Fortnite* does not render all players to one player's view. In other words, millions of players may be in the same space, watching the same single-time event, but each player can only see a subset of the other players, i.e., only the subset of players that are located in the same parallel dimension as themselves.

58.     In at least this way, *Fortnite* has utilized the multi-instance, multi-user animation and experience playback solutions of the Asserted Patents to host large-scale events for multitudes of participants, such as concert collaborations with real-world music artists and promotions for upcoming movie releases. Epic's own documents confirm that it has relied on these large-scale events to drive *Fortnite*'s growth. Hosting large-scale events has also allowed Epic to assist world leading brands and entertainers to reach their audiences through *Fortnite*. A list and descriptions of some of *Fortnite*'s large-scale events is provided by webpage found at: https://fortnite.fandom.com/wiki/Live_Events. A true and correct copy of the webpage is attached hereto as Exhibit O.

59.     As another example, in February 2019, *Fortnite* hosted a concert with music artist

COMPLAINT FOR PATENT INFRINGEMENT – 19
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

Marshmello. The concert boasted 10.7 million concurrent viewers who were signed in and attending simultaneously at the *Fortnite* virtual location Pleasant Park. Yet a video recording of this event from one player's perspective showed significantly fewer attendees. This video recording may be found on YouTube at: https://www.youtube.com/watch?v=NBsCzN-jfvA&t=93s. The one particular recording demonstrates a particular parallel dimension among a plurality of parallel dimension. Each player viewed the same concert and other objects located inside the common space is visible from viewpoints located inside each of the plurality of parallel dimensions. In at least this way, *Fortnite* has utilized the multi-instance, multi-user animation and experience playback solutions of the Asserted Patents to host repeatable, large-scale events for multitudes of participants.

60.    A description of the Marshmello concert is provided on The Verge internet article found at: https://www.theverge.com/2019/2/21/18234980/fortnite-marshmello-concert-viewer-numbers. A true and correct copy of the article is attached hereto as Exhibit P.

61.    As another example, in December 2019, *Fortnite* hosted a movie trailer premiere for the widely anticipated Star Wars movie The Rise of Skywalker. During the event, a virtual avatar of director J.J. Abrams arrived in the virtual world aboard the Millennium Falcon spacecraft and presented a trailer for the upcoming movie to in-game players. After the trailer was concluded, the J.J. Abrams avatar flew away on the Millennium Falcon, chased by enemy TIE-Fighters, and an audio message from the Star Wars character Emperor Palpatine was broadcast to in-game players. In at least this way, *Fortnite* has utilized the multi-instance, multi-user animation and experience playback solutions of the Asserted Patents to host repeatable, large-scale events for multitudes of participants. This virtual event was later referenced in the opening of the movie itself, demonstrating the far-reaching effect of virtual world promotions.

62.    Further information regarding the event was described in a Forbes internet article found at: https://www.forbes.com/sites/davidthier/2019/12/22/youll-only-understand-this-the-rise-of-skywalker-plot-point-if-you-play-fortnite/ and at a The Verge article found at:

COMPLAINT FOR PATENT INFRINGEMENT – 20
 (Case No. 2:21-CV-0799)



https://www.theverge.com/2019/12/14/21020296/star-wars-the-rise-of-skywalker-fortnite-jj-abrams-lightsabers. True and correct copies of the Forbes and The Verge articles are attached hereto as Exhibit Q and Exhibit R.

63.  As another example, in April 2020, *Fortnite* hosted concerts with music artist Travis Scott. The event was repeated multiple times, with each event utilizing prerecorded, choreographed animations to achieve the concert experience. On each repetition, millions of participants were able to attend simultaneously. These participants were necessarily spread across multiple parallel dimensions or instances because only small subsets of avatars were visible in any one instance despite there being many times that many participants attending the same experience.

64.  In at least this way, *Fortnite* has utilized the claimed inventions of the Asserted Patents to host repeatable, large-scale events for multitudes of participants.

65.  The virtual concert was record-breaking in *Fortnite* and Travis Scott reportedly earned significantly more than his average in-person show. According to a Forbes report described in an NME internet article, the digital concert grossed the artist roughly $20 million including merchandise sales. Further information from the NME internet article can be found at: https://www.nme.com/en_asia/news/gaming-news/travis-scott-earned-20million-fortnite-concert-event-2829903. A true and correct copy of the article is attached hereto as Exhibit S.

66.  In these ways, which are by way of example, Epic has directly infringed the Asserted Patents by making, using, selling, offering to sell and/or importing virtual, interactive platforms and games that utilize the multi-instance, multi-user animation and recording and playing back experience solutions, specifically the software that when executed on a server enables many *Fortnite* participants to experience the same virtual worlds for virtual social events and concerts such as those described above (the "Accused Products"), so as to obtain significant benefits of the Asserted Patents' innovations. Utherverse Gaming is entitled to recover from Epic the damages adequate to compensate for such infringement, which have yet to be determined.



## V.     CAUSES OF ACTION
## FIRST CAUSE OF ACTION
## INFRINGEMENT OF THE '071 PATENT

67.     Utherverse Gaming incorporates all of the above paragraphs as though fully set forth herein.

68.     In violation of 35 U.S.C. § 271, Epic has directly and/or indirectly infringed at least claim 8 of the '071 Patent, literally and/or under the doctrine of equivalents, by making, using, selling, offering to sell and/or importing the Accused Products in the United States that use the method recited in claim 8 of the '071 Patent.

69.     Claim 8 of the '071 Patent depends from claim 1.  Claim 1 is incorporated by reference into Claim 8 and therefore recites the following element originally set forth in claim 1: A method for managing a multi-instance, multi-user animation process, comprising modeling, using a computer, a plurality of parallel dimensions in a computer memory, each of the plurality of parallel dimensions being a replica of a modeled three dimensional space configured for modeling occupancy and movement of multiple avatars within limits that are defined by at least one model of a three dimensional object.

70.     Upon information and belief, Epic's Accused Products model, using a computer, a plurality of parallel dimensions in a computer memory, each of which is a replica of a three dimensional space configured for modeling occupancy and movement of multiple avatars within limits that are defined by at least one model of a three dimensional object.

71.     By way of example, Epic's Mashmello concert event was a computer-generated virtual event depicted to participants as a three-dimensional concert venue in which multiple participant avatars could occupy and move.

COMPLAINT FOR PATENT INFRINGEMENT – 22
  (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400



https://www.youtube.com/watch?v=NBsCzN-jfvA (screen shot excerpt of YouTube video of "Marshmello Holds First Ever Fortnite Concert Live at Pleasant Park" posted Feb. 2, 2019).

72. Although more than ten million users watched the concert live, the virtual venue shows only about 100 participant avatars occupying the three dimensional space. Thus, upon information and belief, for the Marshmello concert event, Epic necessarily modeled a plurality of parallel dimensions or separate instances to accommodate the millions of participants. Participant avatars are able to move within a three dimensional venue.

73. Claim 8 of the '071 Patent depends from claim 1. Claim 1 is incorporated by reference into Claim 8 and therefore recites the following element originally set forth in claim 1: assigning ones of a plurality of avatars within the computer memory so that each of the plurality of avatars populates a respective one of the parallel dimensions and each of the plurality of parallel dimensions is populated by a unique subset of the plurality of avatars, so as to prevent over-population of any one of the parallel dimensions by avatars.

74. Upon information and belief, Epic's Accused Products assign a plurality of avatars within the computer memory so that each of the plurality of avatars populates a respective one of the parallel dimensions and each of the plurality of parallel dimensions is populated by a unique

COMPLAINT FOR PATENT INFRINGEMENT – 23
(Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

subset of the plurality of avatars, so as to prevent over-population of any one of the parallel dimensions by avatars.

75. By way of example, while millions of users participated in the Marshmello concert event, the virtual venue shows tens of participant avatars populating the venue in front of the virtual stage.



https://www.youtube.com/watch?v=IbsZKdiyzj4 (screen shot excerpt of YouTube video of "Fortnite Marshmello Concert [FULL EVENT, NO COMMENTARY]")

76. Each of the plurality of parallel dimensions is populated by a unique subset of the plurality of avatars, which prevents over-population of any one of the parallel dimensions by avatars. *See, e.g.,* https://www.youtube.com/watch?v=ureS0NC9hJQ (YouTube video of February 2, 2021 live stream of Marshmello concert showing participant avatars) and https://www.youtube.com/watch?v=Ii5S6HzJce4 (YouTube video of February 2, 2021 live stream of Marshmello concert showing different participant avatars).

77. Claim 8 of the '071 Patent depends from claim 1. Claim 1 is incorporated by

COMPLAINT FOR PATENT INFRINGEMENT – 24
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

reference into Claim 8 and therefore recites the following element originally set forth in claim 1: animating ones of the plurality of avatars populating different ones of the parallel dimensions in response to input from respective corresponding ones of a plurality of clients to provide virtual-reality data, using the computer, the virtual-reality data configured to enable the clients to output an animated display of a corresponding one of the parallel dimensions and avatars populated therein.

78. Upon information and belief, Epic's Accused Products animate the plurality of avatars populating different ones of the parallel dimensions in response to input from respective corresponding ones of a plurality of clients to provide virtual-reality data, using the computer, the virtual-reality data configured to enable the clients to output an animated display of a corresponding one of the parallel dimensions and avatars populated therein.

79. By way of example, for the Marshmello concert event, participants were able to view the same stage, hear the same audio, and view the identical movement of "Marshmello" and other virtual dancing avatars, yet participants viewed the virtual stage and "Marshmello" based on their individual movement relative to the virtual stage and "Marshmello". *See, e.g.,* https://www.youtube.com/watch?v=ureS0NC9hJQ (YouTube video of February 2, 2021 live stream of Marshmello concert ); https://www.youtube.com/watch?v=Ii5S6HzJce4 (YouTube video of February 2, 2021 live stream of Marshmello concert).

80. In addition, participant avatars are able to move in response to input from respective ones of a plurality of clients to provide virtual-reality data, using the computer, the virtual reality data configured to enable clients to output an animated display of a corresponding one of the parallel dimensions and avatars populated therein.

COMPLAINT FOR PATENT INFRINGEMENT – 25
 (Case No. 2:21-CV-0799)





https://www.youtube.com/watch?v=Ii5S6HzJce4 (redacted screen shot excerpt of video of February 2, 2021 live stream of Marshmello concert depicting menu for user to choose *Fortnite* "Take the L" emote).



https://www.youtube.com/watch?v=Ii5S6HzJce4 (redacted screen shot excerpt of video of February 2, 2021 live stream of Marshmello concert depicting avatar performing "Take the L" dance).

81.    Claim 8 of the '071 Patent, in addition to the incorporated elements of claim 1, further recites: modeling a common space in the computer memory configured in relation to the plurality of parallel dimensions so that at least one object located inside the common space is visible

**POLSINELLI**
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

from viewpoints located inside each of the plurality of parallel dimensions.

82.     Upon information and belief, Epic's Accused Products model a common space in the computer memory configured in relation to the plurality of parallel dimensions so that at least one object located inside the common space is visible from viewpoints located inside each of the plurality of parallel dimensions.

83.     By way of example, for the Marshmello concert event, the DJ Mello avatar was situated in the common space of the virtual stage and was visible from each of the dimensions.



https://www.youtube.com/watch?v=ZyBb6Ha1Un4 (screen shot excerpt of video of February 2, 2021 live stream of Marshmello concert).

84.     As of the filing of this complaint, Epic has infringed and continues to infringe the '071 Patent under 35 U.S.C. § 271(a), directly, literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering to sell in the United States and/or importing into the United States, the Accused Products, during the term of the '071 Patent.

85.     Epic's actions and infringement of the '071 Patent are without license or authorization from Utherverse Gaming.

86.     Epic's acts of infringement have caused Utherverse Gaming to suffer damages.

COMPLAINT FOR PATENT INFRINGEMENT – 27
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

Utherverse Gaming is entitled to and seeks to recover from Epic pursuant to 35 U.S.C. § 284 the damages it has sustained as a result of Epic's wrongful actions in an amount subject to proof at trial, and in no event less than a reasonable royalty, together with interest and costs.

