UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UTHERVERSE GAMING LLC,

                Plaintiff,

    v.

EPIC GAMES INC,

                Defendant.

Case No. 2:21-cv-799-RSM-TLF

REPORT AND RECOMMENDATION

NOTED FOR JANUARY 12, 2024

    On June 11, 2021, Utherverse filed a complaint for patent infringement against Epic (Dkt. 1.). Utherverse contends that four *Fortnite* events (the "Accused Events") infringed the '071 Patent and the '605 Patent (collectively, the "Asserted Patents").

    The matter currently before the Court is Epic Games, Inc.'s ("Epic") *Daubert* motion to exclude Utherverse Gaming LLC's ("Utherverse") damages expert, Michele Riley. Dkt. 305 (sealed); Dkt. 309 (unsealed). Utherverse has responded to the motion, and Epic has replied. *See* Dkts. 324; 355. The Court held oral argument on the instant motion on November 21, 2023. Dkt. 364. After careful review of the record and applicable law, the undersigned finds that Epic's motion should be DENIED.

**LEGAL STANDARD**

REPORT AND RECOMMENDATION - 1

I.  Legal Standard for a *Daubert* Motion to Exclude Expert Testimony

"When reviewing damages in patent cases, [the Federal Circuit] appl[ies] regional circuit law to procedural issues and Federal Circuit law to substantive and procedural issues pertaining to patent law." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1347 (Fed. Cir. 2018). In reviewing motions to exclude expert testimony related to patent royalties, the Federal Circuit has applied its own law. *See, e.g.*, *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1373 (Fed. Cir. 2021). Federal Circuit law applies.

Federal Rule of Evidence 702 provides that[1]:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the fact of the case.

As the Federal Circuit has stated, this limitation on the gatekeeping role of the judge with respect to excluding "testimony based on unreliable principles and methods is particularly essential in the context of patent damages." *Apple Inc. v. Motorola Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014). "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above the minimum threshold) may go to the testimony's weight,

---

[1] This recitation of FRE 702 reflects the amended rule that was adopted on December 1, 2023. The amendment clarifies that an expert's qualifications is based on the preponderance of the evidence standard. In anticipation of this amendment, the Court requested the parties to submit supplemental briefing on how, if at all, the changes to FRE 702, as amended, would impact any motions relating to experts. Dkt. 348; Dkt. 360; Dkt. 361.

NOTED FOR JANUARY 12, 2024 - 2

but not its admissibility." *See id*. Where a trial court is faced with a motion exclude an expert's damages opinion, alleging that the expert relied on "unreliable methodology," the Federal Circuit has instructed that it is the role of the trial court to evaluate whether the expert was legally erroneous in his methodology to compute reasonable royalty damages. *Micro Chem., Inc v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).

II.   Legal Standards for Calculating Patent Damages

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Two alternative methods exist for calculating damages in a patent case; they "are the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining." *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1324 (Fed.Cir.2009).

To calculate the reasonable royalty, patentees generally consider a hypothetical negotiation, in which the asserted patent claims are assumed valid, enforceable, and infringed, and attempt "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent,* 580 F.3d at 1324–25; *see also Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1554 n. 13 (Fed.Cir.1995) (en banc).

This hypothetical negotiation "necessarily involves an element of approximation and uncertainty." *Lucent,* 580 F.3d at 1325; *see also Fromson v. Western Litho Plate & Supply Co.,* 853 F.2d 1568, 1574 (Fed.Cir.1988) ("Determining a fair and reasonable royalty is often ... a difficult judicial chore, seeming often to involve more the talents of a

conjurer than those of a judge"). "Still, a reasonable royalty analysis requires a court to hypothesize, not to speculate." *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 869 (Fed.Cir.2010). "A damages theory must be based on 'sound economic and factual predicates.' " *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 67 (Fed.Cir.2012) (quoting *Riles v. Shell Exploration & Prod. Co.,* 298 F.3d 1302, 1311 (Fed.Cir.2002)).

