# EXHIBIT F

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE WESTERN DISTRICT OF WASHINGTON
 3                         AT SEATTLE
    _____
 4

    UTHERVERSE GAMING LLC,         )
 5                                 )
                   Plaintiff,      )
 6                                 )Case No.
            vs.                    )2:21-cv-00799-RSM-TLF
 7                                 )
    EPIC GAMES, INC.,              )
 8                                 )
                   Defendant.      )
 9  _____
10     VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF
11                     BENJAMIN ELLINGER
12                         VOLUME 2
13         **CONFIDENTIAL - ATTORNEYS' EYES ONLY"
14  _____
15
16                        10:08 A.M.
17                   THURSDAY, JUNE 1, 2023
18             1000 SECOND AVENUE, SUITE 3500
19                    SEATTLE, WASHINGTON
20
21
22
23  REPORTED BY: CARLA R. WALLAT, CRR, RPR
24  WA CCR 2578, OR CSR 16-0443, CA CSR 14423
25  PAGES 263 - 532
```

Page 263

| | |
|---|---|
| 1        A P P E A R A N C E S<br>2<br>3  FOR THE PLAINTIFF:<br>4      COLBY B. SPRINGER<br>5      Polsinelli<br>6      Three Embarcadero Center, Suite 2400<br>7      San Francisco, California 94111<br>8      415.248.2100<br>9      cspringer@polsinelli.com<br>10<br>11<br>12 FOR THE DEFENDANT:<br>13     TIMOTHY CHEN<br>14     Morrison Foerster LLP<br>15     425 Market Street<br>16     San Francisco, California 94105<br>17     415.268.7000<br>18     tsaulsbury@mofo.com<br>19<br>20<br>21<br>22<br>23 ALSO PRESENT: ALAN MORGAN, Videographer<br>24<br>25<br>Page 264 | 1       SEATTLE, WASHINGTON; JUNE 1, 2023<br>2       10:08 A.M.<br>3       --oOo--<br>4<br>5       (Deposition Exhibit 1 was marked.)    09:38<br>6       THE VIDEOGRAPHER: We are going on the    10:07<br>7 record at 10:08 a.m. on June 1st, 2023. Please note    10:07<br>8 that microphones are sensitive and may pick up    10:07<br>9 whispering and private conversations. Please mute your    10:07<br>10 phones at this time. Audio and video recording will    10:07<br>11 continue to take place unless all parties agree to go    10:07<br>12 off the record.    10:07<br>13       This is Media Unit 1 in the video-recorded    10:07<br>14 deposition of Ellinger in the matter of Utherverse    10:07<br>15 Gaming versus Epic Games, Inc., filed in the    10:07<br>16 United States District Court for the Western District    10:08<br>17 of Washington, case number 2:1 -- excuse me,    10:08<br>18 2:21-cv-00799-RSM-TLF.    10:08<br>19       My name is Alan Morgan, representing Veritext,    10:08<br>20 and I'm the videographer. The court reporter is    10:08<br>21 Carla Wallat from the firm Veritext.    10:08<br>22       I'm not authorized to administer an oath. I    10:08<br>23 am not related to any party in this action, nor am I    10:08<br>24 financially interested in the outcome. If there are    10:08<br>25 any objections to proceeding, please state them at the    10:08<br>Page 266 |
| 1       I N D E X<br>2<br>3 EXAMINATION BY:       PAGE(S)<br>4 MR. SPRINGER       267<br>5<br>6<br>7<br>8<br>9<br>10 EXHIBITS FOR IDENTIFICATION       PAGE<br>11 Exhibit 1    April 14, 2023 Expert Report of     266<br>12       Benjamin Ellinger<br>13<br>14<br>15<br>16 REPORTER'S NOTE: All quotations from exhibits are<br>17 reflected in the manner in which they were read<br>18 into the record and do not necessarily indicate an<br>19 exact quote from the document.<br>20<br>21<br>22<br>23<br>24<br>25<br>Page 265 | 1 time of your appearance.    10:08<br>2       Counsel and all present will now state their    10:08<br>3 appearances and affiliations for the record, beginning    10:08<br>4 with the noticing attorney.    10:08<br>5       MR. SPRINGER: Colby Springer from    10:08<br>6 Polsinelli LLP on behalf of the plaintiff Utherverse    10:08<br>7 Gaming LLC.    10:08<br>8       MR. SAULSBURY: You have Tim Saulsbury    10:08<br>9 from the MOFO law firm on behalf of Epic Games.    10:08<br>10       THE VIDEOGRAPHER: Will the court    10:08<br>11 reporter please swear in the witness.    10:08<br>12       BENJAMIN ELLINGER,<br>13   sworn as a witness by the Certified Court Reporter,<br>14       testified as follows:<br>15       EXAMINATION<br>16 BY MR. SPRINGER:<br>17    Q. Mr. Ellinger, before the deposition began, the    10:09<br>18 court reporter handed you Exhibit 1.    10:09<br>19      Do you have Exhibit 1 in front of you?    10:09<br>20    A. I do.    10:09<br>21    Q. And do you know what Exhibit 1 is,    10:09<br>22 Mr. Ellinger?    10:09<br>23    A. I do. It appears to be the -- my -- a copy of    10:09<br>24 my expert report.    10:09<br>25    Q. Okay. And this is your expert report of    10:09<br>Page 267 |

