# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| **UTHERVERSE GAMING LLC,** | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 2:21-CV-0799-RSM-TLF<br>) |
| **EPIC GAMES, INC.,** | )<br>) |
| Defendant. | )<br>) |

# EXPERT REPORT OF
# MICHELE M. RILEY

April 14, 2023

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

19. Based upon my analysis of the evidence made available in this matter, in my opinion, a reasonable royalty rate for the infringing use of the Patents-in-Suit is ▮.

20. I calculated total royalty damages by multiplying the total royalty base ranging between $253.5 million and $413.9 million, which includes revenue attributable to the Accused Events, by the reasonable royalty rate of ▮.[4] This calculation yields total damages ranging between $38.0 million and $62.1 million.[5]

21. I intend to calculate prejudgment interest at the time of trial if asked to do so.

IV. **OVERVIEW OF THE RELEVANT INDUSTRIES**

　A. **VIRTUAL WORLD WEB INDUSTRY / METAVERSE**

22. In an Information Memorandum prepared by Ocean Tomo and circulated in 2019,[6] Ocean Tomo described the industry pertaining to the Patents-in-Suit as follows:[7]

> [T]he Virtual World Web (VWW) system, the next generation World Wide Web – transforming the web from a collection of web pages into an immersive virtual reality universe for business, education and entertainment. The VWW system operates on proprietary infrastructure, designed to be secure, flexible and scalable. A single browser enables navigating the web traditionally, in 3D and in Virtual Reality.
>
> …
>
> The VWW system was designed knowing that VR hardware technology would eventually catch up to the platform software being developed, and would ultimately bring the enormous value of the internet to industries that did not get to fully benefit from the capabilities of the traditional web.

---

[4] *See* Exhibit 1.0.

[5] *See* Exhibit 1.0. If only the '605 Patent is found valid and infringed, the royalty base ranging between $141.3 million and $219.9 million, which includes revenue attributable to only the Astronomical Concert Series and the Rift Tour Concert Series, would be multiplied by the reasonable royalty rate of ▮, to yield total damages ranging between $21.2 million and $33.0 million. (*See* Exhibit 1.1). Based upon my understanding from Dr. Rosenberg that the Patents-in-Suit provide similar economic benefits with respect to Epic's hosting of the Accused Events, the royalty rate would not change if only one of the Patents-in-Suit remained at issue.

[6] FORT0000094-96, at 094. Ocean Tomo was engaged to present for sale the VWW software platform, the Curio virtual reality browser, and all associated intellectual property rights (FORT0000094-96, at 094; FORT0000098-113, at 102).

[7] FORT0000098-113, at 102. *See also* BRIANS_004031-066, at 053.

basis, it is my opinion that a percentage of revenue approach would be acceptable to both Epic and Utherverse Digital.

### E. CALCULATION OF THE ROYALTY BASE

137. This section details my calculation of the royalty base for each of the Accused Events. There have been four Accused Events, starting in February 2019 with the Marshmello Concert Series and ending with the Rift Tour Concert Series in August 2021.

138. The Entire Market Value Rule allows for the recovery of damages based on the value of an entire product or service containing several features when the patented feature constitutes the basis for consumer demand.[320] I have not invoked the Entire Market Value Rule. Instead, I have allocated, when appropriate, the revenue Epic earned from the Accused Events, as required by the Federal Circuit,[321] by only including in the royalty base the incremental revenue that Epic generated as a result of it hosting the Accused Events.

139. I calculate the royalty base by determining the revenue attributable to the Accused Events, including the following:

- Microtransaction purchases made by *Fortnite* users using the in-game currency for items specifically made available for the Accused Events through the *Fortnite* Item Shop; and

- Incremental revenue attributable to the Accused Events from microtransaction purchases made by *Fortnite* users using the in-game currency through the *Fortnite* Item Shop.

- Value to Epic of incremental new users gained as a result of the Accused Events; and

- Value to Epic of incremental returning users gained as a result of the Accused Events.

---

[320] *See, e.g.*, *Lucent Technologies v. Gateway*, 580 F.3d 1301 (Fed. Cir. 2009).
[321] *See, e.g.*, *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308 (Fed. Cir. 2014).

royalty rate from this agreement. In addition, I understand from Dr. Rosenberg that the technology licensed as part of this agreement is less valuable than the technology of the Patents-in-Suit would be to Epic at the hypothetical negotiation.[626] This further indicates that the parties at the hypothetical negotiation would apply upward pressure to the ▮ royalty rate.

294. Overall, I find that the parties would consider the data points of ▮ discussed above would inform the royalty rate reference range determined under the hypothetical negotiation construct. I note that this royalty rate reference range, and specifically ▮ data point, is aligned with industry benchmarks. According to the 2020 Royalty Rate Industry Summary from IPSCIO Reports, the Software industry had an average industry royalty rate of 15% based upon IPSCIO's analysis of 616 technology license agreements as of 2020.[627] Additionally, a document produced by the Plaintiff in this case further corroborates this benchmark. ▮

### C.  THE COST APPROACH

295. The Cost Approach to intangible asset analysis "is based upon the economic principles of substitution and price equilibrium (often called the competitive equilibrium price). These basic economic principles assume that an investor will pay no more for an investment than

---

[626] Discussions with Dr. Rosenberg.
[627] IPSCIO Reports Royalty Rate Industry Summary 2020, pp. 2-3.
[628] According to Brian Shuster, ▮ " (Deposition of Brian Shuster, March 3, 2023, 106:2-11, 169:16-171:18).
[629] Udi_005636-641.