**SECOND CAUSE OF ACTION**
**INFRINGEMENT OF THE '954 PATENT**

87.     Utherverse Gaming incorporates all of the above paragraphs as though fully set forth herein.

88.     In violation of 35 U.S.C. § 271, Epic has directly and/or indirectly infringed at least claim 4 of the '954 Patent, literally and/or under the doctrine of equivalents, by making, using, selling, offering to sell and/or importing the Accused Products in the United States that use the method recited in claim 4 of the '954 Patent.

89.     Claim 4 of the '954 Patent depends from claim 1.  Claim 1 is incorporated by reference into Claim 4 and therefore recites the following element originally set forth in claim 1: A method for modeling, in a computer memory, multiple parallel instances of a multi-dimensional virtual reality space, each of the plurality of parallel instances replicating the multi-dimensional virtual reality space.

90.     Upon information and belief, Epic's Accused Products model, in a computer memory, multiple parallel instances of a multi-dimensional virtual reality space, each of the plurality of parallel instances replicating the multi-dimensional virtual reality space.

91.     By way of example, Epic's Mashmello concert event was a computer-generated virtual event depicted to participants as a three-dimensional concert venue.

COMPLAINT FOR PATENT INFRINGEMENT – 28
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

Marshmello Holds First Ever Fortnite Concert Live at Pleasant Park
58,668,362 views • Feb 2, 2019

https://www.youtube.com/watch?v=NBsCzN-jfvA (screen shot excerpt of YouTube video of "Marshmello Holds First Ever Fortnite Concert Live at Pleasant Park" posted Feb. 2, 2019).

92.     Although more than ten million users watched the concert live, the virtual venue shows only about 100 participant avatars occupying the three dimensional space. Thus, upon information and belief, for the Marshmello concert event, Epic necessarily modeled multiple parallel instances of a multi-dimensional virtual reality space, each of the plurality of parallel instances replicating the multi-dimensional virtual reality space.

93.     Claim 4 of the '954 Patent depends from claim 1. Claim 1 is incorporated by reference into Claim 4 and therefore recites the following element originally set forth in claim 1: assigning ones of a plurality of modeled multi-dimensional avatars within the computer memory so that each of the plurality of avatars populates a respective one of the parallel instances and each of the plurality of parallel instances is populated by a unique subset of the plurality of avatars, wherein the assigning limits a total number of the plurality of avatars in each of the unique subsets.

94.     Upon information and belief, Epic's Accused Products assign a plurality of modeled multi-dimensional avatars within the computer memory so that each of the plurality of avatars populates a respective one of the parallel instances and each of the plurality of parallel instances is populated by a unique subset of the plurality of avatars, wherein the assigning limits a total number

COMPLAINT FOR PATENT INFRINGEMENT – 29
 (Case No. 2:21-CV-0799)

POLSINELLI

1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

of the plurality of avatars in each of the unique subsets.

95.     By way of example, while millions of users participated in the Marshmello concert event, the virtual venue shows tens of participant avatars populating the venue in front of the virtual stage.



https://www.youtube.com/watch?v=IbsZKdiyzj4 (screen shot excerpt of YouTube video of "Fortnite Marshmello Concert [FULL EVENT, NO COMMENTARY]")

96.     Each of the plurality of parallel dimensions is populated by a unique subset of the plurality of avatars, and prevents over-population of any one of the parallel dimensions by avatars. *See, e.g.,* https://www.youtube.com/watch?v=ureS0NC9hJQ (YouTube video of February 2, 2021 live stream of Marshmello concert showing participant avatars) and https://www.youtube.com/watch?v=Ii5S6HzJce4 (YouTube video of February 2, 2021 live stream of Marshmello concert showing different participant avatars).

97.     Claim 4 of the '954 Patent depends from claim 1. Claim 1 is incorporated by reference into Claim 4 and therefore recites the following element originally set forth in claim 1: generating an additional parallel instance of the multi-dimensional virtual reality space, based on

POLSINELLI

1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

detecting an increase in a number of a plurality of client devices providing input to the modeling for controlling ones of the plurality of modeled multi-dimensional avatars.

98.     Upon information and belief, Epic's Accused Products generate an additional parallel instance of the multi-dimensional virtual reality space, based on detecting an increase in a number of a plurality of client devices providing input to the modeling for controlling ones of the plurality of modeled multi-dimensional avatars.

99.     By way of example, Epic has explained that it "run[s] Fortnite's dedicated game servers primarily on thousands of c4.8xlarge AWS instances, which scale up and down with our daily peak of players." *See* Exhibit T, https://www.epicgames.com/fortnite/en-US/news/postmortem-of-service-outage-at-3-4m-ccu. During the Marshmello concert, different instantiations appear to have similar limited numbers of avatars all interacting with the same "Marshmello." Thus, on information and belief, Epic generates additional instantiations based on detecting an increase in a number of a plurality of client devices providing input to the modeling for controlling ones of the plurality of modeled multi-dimensional avatars.



https://www.youtube.com/watch?v=HwbScTdNoik (screen shot excerpt of YouTube video of "FULL Marshmello Fortnite Concert Event!!")

COMPLAINT FOR PATENT INFRINGEMENT – 31
 (Case No. 2:21-CV-0799)





https://www.youtube.com/watch?v=IbsZKdiyzj4 (screen shot excerpt of YouTube video of "Fortnite Marshmello Concert [FULL EVENT, NO COMMENTARY]")

100.    Claim 4 of the '954 Patent, in addition to the incorporated elements of claim 1, further recites: modeling a common space in the computer memory configured in relation to the plurality of parallel instances so that at least one object located inside the common space is visible from viewpoints located inside each of the plurality of parallel instances.

101.    By way of example, for the Marshmello concert event, the DJ Mello avatar was situated in the common space of the virtual stage and was visible from each of the dimensions. *See, e.g.,* https://www.youtube.com/watch?v=ZyBb6Ha1Un4 (YouTube video of live stream of Marshmello concert).

COMPLAINT FOR PATENT INFRINGEMENT – 32
 (Case No. 2:21-CV-0799)


1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400



https://www.youtube.com/watch?v=ZyBb6Ha1Un4 (screen shot excerpt of video of February 2, 2021 live stream of Marshmello concert).

102.    Upon information and belief, Epic's Accused Products models a common space in the computer memory configured in relation to the plurality of parallel instances so that at least one object located inside the common space is visible from viewpoints located inside each of the plurality of parallel instances.

103.    Epic has infringed and continues to infringe the '954 Patent under 35 U.S.C. § 271(a), directly, literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering to sell in the United States and/or importing into the United States, the Accused Products, during the term of the '954 Patent.

104.    Epic's actions and infringement of the '954 Patent are without license or authorization from Utherverse Gaming.

105.    Epic's acts of infringement have caused Utherverse Gaming to suffer damages. Utherverse Gaming is entitled to and seeks to recover from Epic pursuant to 35 U.S.C. § 284 the damages it has sustained as a result of Epic's wrongful actions in an amount subject to proof at trial, and in no event less than a reasonable royalty, together with interest and costs.



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

**THIRD CAUSE OF ACTION**
**INFRINGEMENT OF THE '157 PATENT**

106.     Utherverse Gaming incorporates all of the above paragraphs as though fully set forth herein.

107.     In violation of 35 U.S.C. § 271, Epic has directly and/or indirectly infringed at least claim 1 of the '157 Patent, literally and/or under the doctrine of equivalents, by making, using, selling, offering to sell and/or importing the Accused Products in the United States that use the method recited in claim 1 of the '157 Patent.

108.     Claim 1 of the '157 Patent recites: A method, comprising modeling, in a computer memory, multiple parallel instances of a multi-dimensional virtual reality space, each of the plurality of parallel instances replicating the multi-dimensional virtual reality space;

109.     Upon information and belief, Epic's Accused Products model, in a computer memory, multiple parallel instances of a multi-dimensional virtual reality space, each of the plurality of parallel instances replicating the multi-dimensional virtual reality space.

110.     By way of example, Epic's Mashmello concert event was a computer-generated virtual event occurring in a virtual reality space.



https://www.youtube.com/watch?v=NBsCzN-jfvA (screen shot excerpt of YouTube video of

COMPLAINT FOR PATENT INFRINGEMENT – 34
 (Case No. 2:21-CV-0799)



"Marshmello Holds First Ever Fortnite Concert Live at Pleasant Park" posted Feb. 2, 2019).

111.    Although more than ten million users watched the concert live, the virtual venue shows only about 100 participant avatars occupying the virtual reality space. Thus, upon information and belief, for the Marshmello concert event, Epic necessarily modeled a plurality of parallel dimensions or separate instances to accommodate the millions of participants.

112.    Claim 1 of the '157 Patent recites: assigning ones of a plurality of modeled multi-dimensional avatars within the computer memory so that each of the plurality of avatars populates a respective one of the parallel instances and each of the plurality of parallel instances is populated by a unique subset of the plurality of avatars, wherein the assigning limits a total number of the plurality of avatars in each of the unique subsets.

113.    Upon information and belief, Epic's Accused Products assign a plurality of modeled multi-dimensional avatars within the computer memory so that each of the plurality of avatars populates a respective one of the parallel instances and each of the plurality of parallel instances is populated by a unique subset of the plurality of avatars, wherein the assigning limits a total number of the plurality of avatars in each of the unique subset.

114.    By way of example, while millions of users participated in the Marshmello concert event, the virtual venue shows tens of participant avatars populating the venue in front of the virtual stage.

COMPLAINT FOR PATENT INFRINGEMENT – 35
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400



Fortnite #marshmello #concert
Fortnite Marshmello Concert [FULL EVENT, NO COMMENTARY]
118,493 views · Feb 2, 2019 — 7.8K — 207 — SHARE — SAVE — ...

https://www.youtube.com/watch?v=IbsZKdiyzj4 (screen shot excerpt of YouTube video of "Fortnite Marshmello Concert [FULL EVENT, NO COMMENTARY]")

115.     Each of the plurality of parallel instances is populated by a unique subset of the plurality of avatars, which limits the total number of avatars in any one of the parallel instances. *See, e.g.,* https://www.youtube.com/watch?v=ureS0NC9hJQ (YouTube video of February 2, 2021 live stream of Marshmello concert showing participant avatars) and https://www.youtube.com/watch?v=Ii5S6HzJce4 (YouTube video of February 2, 2021 live stream of Marshmello concert showing different participant avatars).

116.     Claim 1 of the '157 Patent recites: modeling a common space in the computer memory configured in relation to the plurality of parallel instances so that at least one object located inside the common space is visible from viewpoints located inside each of the plurality of parallel instances.

117.     Upon information and belief, Epic's Accused Products model a common space in the computer memory configured in relation to the plurality of parallel instances so that at least one object located inside the common space is visible from viewpoints located inside each of the

POLSINELLI

1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

plurality of parallel instances.

118.    By way of example, for the Marshmello concert event, the DJ Mello avatar was situated in the common space of the virtual stage and was visible from each of the dimensions.



https://www.youtube.com/watch?v=ZyBb6Ha1Un4 (screen shot excerpt of video of February 2, 2021 live stream of Marshmello concert).

119.    Epic has infringed and continues to infringe the '157 Patent under 35 U.S.C. § 271(a), directly, literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering to sell in the United States and/or importing into the United States, the Accused Products, during the term of the '157 Patent.

120.    Epic's actions and infringement of the '157 Patent are without license or authorization from Utherverse Gaming.

121.    Epic's acts of infringement have caused Utherverse Gaming to suffer damages. Utherverse Gaming is entitled to and seeks to recover from Epic pursuant to 35 U.S.C. § 284 the damages it has sustained as a result of Epic's wrongful actions in an amount subject to proof at trial, and in no event less than a reasonable royalty, together with interest and costs.

**FOURTH CAUSE OF ACTION**
**INFRINGEMENT OF THE '605 PATENT**

122.    Utherverse Gaming incorporates all of the above paragraphs as though fully set forth

COMPLAINT FOR PATENT INFRINGEMENT – 37
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

herein.