In determining the reasonable royalty that would have been agreed to at the hypothetical negotiation, parties in patent cases frequently utilize the fifteen factors enunciated in *Georgia–Pacific Corp. v. U.S. Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.1970). The Federal Circuit has expressly "sanctioned the use of the *Georgia–Pacific* factors to frame the reasonable royalty inquiry." *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1317 (Fed.Cir.2011).

A hypothetical negotiation can result in either a lump-sum license or a running royalty license. *See Lucent,* 580 F.3d at 1326. A lump-sum license is an up-front payment in full for the invention that involves uncertainty about "whether the technology is commercially successful or even used." *Id.* In contrast, a running royalty license is directly tied to how often the invention is incorporated into products by the licensee and is calculated by multiplying the proposed royalty rate by the proposed royalty base. *See id.* at 1326, 1338–39.

"The burden of proving damages falls on the patentee." *Lucent,* 580 F.3d at 1324. To properly carry this burden, the patentee must sufficiently tie the expert testimony on damages to the facts of the case. *Uniloc,* 632 F.3d at 1315 (citing *Daubert,* 509 U.S. at 591).

III. Michele Riley's Damages Analysis

Ms. Riley's analysis first begins by providing a general overview of the parties' respective industries, the parties themselves and the Accused Events. Dkt. 327, Exhibit A (Michele Riley's Expert Report) at ¶22-97. Ms. Riley explained that, based on her discussions with Dr. Rosenberg, Utherverse's technical expert, she understood that the Asserted Patents involve the ability to allow a large number of participants to connect with others in a virtual computer-generated environment in order to enjoy common virtual experiences. *See id.* at ¶95.

She then calculated the royalty base by determining the revenue attributable to the Accused Events, including microtransaction purchases made by *Fortnite* users using the in-game currency for items specifically made available for the Accused Events through the *Fortnite* Item Shop, incremental revenue attributable to the Accused Events from microtransaction purchases made by *Fortnite* users using the in-game currency through the *Fortnite* Item Shop, and value to Epic of incremental new and returning users as a result of the Accused Events. *See* Dkt. 327 at ¶137-228.

In order to determine the royalty rate, Ms. Riley analyzed Utherverse Digital agreements (*see id.* at ¶245-250, 251-254, 294), including an agreement between ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (*see id.* at ¶260-285).

One of the agreements provided by Epic was between ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. The agreement involved U.S. Patent

NOTED FOR JANUARY 12, 2024 - 5

1   No. 6,720,962 ("'962") and the Ornatrix Maya product. ██████████

2   ██████████████████████████████████████████████████████████████████

3   ██████████████████████████████████████████████████████████████████

4   Ms. Riley described, with respect to each agreement including the ████████, why

5   they would be informative to the parties in this case at a hypothetical negotiation. *See*

6   *id.* at ¶291-293.

7        ████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████████████████

9   ██████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ██████████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████

17       After reviewing multiple data points and analyzing which data points were

18  informative to the parties at a hypothetical negotiation, Ms. Riley provided a royalty rate

19  range of ████████ *Id.* at ¶294. In part relying on a 2020 Royalty Rate Industry

20  Summary from IPSCIO Reports, she specified that ████ is aligned with industry

21  benchmarks *Id.*

                                    **DISCUSSION**
22
        A.  License Comparability
23

24

25

*Georgia–Pacific* factor 1 considers: "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." *Georgia–Pacific,* 318 F.Supp. at 1120. For a damages expert to rely on a prior license, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc,* 632 F.3d at 1317. Therefore, "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit ." *Lucent,* 580 F.3d at 1325.

A patentee may not rely on license agreements that are " 'radically different from the hypothetical agreement under consideration' to determine a reasonable royalty." *Uniloc,* 632 F.3d at 1316 (quoting *Lucent,* 580 F.3d at 1328); *see also, e.g., Wordtech Sys. v. Integrated Networks Solutions, Inc.,* 609 F.3d 1308, 1320 (Fed.Cir. 2010) (declining to find licenses comparable because they "arose from divergent circumstances and covered different material"); *ResQNet.com,* 594 F.3d at 870 (criticizing damages expert for relying on licenses that showed no "discernible link to the claimed technology").