```
 1     Q.  Now, you identify, specifically in           05:02
 2  paragraph 451, a series of other documents purported --   05:02
 3  purportedly related to Massive-3; is that correct?   05:02
 4     A.  Correct.                                      05:02
 5     Q.  This includes an article by Mr. Chris         05:02
 6  Greenhalgh titled, "Applications Of Temporal Links:  05:02
 7  Recording and Replaying Virtual Environments"; is that  05:02
 8  correct?                                             05:02
 9     A.  Correct.                                      05:02
10     Q.  And that bears a date of August of 2002?     05:02
11     A.  Correct.                                      05:02
12     Q.  There's also another article by Mr. Greenhalgh  05:02
13  entitled "Temporal links:  Recording and Replaying   05:03
14  Virtual Environments" that's referred to as Greenhalgh  05:03
15  2; is that also correct?                             05:03
16     A.  Correct.                                      05:03
17     Q.  And that bears a purported publication date of  05:03
18  October 2000; is that correct?                       05:03
19     A.  Correct.                                      05:03
20     Q.  Have you ever spoken to Mr. Greenhalgh?       05:03
21     A.  I have not.                                   05:03
22     Q.  So is your understanding of Massive-3 limited  05:03
23  to your interpretation of the source code and your   05:03
24  readings of these Greenhalgh articles?               05:03
25     A.  In addition to, of course, that the length of  05:03
                                                        Page 496
```

```
 1  my experience as a developer and also based on the   05:03
 2  screenshots, videos and data that are also listed here  05:03
 3  in the documentation.                                05:03
 4     Q.  Okay.  Does the Massive-3 source code standing  05:03
 5  alone anticipate any of the independent -- strike that.  05:03
 6         Does the Massive-3 source code standing alone  05:03
 7  anticipate the asserted claims of the '605 patent?   05:03
 8     A.  Again, hard to say exactly without, you know,  05:03
 9  reviewing it in detail more, could very well.         05:03
10  Certainly, Massive-3, the system as a whole, including  05:03
11  art assets and other things and code does.            05:04
12     Q.  Does the first Chris Greenhalgh article,       05:04
13  Greenhalgh 1, from August of 2002, in your opinion    05:04
14  anticipate each and every element -- strike that.     05:04
15         Each and every asserted claim of the '605     05:04
16  patent?                                              05:04
17     A.  From my understanding, it is not -- it is     05:04
18  evidence that Massive-3 as a whole anticipates it.   05:04
19     Q.  And is it your opinion or do you have an      05:04
20  opinion as to whether Greenhalgh 2, the second       05:04
21  Greenhalgh article published in October 2000, standing  05:04
22  alone, anticipates all of the asserted claims of the  05:04
23  '605 patent?                                         05:04
24     A.  Again, the -- the -- it is evidence that the  05:04
25  Massive-3 system as a whole anticipates all the claims.  05:04
                                                        Page 497
```