123.    In violation of 35 U.S.C. § 271, Epic has directly and/or indirectly infringed at least claim 2 of the '605 Patent, literally and/or under the doctrine of equivalents, by making, using, selling, offering to sell and/or importing the Accused Products in the United States that use the method recited in claim 2 of the '605 Patent.

124.    Claim 2 of the '605 Patent depends from claim 1.  Claim 1 is incorporated by reference into Claim 2 and therefore recites the following element originally set forth in claim 1: A method of playing back a recorded experience in a virtual worlds system, comprising instantiating, using one or more processors of a server, a new instance of a scene, the new instance being defined by data stored in memory, at least one client device displaying and participating in the new instance.

125.    Upon information and belief, Epic's Accused Products instantiate, using one or more processors of a server, a new instance of a scene, the new instance being defined by data stored in memory, at least one client device displaying and participating in the new instance.

126.    By way of example, Epic's Travis Scott concerts were presented by instantiating new instances of a pre-recorded virtual Travis Scott performance that were displayed on participants' devices so that they could participate in the instance. *See* Exhibit U, "This weekend's coolest concert is happening in Fortnite: Travis Scott's in-game 'tour' is a surreal, virtual live show", https://www.vox.com/culture/2020/4/24/21235196/travis-scott-fortnite-concert-livestream-the-scotts-music-video, posted Apr. 24, 2020 ("Anyone who shows up is treated to a surreal, 10-minute show, where Giant Travis Scott suddenly gains godlike powers to fling players into outer space, underwater, and a colorful series of dimensions….All of these visuals are timed to the music, so Scott isn't actually playing his songs live.").

COMPLAINT FOR PATENT INFRINGEMENT – 38
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400



https://www.youtube.com/watch?v=gYP9Katzh0c (screen shot excerpt of YouTube video of "Fortnite Travis Scott Event Full HD! (FREE ASTROWORLD CONCERT) *LIVE NO COMMENTARY*" posted Apr. 23, 2020).

127.    Claim 2 of the '605 Patent depends from claim 1.  Claim 1 is incorporated by reference into Claim 2 and therefore recites the following element originally set forth in claim 1: retrieving a recorded experience file from the memory, the recorded experience file having been generated by saving an initial scene state and saving subsequent changes and respective times during a time period of the recorded experience.

128.    Upon information and belief, Epic's Accused Products retrieve a recorded experience file from the memory, the recorded experience file having been generated by saving an initial scene state and saving subsequent changes and respective times during a time period of the recorded experience.

129.    By way of example, the Travis Scott performance was presented at multiple times on multiple days by replaying a pre-recorded virtual Travis Scott performance that was replayed from a recorded experience file, which had been recorded by saving an initial scene state and further saving changes to the scene state over time. For example, on information and belief, the Travis Scott performance began with an object flying through the scene and coming to the ground, wherein the

COMPLAINT FOR PATENT INFRINGEMENT – 39
 (Case No. 2:21-CV-0799)

POLSINELLI

1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

movement of the object through the instance was determined by previously saved changes:





https://www.youtube.com/watch?v=gYP9Katzh0c (screen shot excerpt of YouTube video of "Fortnite Travis Scott Event Full HD! (FREE ASTROWORLD CONCERT) *LIVE NO COMMENTARY*" posted Apr. 23, 2020). *See also* Exhibit U, "This weekend's coolest concert is happening in Fortnite: Travis Scott's in-game 'tour' is a surreal, virtual live show", https://www.vox.com/culture/2020/4/24/21235196/travis-scott-fortnite-concert-livestream-the-scotts-music-video, posted Apr. 24, 2020 ("Anyone who shows up is treated to a surreal, 10-minute show, where Giant Travis Scott suddenly gains godlike powers to fling players into outer space, underwater, and a colorful series of dimensions….All of these visuals are timed to the music, so Scott isn't actually playing his songs live.").

130.     Claim 2 of the '605 Patent depends from claim 1.  Claim 1 is incorporated by reference into Claim 2 and therefore recites the following element originally set forth in claim 1: playing back the recorded experience file by rendering, for display by the at least one client device, objects of the initial scene state in the new instance, including one or more avatars, and rendering updates to the initial scene state based on the subsequent changes over the time period.

131.     Upon information and belief, Epic's Accused Products play back the recorded experience file by rendering, for display by the at least one client device, objects of the initial scene

COMPLAINT FOR PATENT INFRINGEMENT – 41
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

state in the new instance, including one or more avatars, and rendering updates to the initial scene state based on the subsequent changes over the time period.

132.    By way of example, during Epic's Travis Scott concerns the Travis Scott performance is played back with objects from the initial scene state, such as a large Travis Scott character, rendered in the new instance, for display on at least one client device.



https://www.youtube.com/watch?v=gYP9Katzh0c (screen shot excerpt of YouTube video of "Fortnite Travis Scott Event Full HD! (FREE ASTROWORLD CONCERT) *LIVE NO COMMENTARY*" posted Apr. 23, 2020).

133.    Also rendered for display on at least one client device are participant avatars, such as those appearing in the foreground of the Travis Scott performance. As the Travis Scott performance continues, updates to the initial scene state are made and rendered, replaying the pre-recorded experience for the participants.

COMPLAINT FOR PATENT INFRINGEMENT – 42
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400









https://www.youtube.com/watch?v=gYP9Katzh0c (screen shot excerpts of YouTube video of "Fortnite Travis Scott Event Full HD! (FREE ASTROWORLD CONCERT) *LIVE NO COMMENTARY*" posted Apr. 23, 2020). *See also* Exhibit U, "This weekend's coolest concert is happening in Fortnite: Travis Scott's in-game 'tour' is a surreal, virtual live show", https://www.vox.com/culture/2020/4/24/21235196/travis-scott-fortnite-concert-livestream-the-scotts-music-video, posted Apr. 24, 2020 ("Anyone who shows up is treated to a surreal, 10-minute show, where Giant Travis Scott suddenly gains godlike powers to fling players into outer space, underwater, and a colorful series of dimensions….All of these visuals are timed to the music, so Scott isn't actually playing his songs live.").

134.    Claim 2 of the '605 Patent depends from claim 1.  Claim 1 is incorporated by reference into Claim 2 and therefore recites the following element originally set forth in claim 1: automatically transporting the one or more avatars to a different new instance of the scene, upon occurrence of a threshold event, wherein the threshold event comprises when a maximum capacity of avatars has been reached in the new instance of the scene.

135.    Upon information and belief, Epic's Accused Products automatically transport the one or more avatars to a different new instance of the scene, upon occurrence of a threshold event, wherein the threshold event comprises when a maximum capacity of avatars has been reached in the new instance of the scene.

136.    By way of example, although more than 12.3 million players participated in a simultaneous replay of the pre-recorded virtual Travis Scott performance, the virtual venue shows about 100 participant avatars occupying the three-dimensional space. Thus, upon information and belief, for the Travis Scott concerts, Epic necessarily transported avatars to different new instances of a scene when a maximum capacity of avatars had been reached.

COMPLAINT FOR PATENT INFRINGEMENT – 44
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

1
2
3
4
5
6
7
8
9



10  https://www.youtube.com/watch?v=gYP9Katzh0c (screen shot excerpt of YouTube video of

11  "Fortnite Travis Scott Event Full HD! (FREE ASTROWORLD CONCERT) *LIVE NO

12  COMMENTARY*" posted Apr. 23, 2020).

13      137.    Claim 2 of the '605 Patent, in addition to the incorporated elements of claim 1,

14  further recites: wherein movement within the new instance by the one or more avatars associated

15  with at least one client device is limited by objects of the recorded experience.

16      138.    Upon information and belief, Epic's Accused Products the movement within the

17  new instance by the one or more avatars associated with at least one client device is limited by

18  objects of the recorded experience.

19      139.    By way of example, during Epic's Travis Scott concerts, avatars were unable in

20  some instances to directly interact with certain objects of the recorded experience, such as the

21  large Travis Scott character. Avatars could get close to the large Travis Scott character or occupy

22  certain spaces directly adjacent to the large Travis Scott character, but they could not jump on,

23  attack, or directly engage the Travis Scott character or simultaneously occupy the same space as

24  the large Travis Scott character. In the screen shot below, an avatar moves through space toward

25  the leg of the large Travis Scott character, which limits the avatar's movement within the

26

COMPLAINT FOR PATENT INFRINGEMENT – 45
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

1  instance in which it has been transported.









https://www.youtube.com/watch?v=gYP9Katzh0c (screen shot excerpts of YouTube video of "Fortnite Travis Scott Event Full HD! (FREE ASTROWORLD CONCERT) *LIVE NO COMMENTARY*" posted Apr. 23, 2020).

140.    At another part of the Travis Scott performance, objects of the recorded experience went underwater, taking participants' avatars with them, during which time participants' avatars were limited in function and could only swim, and could not run, jump, or dance.



https://www.youtube.com/watch?v=gYP9Katzh0c (screen shot excerpt of YouTube video of

COMPLAINT FOR PATENT INFRINGEMENT – 47
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

"Fortnite Travis Scott Event Full HD! (FREE ASTROWORLD CONCERT) *LIVE NO COMMENTARY*" posted Apr. 23, 2020).

141.    Epic has infringed and continues to infringe the '605 Patent under 35 U.S.C. § 271(a), directly, literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering to sell in the United States and/or importing into the United States, the Accused Products, during the term of the '605 Patent.

142.    Epic's actions and infringement of the '605 Patent are without license or authorization from Utherverse Gaming.

143.    Epic's acts of infringement have caused Utherverse Gaming to suffer damages. Utherverse Gaming is entitled to and seeks to recover from Epic pursuant to 35 U.S.C. § 284 the damages it has sustained as a result of Epic's wrongful actions in an amount subject to proof at trial, and in no event less than a reasonable royalty, together with interest and costs.

## VI.    PRAYER FOR RELIEF

Wherefore, Utherverse Gaming respectfully requests that this Court enter judgment in its favor and against Epic as follows:

    a)    a judgment and award that Epic has infringed, either literally and/or under the doctrine of equivalents, each of the Asserted Patents;

    b)    a judgment and order requiring Epic to pay Utherverse Gaming its damages, costs, and expenses, to which Utherverse Gaming is entitled due to Epic's infringement;

    c)    a judgment and order requiring Epic to provide an accounting and to pay Utherverse Gaming supplemental damages, including without limitation, pre-judgment and post-judgment interest; and

    d)    such other and further relief to which it may be entitled.

COMPLAINT FOR PATENT INFRINGEMENT – 48
  (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

## VII.    DEMAND FOR JURY TRIAL

Utherverse Gaming hereby demands trial by jury on all claims and issues so triable.

DATED this 11th day of June, 2021.


Respectfully Submitted,

**POLSINELLI P.C.**

By:    /s/ Gary E. Hood
       Gary E. Hood
       WSBA No. 26209
       POLSINELLI P.C.
       1000 Second Avenue, Suite 3500
       Seattle, Washington 98104
       Tel: (206) 393-5400
       Fax: (206) 393-5401
       Email: ghood@polsinelli.com

Of Counsel:

Colby B. Springer (to be admitted *pro hac vice*)
Barrington Dyer (to be admitted *pro hac vice*)
Melenie Van (to be admitted *pro hac vice*)
POLSINELLI LLP
Three Embarcadero Center, Suite 2400
San Francisco, California 94111
Tel: (415) 248-2100
Fax: (415) 248-2101
Email: cspringer@polsinelli.com
bdyer@polsinelli.com
mvan@polsinelli.com

Enes Ovcina (to be admitted *pro hac vice*)
POLSINELLI P.C.
1000 Louisiana Street
Suite 6400
Houston, TX 77002
Tel: (713) 374-1600
Fax: (713) 374-1601
Email: eovcina@polsinelli.com

COMPLAINT FOR PATENT INFRINGEMENT – 49
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

Mark Deming (to be admitted *pro hac vice*)
POLSINELLI P.C.
150 N. Riverside Plaza
Suite 3000
Chicago, IL 60606
Tel: (312) 819-1900
Fax: (312) 819-1901
Email: mdeming@polsinelli.com

*Attorneys for Utherverse Gaming, LLC*

COMPLAINT FOR PATENT INFRINGEMENT – 50
 (Case No. 2:21-CV-0799)



1000 SECOND AVENUE, SUITE 3500
SEATTLE, WA 98104 • (206) 393-5400

# ATTACHMENT C

THE HONORABLE THERESA L. FRICKE

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| UTHERVERSE GAMING, LLC, | CASE NO. 2:21-cv-00799 |
| Plaintiff, | |
| | **STIPULATED** |
| v. | **PROTECTIVE ORDER** |
| EPIC GAMES, INC., | **NOTE ON MOTION** |
| | **CALENDAR: MARCH 15, 2022** |
| Defendant. | |

1. <u>PURPOSES AND LIMITATIONS</u>

      Discovery in this action is likely to involve production of confidential, proprietary, or private information for which special protection may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this agreement is consistent with LCR 26(c). It does not confer blanket protection on all disclosures or responses to discovery, the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles, and it does not presumptively entitle parties to file confidential information under seal.