Further, "comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them." *Wordtech,* 609 F.3d at 1320 (quoting *ResQNet,* 594 F.3d at 873); *see also Finjan, Inc. v. Secure Computing Corp.,* 626 F.3d 1197, 1211 (Fed.Cir.2010) ("[U]se of past patent licenses under factors 1 and 2 must account for differences in the technologies and economic circumstances of the contracting parties."). Moreover, "alleging a loose or vague comparability between different

technologies or licenses does not suffice." *LaserDynamics,* 694 F.3d at 79. The testimony of a damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate should be excluded. *See, e.g., Lucent,* 580 F.3d at 1336.

Epic contends that Ms. Riley used the Ephere license as a substitute for apportionment, which was inappropriate because she has not demonstrated how the Ephere license is sufficiently comparable. Specifically, Epic argues that Ms. Riley failed to analyze the technological comparability between the patent from the Ephere license, i.e., the '962 Patent, and the Asserted Patents.

The Court should hold that Ms. Riley has met a showing of *baseline* comparability between the technology related to the Ephere License and the Asserted Patents.

In addition to providing a summary of the '962 Patent and the background of the invention itself, Ms. Riley also discussed the relationship between the patent from the Ephere license and the Asserted Patents. *See* Dkt. 327, Exhibit A at ¶270-274. Ephere is currently in the field of computer graphics and software development and further specializes in "design and implementation of software solutions for computer graphics, film, and games[;] [e]xtension of existing software for providing new functions[; and] [c]onsulting and support in the fields of film and games industry." *Id.* at ¶273. Ms. Riley points out that similar to Epic, Ephere is also in the field of computer graphics and software development, and Epic has incorporated the '962 Patent within its Unreal Engine 4 product.

Under Federal Circuit precedent, Ms. Riley was required to show a *baseline* comparability between the '962 Patent and the Asserted Patents. She has done so in her report. Further exploration of the similarities and differences between the two is a factual, rather than a methodological, exercise and can be addressed on cross examination.

B. Other Comparable Transactions Analysis

Epic claims further than Ms. Riley cannot rely on Epic's internal document regarding payment to an artist of one of the Accused Events, Epic's merchandise agreements, a published industry report, and a Utherverse Digital license agreement to form her royalty base.

With respect to Epic's merchandise agreements and the Utherverse Digital license agreement, the Court finds that these documents provide at least some indica of the appropriate initial royalty rate such that the court cannot say the royalty rate is "so divorced from the facts of this case" as to render Ms. Riley's testimony inadmissible. *See Microsoft Corp. v. Motorola*, 904 F.Supp.2d 1109, 1118 (W.D. Wash. 2012) (finding that for the purposes of a Daubert motion, the license agreements relied upon by the expert were not untied to the facts of the case). The merchandise agreements, for example, were entered into by Epic and certain artists pertaining to the Accused Events. And, the Utherverse Digital agreement in which Utherverse agreed to pay ▮▮▮▮▮▮▮▮ ▮▮▮▮ was used to support her opinion that ▮▮ was an appropriate royalty rate.

With respect to Epic's internal document and the IPSCIO industry report, these were just two of many data points that Ms. Riley used to conduct her royalty rate analysis. She explained the relevance of these documents and why they relate to her royalty rate analysis. *See* Dkt. 327, Exhibit A at ¶294. The degree of comparability is better left for cross-examination as opposed to a *Daubert* motion.

## CONCLUSION

Based on the foregoing discussion, the Court should DENY Epic's motion to exclude Ms. Riley's expert opinion.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on January 12, 2024, as noted in the caption.

Dated this 26th day of December, 2023.

*Theresa L. Fricke*
Theresa L. Fricke
United States Magistrate Judge