```
 1     Q.  So is it your opinion or is it your testimony  05:04
 2  that one must consider the source code in the context  05:04
 3  of both these Greenhalgh articles in order to evidence  05:04
 4  anticipation of the asserted claims of the            05:04
 5  '605 patents?                                         05:05
 6     A.  All the material source code and these        05:05
 7  articles are part of the evidence that Massive-3 as a  05:05
 8  system anticipates the claims.                        05:05
 9     Q.  Now, two of those articles are separated by   05:05
10  more than two years in time.                          05:05
11        Do you see that?                               05:05
12     A.  Yes.                                           05:05
13     Q.  And the source code you're referring to       05:05
14  apparently was changed last in 1999.  Is that also   05:05
15  correct?                                             05:05
16     A.  I cannot swear to the exact date without      05:05
17  seeing the reference.  Yes, last changed in 1999.    05:05
18     Q.  Okay.  Actually for accuracy, I apologize, I  05:05
19  misstated that, it says -- you indicate in the sentence  05:05
20  above that the revisions range from 1997 to 2002.  Is  05:05
21  that correct?                                        05:05
22     A.  Revisions -- indicate the dates of the        05:05
23  revisions, from '97 to 2002, the code I reviewed inside  05:05
24  this report, the particular code file was last changed  05:06
25  and continued to operate that way -- right, so -- so  05:06
                                                        Page 498
```

```
 1  good point, right.  Because I just saw the last change  05:06
 2  in '99.                                              05:06
 3     Q.  Yeah, I did, too.                             05:06
 4     A.  But no.                                        05:06
 5     Q.  Sorry.                                         05:06
 6     A.  Yeah, last change in 2002, but the point being  05:06
 7  that if an individual code file was last changed      05:06
 8  earlier, it would still continue to operate that way  05:06
 9  when Massive-3 was run in 2002.                       05:06
10     Q.  So what is the basis for that opinion?        05:06
11     A.  When we're talking about when a code file was  05:06
12  last changed, it's still part of the Massive system, so  05:06
13  since no changes were made after that point, even when  05:06
14  you run it years after that point, it's going to do the  05:06
15  same thing for one last change because it has no -- it  05:06
16  has not changed.                                      05:06
17     Q.  Did you compile the Massive-3 source code?    05:06
18     A.  I did not.                                     05:06
19     Q.  Did you ever run the Massive-3 source code?   05:06
20     A.  I did not.                                     05:06
21     Q.  Have you ever seen a demonstration of the     05:06
22  virtual reality environment that purports to be the  05:06
23  Massive-3 system running?                             05:06
24     A.  Yeah, not live.  I've seen videos.            05:07
25     Q.  Okay.  Looking to page 215 of your report,    05:07
                                                        Page 499
```

```
 1    Q.  What is an agent in the context of Massive-3?   05:12
 2    A.  It is their term for, say, in -- in Unreal,     05:12
 3  would be called an actor.  It is something that can be   05:12
 4  moved around and displayed.                            05:12
 5    Q.  And where did you -- where did you come from   05:12
 6  that understanding of how Massive-3 refers to an agent   05:13
 7  and what it's inclusive of?                            05:13
 8    A.  By reviewing the source code.                   05:13
 9    Q.  Okay.  So is that apparent through the review   05:13
10  of the Locale.c file that Massive-3 refers to agents as   05:13
11  being inclusive of avatars?                            05:13
12    A.  While without looking at the exact code, I     05:13
13  could not be 100 percent sure that that specific code   05:13
14  file shows that agents are inclusive of avatars.  I    05:13
15  think it does by my memory, but I couldn't say for sure   05:13
16  without referring to it.  If it's not that one, it's   05:13
17  another one because they're -- that's what very much   05:13
18  shows that agents can be player controlled.            05:13
19    Q.  Okay.                                           05:13
20    A.  But I do believe this one actually shows that.   05:13
21    Q.  Was there any disclosure or explanation         05:13
22  consistent with your testimony found in either the     05:13
23  Greenhalgh 1 or Greenhalgh 2 articles with respect to   05:13
24  an agent being an avatar?                              05:14
25    A.  Well, I would have to look through the          05:14
```
Page 504