2. <u>"CONFIDENTIAL" MATERIAL</u>

"CONFIDENTIAL" material shall include documents and tangible things produced or otherwise exchanged that contain or reflect information that is confidential, proprietary and/or commercially sensitive, in particular:

    i.      information about the producing party's product development, design, or specifications for products or services made available to third parties;

    ii.      information the producing party is obligated by law or by contract to maintain in confidence;

    iii.      accounting/financial information, books, and records that are not made public;

    iv.      sales information about commercial products that are not made public, including information on pricing and sales volumes;

    v.      customer information and data;

    vi.      business and marketing plans, strategies, analyses, or surveys;

    vii.      information on producing party's competitors and competitive environment;

    viii.      contracts and agreements or any draft, negotiations, or summaries thereof;

    ix.      information that is subject to the privacy interest of any individual (e.g., medical records, financial information, etc.).

3. <u>"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL</u>

"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" material is CONFIDENTIAL material that includes extremely commercially sensitive information, disclosure of which to another party or non-party would create a substantial risk of serious harm that could not be avoided by less restrictive means. Such information shall include but is not limited to trade secrets; confidential research and development; any non-public financial, technical, marketing, pricing and revenue information; and any other commercially sensitive trade secret information.

4. <u>"HIGHLY CONFIDENTIAL – SOURCE CODE" MATERIAL</u>

"HIGHLY CONFIDENTIAL – SOURCE CODE" material is CONFIDENTIAL material that includes confidential source code and associated comments, revision histories, and other accompanying documentation contained within source code files, disclosure of which to another

party or non-party would create a substantial risk of serious harm that could not be avoided by less restrictive means. The restrictions herein on confidential source code do not apply to publicly-available source code (e.g., code available as open source code).

5. SCOPE

The protections conferred by this agreement cover not only confidential material (as defined above), but also (1) any information copied or extracted from confidential material; (2) all copies, excerpts, summaries, or compilations of confidential material; and (3) any testimony, conversations, or presentations by parties or their counsel that might reveal confidential material.

However, the protections conferred by this agreement do not cover information that is in the public domain or becomes part of the public domain through trial or otherwise.

6. ACCESS TO AND USE OF CONFIDENTIAL MATERIAL

6.1 Basic Principles. A receiving party may use confidential material that is disclosed or produced by another party or by a non-party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. CONFIDENTIAL material may be disclosed only to the categories of persons and under the conditions described in this agreement. CONFIDENTIAL material must be stored and maintained by a receiving party at a location and in a secure manner that ensures that access is limited to the persons authorized under this agreement.

6.2 Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the designating party, a receiving party may disclose any confidential material only to:

(a) the receiving party's counsel of record in this action, as well as employees of counsel to whom it is reasonably necessary to disclose the information for this litigation;

(b) the officers, directors, and employees (including in house counsel) of the receiving party to whom disclosure is reasonably necessary for this litigation;

(c) experts, consultants, and mock jurors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

**Durie Tangri LLP**, 217 Leidesdorff Street,
San Francisco, CA, Tel: 415-362-6666

(d)      the court, court personnel, and court reporters and their staff;

(e)      copy or imaging services or e-discovery vendors retained by counsel to assist in the duplication of confidential material, provided that counsel for the party retaining the copy or imaging service instructs the service not to disclose any confidential material to third parties and to immediately return all originals and copies of any confidential material;

(f)      during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the designating party or ordered by the court.  Pages of transcribed deposition testimony or exhibits to depositions that reveal confidential material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this agreement;

(g)      the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

6.3      <u>Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Materials</u>.  Unless otherwise ordered by the court or permitted in writing by the designating party, a receiving party may disclose any HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY materials only to:

(a)      the receiving party's counsel of record in this action (but not employees, officers, or affiliates of a Party), as well as employees of counsel to whom it is reasonably necessary to disclose the information for this litigation;

(b)      experts, consultants, and mock jurors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c)      the court, court personnel, and court reporters and their staff;

(d)      copy or imaging services or e-discovery vendors retained by counsel to assist in the duplication of confidential material, provided that counsel for the party retaining the copy or imaging service instructs the service not to disclose any confidential material to third parties and to immediately return all originals and copies of any confidential material;

(e)     the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

6.4     Disclosure of "HIGHLY CONFIDENTIAL – SOURCE CODE ONLY" Materials. Unless otherwise ordered by the court or permitted in writing by the designating party, a receiving party may disclose any HIGHLY CONFIDENTIAL – SOURCE CODE materials pursuant to Section 8.5 of this Order only to:

(a)     the receiving party's counsel of record in this action (but not employees, officers, or affiliates of a party), as well as employees of counsel to whom it is reasonably necessary to disclose the information for this litigation;

(b)     up to four experts or consultants to whom disclosure is reasonably necessary for this litigation, who have been specifically designated by the receiving party to receive HIGHLY CONFIDENTIAL – SOURCE CODE materials, and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c)     the court, court personnel, and court reporters, provided that the court reporters have agreed to keep the material confidential under the terms of this Agreement;

(d)     at their depositions or on the witness stand, employees of the producing party who authored or are otherwise familiar with the HIGHLY CONFIDENTIAL – SOURCE CODE materials and/or who have been designated by the producing party to provide testimony about the HIGHLY CONFIDENTIAL – SOURCE CODE materials.

Notwithstanding the above, a receiving party may include excerpts of HIGHLY CONFIDENTIAL – SOURCE CODE material in pleadings, exhibits, expert reports, and discovery materials in accordance with the procedures set forth in Section 10.6 below.

In no event will contract attorneys be given access to HIGHLY CONFIDENTIAL – SOURCE CODE material.

6.5     Procedures for Approving or Objecting to Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" material:

(a)     Unless otherwise ordered by the court or agreed to in writing by the

designating party, a party that seeks to disclose to an expert or consultant any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" pursuant to paragraph 6.3(b) or 6.4(b) first must make a written request to the designating party that (1) identifies what category of information, whether it is "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE," that the receiving party seeks permission to disclose to the expert or consultant, (2) sets forth the full name of the expert or consultant and the city and state of his or her primary residence, (3) attaches a copy of the expert or consultant's current resume, (4) identifies the expert or consultant's current employer(s), (5) to the extent non-confidential and not privileged, identifies each person or entity from whom the expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years, and (6) identifies (by name and number of the case, filing date, and location of court) any litigation in connection with which the Expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.

(b) A party that makes a request and provides the information specified in the preceding respective paragraphs may disclose the subject protected material to the identified expert or consultant unless, within 7 days of delivering the request, the party receives a written objection from the designating party. Any such objection must set forth in detail the grounds on which it is based.

(c) A party that receives a timely written objection must meet and confer with the designating party to try to resolve the matter by agreement within seven days of the written objection. If no agreement is reached, the party seeking to make the disclosure to the expert or consultant may seek a conference with the Court pursuant to the Court's Order at Dkt. No. 19 and, if necessary, file a motion as provided in Local Civil Rule 7 seeking permission from the court. Any such motion must describe the circumstances with specificity, set forth in detail the reasons why the disclosure to the expert or consultant is reasonably necessary, assess the risk of harm that the disclosure would entail, and suggest any additional means that could be used to reduce that

risk. In addition, any such motion must be accompanied by a competent declaration describing the parties' efforts to resolve the matter by agreement (i.e., the extent and the content of the meet and confer discussions) and setting forth the reasons advanced by the designating party for its refusal to approve the disclosure. In any such proceeding, the party opposing disclosure to the expert or consultant shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the receiving party's need to disclose the protected material to its expert or consultant.

(d)     This section does not apply to disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" material pursuant to paragraph 6.3(b) to jury consultants, mock trial consultants, or mock jurors.

6.6     Filing Confidential Material. Before filing confidential material or discussing or referencing such material in court filings, the filing party shall confer with the designating party, in accordance with Local Civil Rule 5(g)(3)(A), to determine whether the designating party will remove the confidential designation, whether the document can be redacted, or whether a motion to seal or stipulation and proposed order is warranted. When the filing party intends to file information designated as confidential by another party, at least 24 hours before the filing, the filing party shall reasonably identify the material to be filed, discussed, or referenced. Within 24 hours of receipt of the identification, the designating party must confirm in writing that a motion to seal is warranted, provide a redacted copy of the material that can be filed without sealing, or remove the confidential designation. Local Civil Rule 5(g) sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal. It will be the responsibility of the designating party to file a response that satisfies the requirements of Local Civil Rule 5(g)(3)(B).

7.     DESIGNATING PROTECTED MATERIAL

7.1     Exercise of Restraint and Care in Designating Material for Protection. Each party or non-party that designates information or items for protection under this agreement must take care to limit any such designation to specific material that qualifies under the appropriate standards. The designating party must designate for protection only those parts of material,

documents, items, or oral or written communications that qualify, so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this agreement.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or delay the case development process or to impose unnecessary expenses and burdens on other parties) expose the designating party to sanctions.

If it comes to a designating party's attention that information or items that it designated for protection do not qualify for protection, the designating party must promptly notify all other parties that it is withdrawing the mistaken designation.

7.2 <u>Manner and Timing of Designations</u>. Except as otherwise provided in this agreement (see, e.g., second paragraph of paragraph 7.2(a) below), or as otherwise stipulated or ordered, disclosure or discovery material that qualifies for protection under this agreement must be clearly so designated before or when the material is disclosed or produced.

(a) Information in documentary form: (e.g., paper or electronic documents and deposition exhibits, but excluding transcripts of depositions or other pretrial or trial proceedings), the designating party must affix the designation "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" to each page that contains confidential material. If only a portion or portions of the material on a page qualifies for protection, the producing party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

A party or non-party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting party has indicated which material it would like copied and produced. During the inspection and before the designation, all the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or, for source code related materials, "HIGHLY CONFIDENTIAL – SOURCE CODE." After the inspecting party has identified the documents it wants copied and produced, the producing party must determine which documents, or portions

thereof, qualify for protection under this Order. Then, before producing the specified documents, the producing party must affix the appropriate designation in the manner described above.

(b) Testimony given in deposition or in other pretrial proceedings: the parties and any participating non-parties may identify on the record, during the deposition or other pretrial proceeding, all protected testimony, without prejudice to their right to so designate other testimony after reviewing the transcript. The parties shall treat each transcript containing testimony as HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY until 15 days after receiving the final transcript. Any party or non-party may, within fifteen days after receiving the final transcript of the deposition or other pretrial proceeding, designate the transcript, portions thereof, or exhibits thereto, as confidential. If a party or non-party desires to protect confidential information at trial, the issue should be addressed during the pre-trial conference.

(c) Other tangible items: the producing party must affix in a prominent place on the exterior of the container or containers in which the information or item is stored the designation "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" as appropriate. If only a portion or portions of the information or item warrant protection, the producing party, to the extent practicable, shall identify the protected portion(s).