```
 1  articles in their entirety to see whether there is some   05:14
 2  reference to that.  I do not recall that they talked   05:14
 3  about their internal terminology in the code in those   05:14
 4  articles.                                              05:14
 5       Sometimes people use the same thing in the       05:14
 6  codes when they talk about it, sometimes they don't.   05:14
 7  And so I cannot recall for sure.  They might, but I do   05:14
 8  not recall a specific place where they do.             05:14
 9    Q.  Okay.  You've referenced leaving an instance    05:14
10  if enough budget is purportedly not available.         05:14
11       Do you see that?                                 05:14
12    A.  Yes.                                            05:14
13    Q.  Does leaving an instance constitute being       05:14
14  transported to a new instance?                         05:14
15    A.  It would not have to, right?  You could in     05:14
16  certain situations be returning to a common environment   05:14
17  that was not instanced.  You could have situations     05:14
18  where it forcibly logged you out.  But, of course, it   05:15
19  could also be that you were moved to a new instance.   05:15
20    Q.  But is being dropped from an instance, does    05:15
21  that guarantee or does that imply that I am assigned to   05:15
22  a new one?                                             05:15
23    A.  It implies but does not guarantee.              05:15
24    Q.  Okay.  Turning to paragraph 486 of your         05:15
25  report, Mr. Ellinger, on page 230.                     05:15
```
Page 505

```
 1    A.  I'm there.                                      05:15
 2    Q.  You're referencing Claim 2 of the '605 patent;   05:15
 3  is that correct?                                       05:15
 4    A.  That is correct.                                05:15
 5    Q.  In 486, your theory of infringement -- I'm     05:15
 6  sorry.
 7       Your theory of invalidity is based on            05:15
 8  obviousness; is that correct?                          05:15
 9    A.  Yes.                                            05:15
10    Q.  And to arrive at the proposed obviousness      05:15
11  combination that you disclose at 486, does this require   05:15
12  a modification of the Massive-3 system?                05:16
13    A.  Yes.  It would -- it would not -- you couldn't   05:16
14  just run it as they had and -- and have that happen.   05:16
15    Q.  Do you believe the modification that you       05:16
16  proposed with respect to Massive-3 is consistent with   05:16
17  the overall teachings of Massive-3?                    05:16
18    A.  I believe they are.                             05:16
19    Q.  Why is that?                                   05:16
20    A.  Because the type of experience that they are   05:16
21  attempting to create could be made more engaging, more   05:16
22  immersive if they actually had collision with objects   05:16
23  in the scene.  Wouldn't even have to be full collision,   05:16
24  but at least basic collision, especially with large    05:16
25  environmental objects.                                 05:16
```
Page 506

```
 1    Q.  In rendering your opinion of obviousness with   05:17
 2  respect to Claim 2 of the '605 patent, Mr. Ellinger,   05:17
 3  did you undertake any considerations of teaching away?   05:17
 4    A.  I did.                                          05:17
 5    Q.  And what were those considerations?             05:17
 6    A.  I considered whether that it would -- because   05:17
 7  of the nature of -- of the -- of Massive-3, whether    05:17
 8  it -- it would be something that they wouldn't want to   05:17
 9  do, right, because of their goals or something like    05:17
10  that.  Right, and so I considered that, but I believe   05:17
11  they would want to do this.                            05:17
12    Q.  Why do you believe that?                        05:17
13    A.  Because I believe it would make the user       05:17
14  experiences better which is a clear goal that they     05:17
15  have.                                                  05:17
16    Q.  And how would the proposed change that you set   05:17
17  forth with respect to Claim 2 make the user experience   05:18
18  better?                                                05:18
19    A.  By increasing immersion for the players, users   05:18
20  of the experience, by not having the world seem so    05:18
21  insubstantial and -- and, you know, very virtual,     05:18
22  not -- not mirroring anything resembling their         05:18
23  experience in the real world.                          05:18
24    Q.  Did you undertake any consideration as to      05:18
25  whether your proposed modification would make the      05:18
```
Page 507

62 (Pages 504 - 507)