7.3     Inadvertent Failures to Designate.     Inadvertent or unintentional production of documents, information or material without a confidentiality designation shall not be deemed a waiver in whole or in part of a claim for confidential treatment. Any party that produces material qualifying for confidential treatment under this order without designating it, may request destruction of that material by notifying the receiving party after the producing party becomes aware of the disclosure, and providing replacement material that is properly designated. The receiving party shall then destroy all copies of the material that does not bear the correct designation.

8.     CHALLENGING CONFIDENTIALITY DESIGNATIONS

8.1     Timing of Challenges.     Any party or non-party may challenge a designation of confidentiality at any time. A party does not waive its right to challenge a confidentiality

designation by electing not to mount a challenge promptly after the original designation is disclosed.

8.2     Meet and Confer.  The parties must make every attempt to resolve any dispute regarding confidential designations without court involvement.   Any motion regarding confidential designations or for a protective order must include a certification, in the motion or in a declaration or affidavit, that the movant has engaged in a good faith meet and confer conference with other affected parties in an effort to resolve the dispute without court action.  The certification must list the date, manner, and participants to the conference.  A good faith effort to confer requires a face-to-face meeting or a telephone conference.

8.3     Judicial Intervention.   If the parties cannot resolve a challenge without court intervention, the designating party may file and serve a motion to retain confidentiality under Local Civil Rule 7 (and in compliance with Local Civil Rule 5(g), if applicable).   The burden of persuasion in any such motion shall be on the designating party.  Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the challenging party to sanctions.  All parties shall continue to maintain the material in question as confidential until the court rules on the challenge.

9.     PROSECUTION BAR

Absent written consent from the producing party, any individual who receives access to HIGHLY  CONFIDENTIAL  –  ATTORNEYS'  EYES  ONLY  material  or  HIGHLY CONFIDENTIAL – SOURCE CODE material shall not be involved in the prosecution of patents or patent applications directed to interactive entertainment, virtual worlds, or game engines, including without limitation the patents asserted in this action and any patent or application claiming priority to or otherwise related to the patents asserted in this action, before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office").  For purposes of this paragraph, "prosecution" includes drafting, amending, advising, or otherwise affecting the scope or maintenance of patent claims.  To avoid any doubt, this paragraph does not preclude an individual from representing a party challenging or defending a patent before a  domestic  or  foreign  agency  (including,  but  not  limited  to,  a  reissue  protest,  ex  parte

reexamination or inter partes review or reexamination)—however, in the case where the individual is defending a patent before a domestic or foreign agency, while that individual may participate in the defense of the patent, that individual may not suggest, review, direct, or prepare any claim amendments. This Prosecution Bar shall begin when access to the Highly Confidential Attorneys' Eyes Only material or Highly Confidential Source Code material is first received by the affected individual and shall end two (2) years after the receiving individuals involvement with this action ends or two (2) years after final termination of this action, whichever comes first.

10.   SOURCE CODE

10.1   To the extent production of confidential source code becomes necessary in this case, a producing party may designate confidential source code as "HIGHLY CONFIDENTIAL – SOURCE CODE" in accordance with paragraph 4 above.

10.2   Access to a party's confidential source code shall be provided only to approved individuals pursuant to paragraph 6.4, on "stand-alone" computer(s) (that is, the computer may not be linked to any network, including a local area network ("LAN"), an intranet or the Internet). The stand-alone computer(s) will be connected to a printer (printouts shall be made as specified in paragraph 10.7 below). The stand-alone computer(s) shall have an external mouse and an additional monitor both to be provided by or at the expense of the receiving party. The stand-alone computer(s) will be placed in a secured room at the corporate offices of the producing party, at the office of the producing party's outside counsel, or other location as agreed upon by the parties. The producing party shall make its best effort to make a breakout room available within a reasonable distance to the secured room where the receiving party may use the internet and personal electronic devices. No recordable media, recordable devices, computers, cell phones, or other electronic devices may be brought into the secured room. The person(s) conducting the confidential source code review for the receiving party shall be permitted to take notes relating to the confidential source code, but the notes may not include any verbatim copying of the confidential source code into the notes. In addition, all such notes will be taken on bound (spiral or other type of permanently bound) paper notebooks. The receiving party may not bring loose paper or other paper that can be used in a printer into the secure room. No copies of all or any

portion of the confidential source code may leave the room in which the confidential source code is inspected except as otherwise provided herein. The producing party shall also be entitled to have a person who is not an attorney visually monitor, from outside of the secured room, the receiving party's actions in the secured room to ensure compliance with the provisions of this agreement governing confidential source code, provided, however, that said person shall not be permitted to view, from outside the secured room, the screen of the stand-alone computer(s), shall not be permitted to view any work product generated by the receiving party's representative(s), and the producing party shall not install any keystroke or other monitoring software on the stand-alone computer(s).

10.3    The receiving party shall make reasonable efforts to restrict its requests for such access to the stand-alone computer(s) to normal business hours, which for purposes of this paragraph shall be 8:30 a.m. through 5:30 p.m. local time. However, upon reasonable notice from the receiving party, the producing party shall make reasonable efforts to accommodate the receiving party's request for access to the stand-alone computer(s) outside of normal business hours. The parties agree to cooperate in good faith such that maintaining the producing party's confidential source code at its corporate offices or other location agreed to by the parties shall not unreasonably hinder the receiving party's ability to efficiently and effectively conduct the prosecution or defense of this Action. The parties likewise agree to cooperate in good faith to avoid the necessity to conduct inspections over weekends and holidays unless necessary, and shall meet and confer concerning any such requests.

10.4    The producing party shall provide the receiving party with information explaining how to start, log on to, and operate the stand-alone computer(s) in order to access the produced confidential source code on the stand-alone computer(s).

10.5    The producing party will produce confidential source code in computer searchable format on the stand-alone computer(s) as described above.

10.6    A receiving party may include excerpts of confidential source code in a pleading, exhibit, expert report, infringement contentions, discovery document, deposition transcript, other Court document, provided that such materials are appropriately marked under this Order, restricted

to those who are entitled to have access to them as specified in paragraph 6.4, and, if filed with the Court, filed under seal in accordance with the Court's rules, procedures and orders. To the extent portions of confidential source code are quoted or reproduced in a document pursuant to the above, confidential source code not cited or relied upon must be redacted and, either (1) the entire document will be stamped and treated as HIGHLY CONFIDENTIAL – SOURCE CODE or (2) those pages containing quoted or reproduced confidential source code will be separately stamped and treated as HIGHLY CONFIDENTIAL – SOURCE CODE.

      10.7    The stand-alone computer(s) shall be equipped with a high-speed laser printer (with commercially reasonable printing speeds) to print copies of the confidential source code. The receiving party shall be permitted to print a reasonable number of pages of confidential source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the confidential source code other than electronically as set forth in paragraph (a) in the first instance. Printouts shall be designated and clearly labeled "HIGHLY CONFIDENTIAL – SOURCE CODE." Printouts shall be limited to 500 total pages of source code, with no contiguous block greater than 50 pages. The receiving party may request to print additional pages or longer contiguous blocks beyond the aforementioned limits and the parties will meet and confer in good faith regarding such a request. If an agreement cannot be reached, the burden shall be on the receiving party to demonstrate that such printed portions are no more than is reasonably necessary for a permitted purpose and not merely printed for the purposes of review and analysis elsewhere. Printed source code pages shall not be removed from the secured room by the receiving party, but shall instead be left in the secured room at the end of the review day. Within three (3) business days of the review day on which the pages were printed, the producing party shall either raise an objection in accordance with this paragraph or else Bates-stamp the printed pages, label them "HIGHLY CONFIDENTIAL – SOURCE CODE," and produce them. The receiving party's outside counsel may make no more than two (2) additional paper copies of any portions of the confidential source code, not including copies attached to court filings or used at depositions or attached to expert reports. The receiving party shall be permitted to print the folder structures, if

any, containing the confidential source code, including the filenames contained therein. Such printout of the folder structure shall be clearly labeled "HIGHLY CONFIDENTIAL – SOURCE CODE," and such printout shall not count against the aforementioned page limits.

10.8 The receiving party shall maintain a log of all paper copies of the confidential source code including the names of the custodian(s) or location(s) where the paper copies are stored when the paper copies are not in use. No more than a total of ten (10) individuals identified by the receiving party shall have access to the printed portions of confidential source code (except insofar as such code appears in any court filing or expert report). The receiving party shall provide a copy of this log to the producing party upon request.

10.9 No additional written or electronic copies of confidential source code beyond the additional copies provided in paragraph 10.7 shall be made without prior written consent of the producing party, except as provided in paragraphs 10.6 through 10.8 above and as necessary to create documents which, pursuant to the Court's rules, procedures and order, must be filed or served electronically.

10.10 Proper identification of all authorized persons shall be provided prior to any access to the secure room or the computer(s) containing confidential source code. Proper identification requires showing, at a minimum, a photo identification card sanctioned by the government of any State of the United States or, by the government of the United States. Access to the secure room or the confidential source code computer(s) may be denied, at the discretion of the producing party, to any individual who fails to provide proper identification until such proper identification is provided.

10.11 If the receiving party's outside counsel, consultants, experts, or any other authorized person obtain printouts or photocopies of confidential source code, the receiving party shall ensure that such outside counsel, consultants, experts, or person keeps the printouts or photocopies in a secured locked area in the offices of such outside counsel. The receiving party may also temporarily keep the printouts or photocopies in a secured location under lock and key at: (i) the Court for any proceedings(s) relating to the confidential source code, for the dates associated with the proceeding(s); (ii) the sites where any deposition(s) relating to the confidential

source code are taken, for the dates associated with the deposition(s); and (iii) any secure intermediate location reasonably necessary to transport the printouts or photocopies.

10.12   A producing party's confidential source code may only be transported by the receiving party at the direction of outside counsel, on paper via secure and reliable hand carry. Confidential source code may not be transported or transmitted electronically over a network of any kind, including a LAN, an intranet, or the Internet except as provided in paragraph 10.6 above and as necessary to create documents which, pursuant to the Court's rules, procedures and order, must be filed or served electronically.

10.13   The producing party shall install a reasonable number of non-redundant commercially available software tools of the receiving party's choice for viewing and searching confidential source code on the confidential source code computers at the requested date and time of inspection, provided, however, that such other software tools are in compliance with all of the terms, conditions, and protections herein.   Software tools may include, but are not limited to, Eclipse, Microsoft Visual Studio, Source-Navigator, PowerGrep, ExamDiff Pro, Understand, Notepad++, Windows GREP, dtSearch, Beyond Compare, Crimson Editor, or similar programs. In no event shall the receiving party use said software tools to compile the confidential source code or otherwise attempt to execute the confidential source code.   At least five (5) business days in advance of the inspection, the receiving party must provide the producing party with the software tool(s) either via a CD or DVD containing such software tool(s) or directions for downloading the software tool(s).   The receiving party is responsible for the cost of and for obtaining any necessary licenses for any such software tool(s).   The software tool(s) provided by the receiving party shall not be modified by the producing party prior to or after installation; and

10.14   The receiving party's outside counsel and retained experts or consultants otherwise allowed to view confidential source code shall be entitled to take notes relating to the confidential source code provided, however, that no one may copy confidential source code into said notes. No provision in this Protective Order gives the producing party the right to inspect or review any notes and/or other work product of the receiving party.   However, if the producing party has good cause to believe that the provisions of this Protective Order have been violated, then the producing

party may request that the Court conduct an in-camera review of said notes.

11. <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION</u>

If a party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," OR "HIGHLY CONFIDENTIAL – SOURCE CODE," that party must:

(a) promptly notify the designating party in writing and include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this agreement. Such notification shall include a copy of this agreement;

(c) not produce the designating party's confidential material until either: (1) the designating party provides its consent in writing; (2) fourteen days has passed since the notification to the designating party without any response from the designating party; or (3) if the designating party objects and indicates that it intends to seek a protective order shielding the designated material from production, the request has been resolved against the designating party;

(d) cooperate with respect to all reasonable procedures sought to be pursued by the designating party whose confidential material may be affected.

12. <u>UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL</u>

If a receiving party learns that, by inadvertence or otherwise, it has disclosed confidential material to any person or in any circumstance not authorized under this agreement, the receiving party must immediately (a) notify in writing the designating party of the unauthorized disclosures, (b) retrieve all unauthorized copies of the protected material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this agreement, and (d) request that such person or persons execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

13.  **INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL**

When a producing party gives notice to receiving parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the receiving parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B).  The producing party must provide a privilege log for the clawed back material within five (5) days of giving notice to the receiving party of the inadvertent production and claim of privilege.  This provision is not intended to modify whatever procedure may be established in an e-discovery order or agreement that provides for production without prior privilege review.  The parties agree to the entry of a non-waiver order under Fed. R. Evid. 502(d) as set forth herein.

14.  **MATERIAL PRODUCED BY THIRD PARTIES**

Third parties who produce documents in this litigation, whether pursuant to subpoena or voluntarily, may designate documents in accordance with this Agreement, and documents so designated shall receive the full protection of this Agreement as if produced by one of the parties to this matter.

15.  **NON TERMINATION AND RETURN OF DOCUMENTS**

Within 60 days after the termination of this action, including all appeals, each receiving party must return all confidential material to the producing party, including all copies, extracts and summaries thereof.  Alternatively, the parties may agree upon appropriate methods of destruction.

Notwithstanding this provision, counsel are entitled to retain one archival copy of all documents filed with the court, trial, deposition, and hearing transcripts, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain confidential material.

The confidentiality obligations imposed by this agreement shall remain in effect until a designating party agrees otherwise in writing or a court orders otherwise.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

Dated:  March 15, 2022

Respectfully submitted,

By:   /s/ Jessica M. Andrade
       Jessica M. Andrade (WSBA No. 39297)
       **POLSINELLI PC**
       1000 Second Avenue, Suite 3500
       Seattle, WA  98104
       Tel:  206-393-5400
       Fax: 206-393-5401
       Email: jessica.andrade@polsinelli.com

       Mark Deming (*pro hac vice*)
       **POLSINELLI PC**
       150 N. Riverside Place, Suite 3000
       Chicago, IL  60606
       Tel: 312-819-1900
       Fax: 312-819-1901
       Email: mdeming@polsinelli.com

*Of Counsel:*

Colby B. Springer (admitted *pro hac vice*)
Melenie Van (admitted *pro hac vice*)
**POLSINELLI LLP**
Three Embarcadero Center, Suite 2400
San Francisco, CA  94111
Tel:  415-248-2100
Fax: 415-248-2101
Email: cspringer@polsinelli.com
Email: mvan@polsinelli.com

       Enes Ovcina (*pro hac vice*)
       **POLSINELLI PC**
       1000 Louisiana Street, Suite 6400
       Houston, TX  77002
       Tel: 713-374-1600
       Fax: 713-374-1601
       Email: eovcina@polsinelli.com

       Attorneys for Plaintiff
       UTHERVERSE GAMING LLC

Dated:  March 15, 2022

By:  */s/ Matthaeus Martino-Weinhardt*

Matthaeus Martino-Weinhardt (*pro hac vice*)
mweinhardt@durietangri.com

Mark A. Lemley (*pro hac vice*)
mlemley@durietangri.com
Eugene Novikov (*pro hac vice*)
enovikov@durietangri.com
Timothy C. Saulsbury (*pro hac vice*)
tsaulsbury@durietangri.com
Bethany D. Bengfort (*pro hac vice*)
bbengfort@durietangri.com
Nari E.C. Ely (*pro hac vice*)
nely@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: (415) 362-6666
Facsimile: (415) 236-6300

Attorneys for Defendant
EPIC GAMES, INC.

Dated:  March 15, 2022

By: */s/ Antoine M. McNamara*

Antoine M. McNamara (WSBA No. 41701)
Christina J. McCullough (WSBA No. 47147)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206-359-8000
Facsimile: 206-359-9000
Email: AMcNamara@perkinscoie.com
Email: CMcCullough@perkinscoie.com

Attorneys for Defendant
EPIC GAMES, INC.

PURSUANT TO STIPULATION, IT IS SO ORDERED

IT IS FURTHER ORDERED that pursuant to Fed. R. Evid. 502(d), the production of any documents in this proceeding shall not, for the purposes of this proceeding or any other federal or state proceeding, constitute a waiver by the producing party of any privilege applicable to those documents, including the attorney-client privilege, attorney work-product protection, or any other privilege or protection recognized by law.

DATED:     March 21, 2022

_____

Theresa L. Fricke
United States Magistrate Judge

## EXHIBIT A

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of

_____ [print or type full address], declare under penalty of

perjury that I have read in its entirety and understand the Stipulated Protective Order that was

issued by the United States District Court for the Western District of Washington on _____

in the case of *Utherverse Gaming, LLC v. Epic Games Inc.*, Case No. 2:21-cv-00799-RSM-TLF.

I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I

understand and acknowledge that failure to so comply could expose me to sanctions and

punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner

any information or item that is subject to this Stipulated Protective Order to any person or entity

except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the

Western District of Washington for the purpose of enforcing the terms of this Stipulated Protective

Order, even if such enforcement proceedings occur after termination of this action.


Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____

THE HONORABLE THERESA L. FRICKE

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| UTHERVERSE GAMING, LLC,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>EPIC GAMES, INC.,<br><br>　　　　　　Defendant. | CASE NO. 2:21-cv-00799<br><br>**STIPULATED<br>PROTECTIVE ORDER**<br><br>**NOTE ON MOTION<br>CALENDAR: MARCH 15, 2022** |

1. <u>PURPOSES AND LIMITATIONS</u>

　　　Discovery in this action is likely to involve production of confidential, proprietary, or private information for which special protection may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this agreement is consistent with LCR 26(c). It does not confer blanket protection on all disclosures or responses to discovery, the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles, and it does not presumptively entitle parties to file confidential information under seal.

**Durie Tangri LLP**, 217 Leidesdorff Street,
San Francisco, CA, Tel: 415-362-6666

2.   <u>"CONFIDENTIAL" MATERIAL</u>

"CONFIDENTIAL" material shall include documents and tangible things produced or otherwise exchanged that contain or reflect information that is confidential, proprietary and/or commercially sensitive, in particular:

    i.      information about the producing party's product development, design, or specifications for products or services made available to third parties;

    ii.      information the producing party is obligated by law or by contract to maintain in confidence;

    iii.      accounting/financial information, books, and records that are not made public;

    iv.      sales information about commercial products that are not made public, including information on pricing and sales volumes;

    v.      customer information and data;

    vi.      business and marketing plans, strategies, analyses, or surveys;

    vii.      information on producing party's competitors and competitive environment;

    viii.      contracts and agreements or any draft, negotiations, or summaries thereof;

    ix.      information that is subject to the privacy interest of any individual (e.g., medical records, financial information, etc.).

3.   <u>"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL</u>

"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" material is CONFIDENTIAL material that includes extremely commercially sensitive information, disclosure of which to another party or non-party would create a substantial risk of serious harm that could not be avoided by less restrictive means.  Such information shall include but is not limited to trade secrets; confidential research and development; any non-public financial, technical, marketing, pricing and revenue information; and any other commercially sensitive trade secret information.

4.   <u>"HIGHLY CONFIDENTIAL – SOURCE CODE" MATERIAL</u>

"HIGHLY CONFIDENTIAL – SOURCE CODE" material is CONFIDENTIAL material that includes confidential source code and associated comments, revision histories, and other accompanying documentation contained within source code files, disclosure of which to another

party or non-party would create a substantial risk of serious harm that could not be avoided by less restrictive means. The restrictions herein on confidential source code do not apply to publicly-available source code (e.g., code available as open source code).

5.    SCOPE

The protections conferred by this agreement cover not only confidential material (as defined above), but also (1) any information copied or extracted from confidential material; (2) all copies, excerpts, summaries, or compilations of confidential material; and (3) any testimony, conversations, or presentations by parties or their counsel that might reveal confidential material.

However, the protections conferred by this agreement do not cover information that is in the public domain or becomes part of the public domain through trial or otherwise.

6.    ACCESS TO AND USE OF CONFIDENTIAL MATERIAL

6.1    Basic Principles.  A receiving party may use confidential material that is disclosed or produced by another party or by a non-party in connection with this case only for prosecuting, defending, or attempting to settle this litigation.  CONFIDENTIAL material may be disclosed only to the categories of persons and under the conditions described in this agreement. CONFIDENTIAL material must be stored and maintained by a receiving party at a location and in a secure manner that ensures that access is limited to the persons authorized under this agreement.

6.2    Disclosure of "CONFIDENTIAL" Information or Items.  Unless otherwise ordered by the court or permitted in writing by the designating party, a receiving party may disclose any confidential material only to:

(a)    the receiving party's counsel of record in this action, as well as employees of counsel to whom it is reasonably necessary to disclose the information for this litigation;

(b)    the officers, directors, and employees (including in house counsel) of the receiving party to whom disclosure is reasonably necessary for this litigation;

(c)    experts, consultants, and mock jurors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

STIPULATED PROTECTIVE ORDER - 3
(CASE NO. 2:21-CV-00799-RSM-TLF)

**Durie Tangri LLP**, 217 Leidesdorff Street,
San Francisco, CA, Tel: 415-362-6666

(d)    the court, court personnel, and court reporters and their staff;

(e)    copy or imaging services or e-discovery vendors retained by counsel to assist in the duplication of confidential material, provided that counsel for the party retaining the copy or imaging service instructs the service not to disclose any confidential material to third parties and to immediately return all originals and copies of any confidential material;

(f)    during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the designating party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal confidential material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this agreement;

(g)    the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

6.3    <u>Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Materials</u>. Unless otherwise ordered by the court or permitted in writing by the designating party, a receiving party may disclose any HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY materials only to:

(a)    the receiving party's counsel of record in this action (but not employees, officers, or affiliates of a Party), as well as employees of counsel to whom it is reasonably necessary to disclose the information for this litigation;

(b)    experts, consultants, and mock jurors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c)    the court, court personnel, and court reporters and their staff;

(d)    copy or imaging services or e-discovery vendors retained by counsel to assist in the duplication of confidential material, provided that counsel for the party retaining the copy or imaging service instructs the service not to disclose any confidential material to third parties and to immediately return all originals and copies of any confidential material;

(e)     the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

6.4     Disclosure of "HIGHLY CONFIDENTIAL – SOURCE CODE ONLY" Materials. Unless otherwise ordered by the court or permitted in writing by the designating party, a receiving party may disclose any HIGHLY CONFIDENTIAL – SOURCE CODE materials pursuant to Section 8.5 of this Order only to:

(a)     the receiving party's counsel of record in this action (but not employees, officers, or affiliates of a party), as well as employees of counsel to whom it is reasonably necessary to disclose the information for this litigation;

(b)     up to four experts or consultants to whom disclosure is reasonably necessary for this litigation, who have been specifically designated by the receiving party to receive HIGHLY CONFIDENTIAL – SOURCE CODE materials, and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c)     the court, court personnel, and court reporters, provided that the court reporters have agreed to keep the material confidential under the terms of this Agreement;

(d)     at their depositions or on the witness stand, employees of the producing party who authored or are otherwise familiar with the HIGHLY CONFIDENTIAL – SOURCE CODE materials and/or who have been designated by the producing party to provide testimony about the HIGHLY CONFIDENTIAL – SOURCE CODE materials.

Notwithstanding the above, a receiving party may include excerpts of HIGHLY CONFIDENTIAL – SOURCE CODE material in pleadings, exhibits, expert reports, and discovery materials in accordance with the procedures set forth in Section 10.6 below.

In no event will contract attorneys be given access to HIGHLY CONFIDENTIAL – SOURCE CODE material.

6.5     Procedures for Approving or Objecting to Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" material:

(a)     Unless otherwise ordered by the court or agreed to in writing by the

designating party, a party that seeks to disclose to an expert or consultant any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" pursuant to paragraph 6.3(b) or 6.4(b) first must make a written request to the designating party that (1) identifies what category of information, whether it is "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE," that the receiving party seeks permission to disclose to the expert or consultant, (2) sets forth the full name of the expert or consultant and the city and state of his or her primary residence, (3) attaches a copy of the expert or consultant's current resume, (4) identifies the expert or consultant's current employer(s), (5) to the extent non-confidential and not privileged, identifies each person or entity from whom the expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years, and (6) identifies (by name and number of the case, filing date, and location of court) any litigation in connection with which the Expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.

(b)     A party that makes a request and provides the information specified in the preceding respective paragraphs may disclose the subject protected material to the identified expert or consultant unless, within 7 days of delivering the request, the party receives a written objection from the designating party.  Any such objection must set forth in detail the grounds on which it is based.

(c)     A party that receives a timely written objection must meet and confer with the designating party to try to resolve the matter by agreement within seven days of the written objection.  If no agreement is reached, the party seeking to make the disclosure to the expert or consultant may seek a conference with the Court pursuant to the Court's Order at Dkt. No. 19 and, if necessary, file a motion as provided in Local Civil Rule 7 seeking permission from the court. Any such motion must describe the circumstances with specificity, set forth in detail the reasons why the disclosure to the expert or consultant is reasonably necessary, assess the risk of harm that the disclosure would entail, and suggest any additional means that could be used to reduce that

risk.  In addition, any such motion must be accompanied by a competent declaration describing the parties' efforts to resolve the matter by agreement (i.e., the extent and the content of the meet and confer discussions) and setting forth the reasons advanced by the designating party for its refusal to approve the disclosure.  In any such proceeding, the party opposing disclosure to the expert or consultant shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the receiving party's need to disclose the protected material to its expert or consultant.

(d)     This section does not apply to disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" material pursuant to paragraph 6.3(b) to jury consultants, mock trial consultants, or mock jurors.

6.6     <u>Filing Confidential Material</u>.  Before filing confidential material or discussing or referencing such material in court filings, the filing party shall confer with the designating party, in accordance with Local Civil Rule 5(g)(3)(A), to determine whether the designating party will remove the confidential designation, whether the document can be redacted, or whether a motion to seal or stipulation and proposed order is warranted.  When the filing party intends to file information designated as confidential by another party, at least 24 hours before the filing, the filing party shall reasonably identify the material to be filed, discussed, or referenced.  Within 24 hours of receipt of the identification, the designating party must confirm in writing that a motion to seal is warranted, provide a redacted copy of the material that can be filed without sealing, or remove the confidential designation.  Local Civil Rule 5(g) sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.  It will be the responsibility of the designating party to file a response that satisfies the requirements of Local Civil Rule 5(g)(3)(B).

7.     <u>DESIGNATING PROTECTED MATERIAL</u>

7.1     <u>Exercise of Restraint and Care in Designating Material for Protection</u>.  Each party or non-party that designates information or items for protection under this agreement must take care to limit any such designation to specific material that qualifies under the appropriate standards. The designating party must designate for protection only those parts of material,

documents, items, or oral or written communications that qualify, so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this agreement.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or delay the case development process or to impose unnecessary expenses and burdens on other parties) expose the designating party to sanctions.

If it comes to a designating party's attention that information or items that it designated for protection do not qualify for protection, the designating party must promptly notify all other parties that it is withdrawing the mistaken designation.

7.2  <u>Manner and Timing of Designations</u>.  Except as otherwise provided in this agreement (see, e.g., second paragraph of paragraph 7.2(a) below), or as otherwise stipulated or ordered, disclosure or discovery material that qualifies for protection under this agreement must be clearly so designated before or when the material is disclosed or produced.

(a)  Information in documentary form: (e.g., paper or electronic documents and deposition exhibits, but excluding transcripts of depositions or other pretrial or trial proceedings), the designating party must affix the designation "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" to each page that contains confidential material.  If only a portion or portions of the material on a page qualifies for protection, the producing party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

A party or non-party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting party has indicated which material it would like copied and produced.  During the inspection and before the designation, all the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or, for source code related materials, "HIGHLY CONFIDENTIAL – SOURCE CODE."  After the inspecting party has identified the documents it wants copied and produced, the producing party must determine which documents, or portions

thereof, qualify for protection under this Order. Then, before producing the specified documents, the producing party must affix the appropriate designation in the manner described above.

(b)     Testimony given in deposition or in other pretrial proceedings: the parties and any participating non-parties may identify on the record, during the deposition or other pretrial proceeding, all protected testimony, without prejudice to their right to so designate other testimony after reviewing the transcript. The parties shall treat each transcript containing testimony as HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY until 15 days after receiving the final transcript. Any party or non-party may, within fifteen days after receiving the final transcript of the deposition or other pretrial proceeding, designate the transcript, portions thereof, or exhibits thereto, as confidential. If a party or non-party desires to protect confidential information at trial, the issue should be addressed during the pre-trial conference.

(c)     Other tangible items: the producing party must affix in a prominent place on the exterior of the container or containers in which the information or item is stored the designation "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" as appropriate. If only a portion or portions of the information or item warrant protection, the producing party, to the extent practicable, shall identify the protected portion(s).

7.3     Inadvertent Failures to Designate. Inadvertent or unintentional production of documents, information or material without a confidentiality designation shall not be deemed a waiver in whole or in part of a claim for confidential treatment. Any party that produces material qualifying for confidential treatment under this order without designating it, may request destruction of that material by notifying the receiving party after the producing party becomes aware of the disclosure, and providing replacement material that is properly designated. The receiving party shall then destroy all copies of the material that does not bear the correct designation.

8.     CHALLENGING CONFIDENTIALITY DESIGNATIONS

8.1     Timing of Challenges. Any party or non-party may challenge a designation of confidentiality at any time. A party does not waive its right to challenge a confidentiality

STIPULATED PROTECTIVE ORDER - 9
(CASE NO. 2:21-CV-00799-RSM-TLF)

**Durie Tangri LLP**, 217 Leidesdorff Street,
San Francisco, CA, Tel: 415-362-6666

designation by electing not to mount a challenge promptly after the original designation is disclosed.

8.2     Meet and Confer.  The parties must make every attempt to resolve any dispute regarding confidential designations without court involvement.   Any motion regarding confidential designations or for a protective order must include a certification, in the motion or in a declaration or affidavit, that the movant has engaged in a good faith meet and confer conference with other affected parties in an effort to resolve the dispute without court action.  The certification must list the date, manner, and participants to the conference.  A good faith effort to confer requires a face-to-face meeting or a telephone conference.

8.3     Judicial Intervention.  If the parties cannot resolve a challenge without court intervention, the designating party may file and serve a motion to retain confidentiality under Local Civil Rule 7 (and in compliance with Local Civil Rule 5(g), if applicable).   The burden of persuasion in any such motion shall be on the designating party.  Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the challenging party to sanctions.  All parties shall continue to maintain the material in question as confidential until the court rules on the challenge.

9.     PROSECUTION BAR

Absent written consent from the producing party, any individual who receives access to HIGHLY  CONFIDENTIAL  –  ATTORNEYS'  EYES  ONLY  material  or  HIGHLY CONFIDENTIAL – SOURCE CODE material shall not be involved in the prosecution of patents or patent applications directed to interactive entertainment, virtual worlds, or game engines, including without limitation the patents asserted in this action and any patent or application claiming priority to or otherwise related to the patents asserted in this action, before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office").  For purposes of this paragraph, "prosecution" includes drafting, amending, advising, or otherwise affecting the scope or maintenance of patent claims.  To avoid any doubt, this paragraph does not preclude an individual from representing a party challenging or defending a patent before a  domestic  or  foreign  agency  (including,  but  not  limited  to,  a  reissue  protest,  ex  parte

reexamination or inter partes review or reexamination)—however, in the case where the individual is defending a patent before a domestic or foreign agency, while that individual may participate in the defense of the patent, that individual may not suggest, review, direct, or prepare any claim amendments. This Prosecution Bar shall begin when access to the Highly Confidential Attorneys' Eyes Only material or Highly Confidential Source Code material is first received by the affected individual and shall end two (2) years after the receiving individuals involvement with this action ends or two (2) years after final termination of this action, whichever comes first.

10.    SOURCE CODE

10.1    To the extent production of confidential source code becomes necessary in this case, a producing party may designate confidential source code as "HIGHLY CONFIDENTIAL – SOURCE CODE" in accordance with paragraph 4 above.

10.2    Access to a party's confidential source code shall be provided only to approved individuals pursuant to paragraph 6.4, on "stand-alone" computer(s) (that is, the computer may not be linked to any network, including a local area network ("LAN"), an intranet or the Internet). The stand-alone computer(s) will be connected to a printer (printouts shall be made as specified in paragraph 10.7 below). The stand-alone computer(s) shall have an external mouse and an additional monitor both to be provided by or at the expense of the receiving party. The stand-alone computer(s) will be placed in a secured room at the corporate offices of the producing party, at the office of the producing party's outside counsel, or other location as agreed upon by the parties. The producing party shall make its best effort to make a breakout room available within a reasonable distance to the secured room where the receiving party may use the internet and personal electronic devices. No recordable media, recordable devices, computers, cell phones, or other electronic devices may be brought into the secured room. The person(s) conducting the confidential source code review for the receiving party shall be permitted to take notes relating to the confidential source code, but the notes may not include any verbatim copying of the confidential source code into the notes. In addition, all such notes will be taken on bound (spiral or other type of permanently bound) paper notebooks. The receiving party may not bring loose paper or other paper that can be used in a printer into the secure room. No copies of all or any

portion of the confidential source code may leave the room in which the confidential source code is inspected except as otherwise provided herein. The producing party shall also be entitled to have a person who is not an attorney visually monitor, from outside of the secured room, the receiving party's actions in the secured room to ensure compliance with the provisions of this agreement governing confidential source code, provided, however, that said person shall not be permitted to view, from outside the secured room, the screen of the stand-alone computer(s), shall not be permitted to view any work product generated by the receiving party's representative(s), and the producing party shall not install any keystroke or other monitoring software on the stand-alone computer(s).

10.3    The receiving party shall make reasonable efforts to restrict its requests for such access to the stand-alone computer(s) to normal business hours, which for purposes of this paragraph shall be 8:30 a.m. through 5:30 p.m. local time. However, upon reasonable notice from the receiving party, the producing party shall make reasonable efforts to accommodate the receiving party's request for access to the stand-alone computer(s) outside of normal business hours. The parties agree to cooperate in good faith such that maintaining the producing party's confidential source code at its corporate offices or other location agreed to by the parties shall not unreasonably hinder the receiving party's ability to efficiently and effectively conduct the prosecution or defense of this Action. The parties likewise agree to cooperate in good faith to avoid the necessity to conduct inspections over weekends and holidays unless necessary, and shall meet and confer concerning any such requests.

10.4    The producing party shall provide the receiving party with information explaining how to start, log on to, and operate the stand-alone computer(s) in order to access the produced confidential source code on the stand-alone computer(s).

10.5    The producing party will produce confidential source code in computer searchable format on the stand-alone computer(s) as described above.

10.6    A receiving party may include excerpts of confidential source code in a pleading, exhibit, expert report, infringement contentions, discovery document, deposition transcript, other Court document, provided that such materials are appropriately marked under this Order, restricted

STIPULATED PROTECTIVE ORDER - 12
(CASE NO. 2:21-CV-00799-RSM-TLF)

**Durie Tangri LLP**, 217 Leidesdorff Street,
San Francisco, CA, Tel: 415-362-6666

to those who are entitled to have access to them as specified in paragraph 6.4, and, if filed with the Court, filed under seal in accordance with the Court's rules, procedures and orders. To the extent portions of confidential source code are quoted or reproduced in a document pursuant to the above, confidential source code not cited or relied upon must be redacted and, either (1) the entire document will be stamped and treated as HIGHLY CONFIDENTIAL – SOURCE CODE or (2) those pages containing quoted or reproduced confidential source code will be separately stamped and treated as HIGHLY CONFIDENTIAL – SOURCE CODE.

10.7    The stand-alone computer(s) shall be equipped with a high-speed laser printer (with commercially reasonable printing speeds) to print copies of the confidential source code. The receiving party shall be permitted to print a reasonable number of pages of confidential source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the confidential source code other than electronically as set forth in paragraph (a) in the first instance. Printouts shall be designated and clearly labeled "HIGHLY CONFIDENTIAL – SOURCE CODE." Printouts shall be limited to 500 total pages of source code, with no contiguous block greater than 50 pages. The receiving party may request to print additional pages or longer contiguous blocks beyond the aforementioned limits and the parties will meet and confer in good faith regarding such a request. If an agreement cannot be reached, the burden shall be on the receiving party to demonstrate that such printed portions are no more than is reasonably necessary for a permitted purpose and not merely printed for the purposes of review and analysis elsewhere. Printed source code pages shall not be removed from the secured room by the receiving party, but shall instead be left in the secured room at the end of the review day. Within three (3) business days of the review day on which the pages were printed, the producing party shall either raise an objection in accordance with this paragraph or else Bates-stamp the printed pages, label them "HIGHLY CONFIDENTIAL – SOURCE CODE," and produce them. The receiving party's outside counsel may make no more than two (2) additional paper copies of any portions of the confidential source code, not including copies attached to court filings or used at depositions or attached to expert reports. The receiving party shall be permitted to print the folder structures, if

1    any, containing the confidential source code, including the filenames contained therein. Such

2    printout of the folder structure shall be clearly labeled "HIGHLY CONFIDENTIAL – SOURCE

3    CODE," and such printout shall not count against the aforementioned page limits.

4          10.8    The receiving party shall maintain a log of all paper copies of the confidential

5    source code including the names of the custodian(s) or location(s) where the paper copies are

6    stored when the paper copies are not in use. No more than a total of ten (10) individuals identified

7    by the receiving party shall have access to the printed portions of confidential source code (except

8    insofar as such code appears in any court filing or expert report). The receiving party shall provide

9    a copy of this log to the producing party upon request.

10         10.9    No additional written or electronic copies of confidential source code beyond the

11   additional copies provided in paragraph 10.7 shall be made without prior written consent of the

12   producing party, except as provided in paragraphs 10.6 through 10.8 above and as necessary to

13   create documents which, pursuant to the Court's rules, procedures and order, must be filed or

14   served electronically.

15         10.10   Proper identification of all authorized persons shall be provided prior to any access

16   to the secure room or the computer(s) containing confidential source code. Proper identification

17   requires showing, at a minimum, a photo identification card sanctioned by the government of any

18   State of the United States or, by the government of the United States. Access to the secure room

19   or the confidential source code computer(s) may be denied, at the discretion of the producing party,

20   to any individual who fails to provide proper identification until such proper identification is

21   provided.

22         10.11   If the receiving party's outside counsel, consultants, experts, or any other

23   authorized person obtain printouts or photocopies of confidential source code, the receiving party

24   shall ensure that such outside counsel, consultants, experts, or person keeps the printouts or

25   photocopies in a secured locked area in the offices of such outside counsel. The receiving party

26   may also temporarily keep the printouts or photocopies in a secured location under lock and key

27   at: (i) the Court for any proceedings(s) relating to the confidential source code, for the dates

28   associated with the proceeding(s); (ii) the sites where any deposition(s) relating to the confidential

1  source code are taken, for the dates associated with the deposition(s); and (iii) any secure

2  intermediate location reasonably necessary to transport the printouts or photocopies.

3      10.12  A producing party's confidential source code may only be transported by the

4  receiving party at the direction of outside counsel, on paper via secure and reliable hand carry.

5  Confidential source code may not be transported or transmitted electronically over a network of

6  any kind, including a LAN, an intranet, or the Internet except as provided in paragraph 10.6 above

7  and as necessary to create documents which, pursuant to the Court's rules, procedures and order,

8  must be filed or served electronically.

9      10.13  The producing party shall install a reasonable number of non-redundant

10  commercially available software tools of the receiving party's choice for viewing and searching

11  confidential source code on the confidential source code computers at the requested date and time

12  of inspection, provided, however, that such other software tools are in compliance with all of the

13  terms, conditions, and protections herein.  Software tools may include, but are not limited to,

14  Eclipse, Microsoft Visual Studio, Source-Navigator, PowerGrep, ExamDiff Pro, Understand,

15  Notepad++, Windows GREP, dtSearch, Beyond Compare, Crimson Editor, or similar programs.

16  In no event shall the receiving party use said software tools to compile the confidential source code

17  or otherwise attempt to execute the confidential source code.  At least five (5) business days in

18  advance of the inspection, the receiving party must provide the producing party with the software

19  tool(s) either via a CD or DVD containing such software tool(s) or directions for downloading the

20  software tool(s).  The receiving party is responsible for the cost of and for obtaining any necessary

21  licenses for any such software tool(s).  The software tool(s) provided by the receiving party shall

22  not be modified by the producing party prior to or after installation; and

23      10.14  The receiving party's outside counsel and retained experts or consultants otherwise

24  allowed to view confidential source code shall be entitled to take notes relating to the confidential

25  source code provided, however, that no one may copy confidential source code into said notes.

26  No provision in this Protective Order gives the producing party the right to inspect or review any

27  notes and/or other work product of the receiving party.  However, if the producing party has good

28  cause to believe that the provisions of this Protective Order have been violated, then the producing

1  party may request that the Court conduct an in-camera review of said notes.

2  11.    PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER

3  LITIGATION

4        If a party is served with a subpoena or a court order issued in other litigation that compels

5  disclosure of any information or items designated in this action as "CONFIDENTIAL," "HIGHLY

6  CONFIDENTIAL – ATTORNEYS' EYES ONLY," OR "HIGHLY CONFIDENTIAL –

7  SOURCE CODE," that party must:

8        (a)    promptly notify the designating party in writing and include a copy of the

9  subpoena or court order;

10        (b)    promptly notify in writing the party who caused the subpoena or order to

11  issue in the other litigation that some or all of the material covered by the subpoena or order is

12  subject to this agreement.  Such notification shall include a copy of this agreement;

13        (c)    not produce the designating party's confidential material until either: (1) the

14  designating party provides its consent in writing; (2) fourteen days has passed since the notification

15  to the designating party without any response from the designating party; or (3) if the designating

16  party objects and indicates that it intends to seek a protective order shielding the designated

17  material from production, the request has been resolved against the designating party;

18        (d)    cooperate with respect to all reasonable procedures sought to be pursued by

19  the designating party whose confidential material may be affected.

20  12.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

21        If a receiving party learns that, by inadvertence or otherwise, it has disclosed confidential

22  material to any person or in any circumstance not authorized under this agreement, the receiving

23  party must immediately (a) notify in writing the designating party of the unauthorized disclosures,

24  (b) retrieve all unauthorized copies of the protected material, (c) inform the person or persons to

25  whom unauthorized disclosures were made of all the terms of this agreement, and (d) request that

26  such person or persons execute the "Acknowledgment and Agreement to Be Bound" that is

27  attached hereto as Exhibit A.

28

13.    <u>INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED</u>

<u>MATERIAL</u>

       When a producing party gives notice to receiving parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the receiving parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). The producing party must provide a privilege log for the clawed back material within five (5) days of giving notice to the receiving party of the inadvertent production and claim of privilege. This provision is not intended to modify whatever procedure may be established in an e-discovery order or agreement that provides for production without prior privilege review. The parties agree to the entry of a non-waiver order under Fed. R. Evid. 502(d) as set forth herein.

14.    <u>MATERIAL PRODUCED BY THIRD PARTIES</u>

       Third parties who produce documents in this litigation, whether pursuant to subpoena or voluntarily, may designate documents in accordance with this Agreement, and documents so designated shall receive the full protection of this Agreement as if produced by one of the parties to this matter.

15.    <u>NON TERMINATION AND RETURN OF DOCUMENTS</u>

       Within 60 days after the termination of this action, including all appeals, each receiving party must return all confidential material to the producing party, including all copies, extracts and summaries thereof. Alternatively, the parties may agree upon appropriate methods of destruction.

       Notwithstanding this provision, counsel are entitled to retain one archival copy of all documents filed with the court, trial, deposition, and hearing transcripts, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain confidential material.

       The confidentiality obligations imposed by this agreement shall remain in effect until a designating party agrees otherwise in writing or a court orders otherwise.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

Dated:  March 15, 2022

Respectfully submitted,

By:  <u>/s/ Jessica M. Andrade</u>
Jessica M. Andrade (WSBA No. 39297)
**POLSINELLI PC**
1000 Second Avenue, Suite 3500
Seattle, WA  98104
Tel:  206-393-5400
Fax: 206-393-5401
Email: jessica.andrade@polsinelli.com

Mark Deming (*pro hac vice*)
**POLSINELLI PC**
150 N. Riverside Place, Suite 3000
Chicago, IL  60606
Tel:  312-819-1900
Fax: 312-819-1901
Email: mdeming@polsinelli.com

Enes Ovcina (*pro hac vice*)
**POLSINELLI PC**
1000 Louisiana Street, Suite 6400
Houston, TX  77002
Tel:  713-374-1600
Fax: 713-374-1601
Email: eovcina@polsinelli.com

Attorneys for Plaintiff
UTHERVERSE GAMING LLC

*Of Counsel:*

Colby B. Springer (admitted *pro hac vice*)
Melenie Van (admitted *pro hac vice*)
**POLSINELLI LLP**
Three Embarcadero Center, Suite 2400
San Francisco, CA  94111
Tel:  415-248-2100
Fax: 415-248-2101
Email: cspringer@polsinelli.com
Email: mvan@polsinelli.com

Dated: March 15, 2022    By: /s/ Matthaeus Martino-Weinhardt

Matthaeus Martino-Weinhardt (*pro hac vice*)
mweinhardt@durietangri.com

Mark A. Lemley (*pro hac vice*)
mlemley@durietangri.com
Eugene Novikov (*pro hac vice*)
enovikov@durietangri.com
Timothy C. Saulsbury (*pro hac vice*)
tsaulsbury@durietangri.com
Bethany D. Bengfort (*pro hac vice*)
bbengfort@durietangri.com
Nari E.C. Ely (*pro hac vice*)
nely@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: (415) 362-6666
Facsimile: (415) 236-6300

Attorneys for Defendant
EPIC GAMES, INC.

Dated: March 15, 2022

By: /s/ Antoine M. McNamara

Antoine M. McNamara (WSBA No. 41701)
Christina J. McCullough (WSBA No. 47147)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206-359-8000
Facsimile: 206-359-9000
Email: AMcNamara@perkinscoie.com
Email: CMcCullough@perkinscoie.com

Attorneys for Defendant
EPIC GAMES, INC.

PURSUANT TO STIPULATION, IT IS SO ORDERED

IT IS FURTHER ORDERED that pursuant to Fed. R. Evid. 502(d), the production of any documents in this proceeding shall not, for the purposes of this proceeding or any other federal or state proceeding, constitute a waiver by the producing party of any privilege applicable to those documents, including the attorney-client privilege, attorney work-product protection, or any other privilege or protection recognized by law.

DATED: ___March 21, 2022___

_____
Theresa L. Fricke
United States Magistrate Judge

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of

_____ [print or type full address], declare under penalty of

perjury that I have read in its entirety and understand the Stipulated Protective Order that was

issued by the United States District Court for the Western District of Washington on _____

in the case of *Utherverse Gaming, LLC v. Epic Games Inc.*, Case No. 2:21-cv-00799-RSM-TLF.

I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I

understand and acknowledge that failure to so comply could expose me to sanctions and

punishment in the nature of contempt.  I solemnly promise that I will not disclose in any manner

any information or item that is subject to this Stipulated Protective Order to any person or entity

except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the

Western District of Washington for the purpose of enforcing the terms of this Stipulated Protective

Order, even if such enforcement proceedings occur after termination of this action.


Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____