# EXHIBIT D

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

THE HONORABLE RICARDO S. MARTINEZ

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| UTHERVERSE GAMING LLC,<br><br>               Plaintiff,<br><br>   v.<br><br>EPIC GAMES, INC.,<br><br>               Defendant. | Case No. 2:21-cv-00799-RSM-TLF<br><br>**EPIC GAMES, INC.'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO UTHERVERSE GAMING LLC'S FIRST, SECOND, THIRD, AND FOURTH SET OF INTERROGATORIES [NOS. 1-14]** |

virtual worlds.  Utherverse's expert Mr. Crane himself opines that the claims recite the use of "*improved* computer equipment *as had been in use for legacy VRUs*," meaning the same sorts of computer components "had been in use for legacy VRUs."  Crane Report ¶ 120.

Additionally, Epic incorporates by reference Section X of the Expert Report of Benjamin Ellinger, served on April 14, 2023.

**INTERROGATORY NO. 2:**

Describe with full particularity why Defendant contends or will contend that any of the claims of the Asserted Patents are invalid under 35 U.S.C. § 112.

**RESPONSE TO INTERROGATORY NO. 2:**

Epic objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, including the common-interest privilege, or the work product doctrine. Epic expressly reserves the right to supplement its response to this Interrogatory.

Epic further objects that Utherverse has not articulated clear positions regarding the interpretation of claims, including because Utherverse's infringement contentions are deficient and fail to adequately explain Utherverse's theories.  Epic reserves the right to amend this response to assert that claims are invalid for lack of enablement or written description, or for indefiniteness, and to address these requirements in connection with claim construction.

Subject to and without waiving its General or Specific Objections, Epic responds that the Asserted Patents are invalid for at least the reasons articulated in Epic's invalidity contentions, and any supplements thereto, which Epic hereby incorporates.

<u>Enablement</u>

The enablement requirement of 35 U.S.C. § 112 requires that the patentee teach that the alleged invention is useful or operative for its intended purpose.  *See, e.g., In re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1323–24 (Fed. Cir. 2009).  The patentee must do more than simply guess at which "invention" will work, for "[w]hen one of the guesses later proved true, the 'inventor' would be rewarded the spoils instead of the party who demonstrated that the method actually worked."  *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1325 (Fed.

Cir. 2005).  Instead, the patentee must show that the invention works for its intended purpose.  "Claims are not enabled when, at the effective filing date of the patent, one of ordinary skill in the art could not practice their full scope without undue experimentation."  *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013).

With respect to the MMAP Patents (the '071 Patent, '157 Patent, and '954 Patent):

Epic has contended that the asserted claims of the MMAP patents are invalid based on the prior art.  To the extent Utherverse contends that for claims reciting a "common space," it would *not* be obvious based on the knowledge of one of ordinary skill in the art how to combine the disclosures of prior art teaching instancing (including McFarlane, Moraal, or Bernard) with references teaching a virtual space with objects viewable to all players in a given geographic space (including as taught by Muller, Rosedale, Guild Wars, World of Warcraft, and Second Life), the MMAP Patents fail to enable a person of skill in the art to practice the "common space" requirement.  This applies at least to claims 8, 9, 10, and 11 of the '071 Patent, claims 4, 16, and 18 of the '954 Patent, and claims 1, 2, 10, 12, and 13 of the '157 Patent.  In particular, the specifications and claims of the MMAP Patents provide no explanation or detail on how to implement a "common space" in a virtual space with multiple parallel dimensions (instances).  For example, the specification of the '071 Patent states:

> Environment 311 may further comprise one or more common spaces 322 that provide for simultaneous interaction with multiple instances of parallel dimensions 320. For example, a common space may comprise a stage to a club or theater. The interior of the common space may be visible and/or audible in each of the dimensions 321a-d. An avatar or other object in the common space 322 may be able to pass into each of the parallel spaces, being replicated in the process.

'071 Patent, 9:9-16.  To the extent Utherverse argues that it would not be obvious to one of skill in the art how to implement these steps based on the disclosures in the above prior art, or how to modify prior art disclosing instancing to practice these steps, the MMAP Patents are not enabled because they provide no detail on how to implement these steps either.  They merely recite the desired result, such as a common space that may be visible in each of the dimensions, and where

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

an object may be able to pass into each of the parallel instances, but provide no technical detail provided for how to accomplish this result.  For example, the MMAP Patents provide no concrete steps—no instructions or step-by-step discussion of the kind provided by prior art references like McFarlane, Moraal, or Rosedale—to achieve the desired outcome that "at least one object located inside the common space is visible from viewpoints located inside each of the plurality of parallel dimensions."  *E.g.*, '071 Patent, Claim 8; '157 Patent, Claim 1.   To the extent Utherverse contends it was not obvious to one of skill in the art to implement these steps in a virtual world with parallel dimensions (instances), the MMAP Patents would not enable one of skill in the art to do so without undue experimentation.

Epic has also contended that the asserted claims of the MMAP Patents reciting a "template space" are invalid based on prior art.  For example, Claim 7 of the '071 Patent recites "The method of claim 1, further comprising generating the plurality of parallel dimensions as replicas of a template space."  To the extent Utherverse argues that it would not be obvious to one of skill in the art to modify prior art disclosing instances (including at least McFarlane, Moraal, Muller, Bernard, Rosedale, Guild Wars, World of Warcraft) to generate those instances based on a template space (as disclosed at least by El-Nasr), the MMAP Patents fail to enable a person of skill in the art to practice the "replicas of a template space" requirement.  For example, the MMAP Patents do not provide any technical instructions or detail on how to generate an additional instance based on a template space; they merely recite the desired result.  For example: "In an embodiment of the invention, a new parallel dimension may be generated by copying certain elements of an existing space, or by copying a template for an existing space that is reserved in memory for the purpose of generating parallel dimensions when needed."  '071 Patent, 14:24-29.  To the extent Utherverse contends it was not obvious to one of skill in the art based on the disclosures in the cited prior art how to implement these steps in a virtual world with parallel dimensions (instances), the MMAP Patents would not enable one of skill in the art to do so without undue experimentation.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Epic has also contended that asserted claims of the MMAP Patents reciting communication between avatars in different instances are invalid based on prior art.  For example, Claim 8 of the '157 Patent recites "a communication channel between avatars populating different ones of the plurality of parallel instances."  Claim 21 of the '157 Patent and claim 27 of the '954 patent also recite a "communication channel."  At least World of Warcraft and Guild Wars disclose cross-instance communication, specifically through text chat features.  To the extent Utherverse contends that it would not be obvious to one of skill in the art to incorporate those disclosures or to modify certain prior art disclosing parallel instances or shared experiences (including at least McFarlane, Bernard, Muller, Rosedale, and Second Life) to provide such a communication channel, the MMAP Patents fail to enable a person of skill in the art to practice this requirement, instead reciting only the desired result.  For example, the specification of the '157 Patent states that "although parallel dimensions may be animated separately, they are still part of the same environment and may still make use of the same communication tools.  In an embodiment of the invention, therefore, a communication channel may be provided between avatars in different ones of the plurality of dimensions."  '157 Patent, 18:33-38.  It provides no technical detail on the means to accomplish this desired result.  To the extent Utherverse contends it was not obvious to one of skill in the art to implement these steps in a virtual world with parallel dimensions (instances), the MMAP Patents would not enable one of skill in the art to do so without undue experimentation.

With respect to the '605 Patent:

Epic has contended that the asserted claims of the '605 Patent are invalid based on the prior art.  To the extent Utherverse contends that it would not be obvious to one of skill in the art to modify prior art references teaching recording and interactive playback of virtual experiences (including at least Raitt, Brook, Miura, Wagner, Greenhalgh-1, Greenhalgh-2) to disclose the requirement of automatically transporting avatars to a different instance of the scene upon occurrence of a threshold event (e.g., '605 Patent, Claim 1), including at least by combination with prior art teaching instancing and transporting avatars to an instance (as disclosed by at least

**Morrison & Foerster LLP**, 425 Market Street,
San Francisco, CA, Tel: 415-268-7000

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   Sony, Starcraft II, MASSIVE-3), the '605 Patent fails to enable a person of skill in the art to

2   practice this requirement, instead reciting only the desired result and examples of how that result

3   would look in a particular game.  For instance, the specification of the '605 Patent states:

> In one embodiment, an environment may automatically change, or
> the avatars may be automatically transported, when a threshold
> event takes place.  For example, avatars waiting to play poker may
> be automatically transported to the poker room when eight avatars
> have signed up for the table.  In another example, a prospective
> tennis player may wait in a waiting room until another tennis
> player arrives and the waiting room is transformed into a tennis
> court.

9   '605 Patent, 4:56-61.  These statements merely recite the desired outcome, as well as examples

10   of how the desired outcome would look in a game—transporting eight avatars waiting to play

11   poker to the poker room, or transforming a waiting room into a tennis court when both virtual

12   tennis players have arrived.  The '605 Patent is entirely bereft of instructions or technical details

13   that would inform one how to implement this in a system for playing back recordings of virtual

14   experiences.  To the extent Utherverse contends that it was not obvious to one of skill in the art

15   to implement these steps in a system offering recording and playback of virtual experiences, the

16   '605 Patent would not enable one of skill in the art to do so without undue experimentation.

17   <u>Indefiniteness</u>

18       As set forth in 35 U.S.C. § 112, an applicant must "particularly point[] out and distinctly

19   claim[] the subject matter which the applicant regards as his invention."  To satisfy the

20   definiteness requirement, the "claims, when read in light of the specification and the prosecution

21   history, must provide objective boundaries for those of skill in the art."  *Interval Licensing LLC*

22   *v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (citing *Nautilus, Inc. v. Biosig Instruments,*

23   *Inc.*, 134 S. Ct. 2120, 2130 (2014)).  Claims are invalid as indefinite where they fail this test.  *See*

24   *id.*

25       Claim 9 of the '071 Patent recites an "animated display including at least a portion of

26   each of the plurality of parallel dimensions and avatars populated therein."  Claim 17 of the '954

27   Patent contains a similar requirement.  The MMAP Patents fail to provide objective boundaries

28

of this requirement discernable by those skilled in the art.  For example, it is unclear whether this claim purports to require an animated display that shows a portion of each and every parallel instance in a video game, such that if a video game had 300 unique instances, the animated display would have to display a portion of each of the 300 instances to qualify.  The specification, which provides only the following discussion of an "animated display," adds no clarity:

> For example, a first user corresponding to an avatar located in parallel dimension A may receive virtual-reality data for viewing objects and other avatars inside of dimension A, while a second user controlling an avatar located in parallel dimension B may receive data for displaying the interior of dimension B.

'071 Patent, 16:5-10; *see also* '157 Patent, 16:8-13; '954 Patent, 16:8-13.

Several claims of the MMAP Patents recite "modeling occupancy…of multiple avatars." *E.g.*, 1\'071 Patent, claim 1.  The MMAP Patents fail to provide objective boundaries of this requirement discernable by those skilled in the art.  It is unclear what it means to model occupancy of avatars, because occupancy typically describes the capacity of a space.  Moreover, even were occupancy to refer to a space instead of avatars, it is unclear what would constitute "modeling" that occupancy in three-dimensional space.

Claim 1 of the '605 Patent recites "automatically transporting the one or more avatars to a different new instance of the scene, upon occurrence of a threshold event, wherein the threshold event comprises when a maximum capacity of avatars has been reached in the new instance of the scene."  The only other independent claims of the '605 Patent, claims 17 and 19, include similar requirements, except that the scene "changes to a different scene" instead of the avatars being transported to a different new scene.  The '605 Patent fails to provide objective boundaries of this requirement discernible to those skilled in the art.  The reference to transporting "the one or more avatars" appears to refer back to "playing back the recorded experience file by rendering, for display by the at least one client device, objects of the initial scene state in the new instance, including *one or more avatars*…."  '605 Patent, claim 1 (emphasis added).  That would suggest that one or more avatars in the recorded experience file

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

are the ones that must be automatically transported, not avatars of players that are viewing playback of the recorded experience file.  In that case, it is not discernible what would qualify as "transporting"—for example, to what location are the recorded avatars transported?  Does this imply that the avatars from the initial instance of the recorded experience file no longer appear in that instance, and only appear in the different new instance?  If Utherverse interprets the claim to instead require transporting of avatars of the players who are viewing the playback, this is not clear or evident from the claim language.  And even if the claim were to be interpreted to require "transporting" the player avatars to a different new instance of the scene, it is still unclear what the word "transporting" means (for example, who or what does the transporting, from what location and to what location is an avatar transported, and what is the method of transportation?).

Claims 1, 9, and 10 of the '954 Patent, and claims 1, 9, and 10 of the '157 Patent recite "multi-dimensional avatars."  The respective patents fail to provide objective boundaries of this requirement for those skilled in the art.  For example, it is unclear whether multi-dimensional avatars are avatars that must be present and animated in all instances (dimensions) of a video game at once, such that if a given video game has 300 unique instances, an avatar is only multi-dimensional if present and animated in all 300 of those instances at the same time.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

Epic further responds that several claims of the MMAP Patents recite "parallel dimensions" / "parallel instances."  *E.g.*, '071 Patent, claim 1; '954 Patent, claim 1; '157 Patent, claim 1.  The specification states: "As used herein, a 'parallel dimension' means a duplicate or recognizable counterpart of a bounded, computer modeled space that is accessible via a common environment."  '071 Patent, 13:37-39; '954 Patent, 13:41-43; '157 Patent, 13:41-43.  The MMAP Patents fail to provide objective boundaries of this requirement discernable by those skilled in the art.  It is unclear what would qualify as a "recognizable counterpart," as what is "recognizable" to a person is necessarily subjective.  The specification states: "Each of the plurality of parallel dimensions may comprise an independent model of a physical, three-dimensional space having corresponding features such that the parallel dimensions are

recognizable as counterparts to each other." '071 Patent, 13:42-46. Game designers frequently re-use assets and code when designing a game world or portion of a game world. Thus, modeled spaces in video games may often look similar to one another. But where two modeled spaces share some features but diverge in others, it would not be reasonably certain to those skilled in the art whether the two spaces are "recognizable counterparts" or not. What is a "recognizable counterpart" may also depend on one's subjective expectations and experience in the context of a particular video game. For example, in a tennis video game, players familiar with tennis might be finely attuned to small differences between tennis courts, and recognize that these small differences represent different real-life locations—even though they share many of the same features, such as the material of the turf and dimensions of the field and net.

Those skilled in the art would also not be able to discern, with reasonable certainty, what the word "counterpart" means. It is unclear whether a "counterpart" refers to identical geographic zones in the same game world, identical portions of a particular space in a virtual environment, or something else.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

Epic further responds that claim 18 of the '071 patent recites "synchronously animating an avatar present in multiple ones of the plurality of dimensions." Epic has contended that this claim is invalid based on prior art, including McFarlane, Moraal, Muller, Bernard, Rosedale, Guild Wars, World of Warcraft, and EverQuest II. To the extent Utherverse argues that this claim is not disclosed by the prior art, that it would not be obvious to one of skill in the art how to implement "synchronously animating an avatar present in multiple ones of the plurality of dimensions" based on the disclosures in this prior art, or how to modify prior art disclosing instancing to practice these steps, the MMAP Patents are not enabled because they provide no detail on how to implement these steps and would not permit one of skill in the art to do so without undue experimentation. For example, the MMAP Patents do not provide any technical instructions or detail on how to synchronously animate an avatar present in multiple ones of the plurality of dimensions. The specification states:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

> If the object is allowed to "pass' through the interface, an object passing from the common space into multiple parallel dimensions may be replicated as it passes through the interface, as indicated at step 1008. The replicated objects may then be animated synchronously (as in the case of an avatar controlled by a single user) . . . in each of the parallel dimensions.

'071 Patent, 16:62-17:2.  But this only recites the desired result—a replicated object "may then be animated synchronously," without any details concerning how to accomplish that result.  The specification does not teach how the synchronization of animation would be accomplished, which would be especially important to explain since the specification expressly recognizes the "limitations on computer processing, network bandwidth, and other factors" on online virtual environments.  *See* '071 Patent, 1:50-52.  Specifically, the specification explains that in existing VRUs:

> (a) server capacity is incapable of simultaneously handling the number of users desired or (b) client capacity, for each user, is insufficient to process and display the data needed for such user's computer to appropriately and adequately render avatars or other representations of the other users, and otherwise construct a complete and accurate representation of the environment; or (c) independent of hardware or software capacity considerations, limitations imposed by geometric constraints of the simulated environment, or simply put, lack of simulated space.

'071 Patent, 1:65-2:9.  Given these limitations, there are numerous technical hurdles to implementing synchronously animating an avatar present in multiple dimensions, especially ensuring that animation is synchronous despite the limited capacity of servers and clients to process and display the animation data.  Again, the MMAP Patents expressly recognize the problem of tracking, rendering, and animating large numbers of avatars at the same time.  *See* '071 Patent, 2:59-63 ("if the dimensions of the nightclub were drawn so that 10,000 avatars could simultaneously be accommodated, seen, and interacted with, each user computer would be tasked with tracking, rendering and animating each of 10,000 autonomously controlled avatars").  Further, the technical hurdles would only be compounded if the large number of avatars must be animated and displayed in sync across many different instances, as each copy of the synchronous avatar would have to be animated and displayed to the many users watching the synchronous

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

avatar in that instance.  That is particularly true when there are many users' avatars present in any given instance, as the MMAP Patents contemplate.  *See* '071 Patent, 3:1-4 ("It is desirable, therefore, to resolve these problems and to provide access for greater numbers of avatars within a VRU space while minimizing undesired experiences for VRU participants . . . .").  In addition, ensuring that the animation of a particular avatar is in sync with the animation of any version of that avatar across multiple other instances adds further to the technical complexity of this claim limitation.  Yet the MMAP Patents offer no details on how to surmount these problems, leaving one of skill in the art forced to engage in undue experimentation to even have a chance of implementing "synchronously animating an avatar present in multiple ones of the plurality of dimensions."

Epic has also contended that the asserted claims of the MMAP Patents reciting that a "modeled object originating from the common space is capable of passing into at least one of the plurality of parallel dimensions" are invalid based on prior art.  *See* '071 Patent, claim 10; '954 patent, claim 18; '157 Patent, claim 12.  Epic has further contended that the asserted claims of the MMAP Patents reciting "replicating the modeled object passing into the plurality of parallel dimensions so that a replica of the object is modeled in each of the plurality of parallel dimensions after the object passes from the common space" are invalid based on prior art.  *See* '071 Patent, claim 11; '954 patent, claim 19; '157 Patent, claim 13.  To the extent Utherverse contends that it would not be obvious to one of ordinary skill in the art how to practice these claim steps by combining the disclosures of prior art teaching instancing (including McFarlane, Moraal, or Bernard) with references teaching a virtual space with objects viewable to all players in a given geographic space, and objects that can cross zone boundaries within the virtual world (including as taught by Muller, Rosedale, Guild Wars, World of Warcraft, Second Life, and EverQuest II), the MMAP Patents fail to enable a person of skill in the art to practice these claim steps.  In particular, the specifications and claims of the MMAP Patents provide no explanation or detail on how to ensure that a modeled object is "capable of passing into" a parallel dimension

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

from a common space and is then replicated in each parallel dimension, but instead recite only the desired result.  For example, the specification states:

> The interior of the common space may be visible and/or audible in each of the dimensions 321a-d. An avatar or other object in the common space 322 may be able to pass into each of the parallel spaces, being replicated in the process.

'071 Patent, 9:13-16.  This recites the desired outcome—that an object "may be able to pass into each of the parallel spaces, being replicated in the process"—but provides no details whatsoever on how to achieve that outcome.  Other passages of the specification referring to these claim requirements similarly recite only the desired result, but do not provide any instructions or other details that would allow one of ordinary skill in the art to achieve the desired result.  Another passage states:

> For example, the system may consult a properties table associated with the object to determine whether or not the object has the capability of passing through the interface. The simulation may then proceed differently, depending on the properties of the object. If the object is allowed to "pass" through the interface, an object passing from the common space into multiple parallel dimensions may be replicated as it passes through the interface, as indicated at step 1008.

'071 Patent, 16:58-66.  This portion of the specification states that there can be a properties table that indicates "whether or not the object has the capability of passing through the interface," but not *how* an object could achieve that capability as a technical matter.  Similarly, it states the desired result that the object "may be replicated as it passes through the interface" but does not explain how to accomplish that result.

The MMAP Patents provide no instruction or discussion of how to achieve the desired outcome that that an object "may be able to pass into each of the parallel spaces" and be replicated in the process.  It is not clear from the MMAP Patents how a client-server architecture would be configured to enable objects to "pass into" parallel spaces from a common space, especially since parallel spaces are different from a common space in that they are instanced, and thus may be supported by different computers, servers, and/or software processes than the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

common space.  As an object crosses a boundary like the "interface" described in the MMAP Patents, a hand-off between these different components must occur for the object not to disappear from existence, and to ensure it maintains its properties (its appearance, as well as any other attributes associated with it, such as the durability of a weapon object) as it crosses the boundary.  Then, that object (and its associated properties) would have to be replicated, again requiring communication and a hand-off between the various components.  These are hurdles that would have to be overcome to implement this functionality, yet the MMAP Patents do not identify these hurdles or provide any instructions on how to overcome them.  Thus, to the extent Utherverse contends it was not obvious to one of skill in the art to implement these steps in a virtual world with parallel dimensions, the MMAP Patents would not enable one of skill in the art to do so without undue experimentation.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

Subject to and without waiving its General or Specific Objections, Epic further responds that it incorporates by reference Section XIV of the Expert Report of Benjamin Ellinger, served on April 14, 2023.

**INTERROGATORY NO. 3:**

For each of the Asserted Patents, describe with full particularity the level of skill in the art that Defendant contends or will contend a person of ordinary skill in the art would possess at the time each invention was made.

**RESPONSE TO INTERROGATORY NO. 3:**

Epic objects to this Interrogatory as premature in that it seeks expert testimony before the time for disclosure of such testimony.

Subject to and without waiving its General or Specific Objections, Epic responds as follows:

For each of the Patents-in-Suit, a person of ordinary skill in the art would have at least a bachelor's degree in computer science or equivalent and at least five years' experience developing massively multiplayer online games and/or virtual worlds.

**Morrison & Foerster LLP**, 425 Market Street,
San Francisco, CA, Tel: 415-268-7000

## PROOF OF SERVICE

I am employed in San Francisco County, State of California, in the office of a member of the bar of this Court, at whose direction the service was made. I am over the age of eighteen years, and not a party to the within action. My business address is 425 Market Street, San Francisco, CA 94105.

On June 9, 2023, I served the following documents in the manner described below:

**EPIC GAMES, INC.'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO UTHERVERSE GAMING LLC'S FIRST, SECOND, THIRD, AND FOURTH SET OF INTERROGATORIES**

[X]     (BY ELECTRONIC SERVICE) By electronically mailing a true and correct copy through Morrison & Foerster LLP's electronic mail system from cortega@mofo.com to the email addresses set forth below.

On the following part(ies) in this action:

Colby B. Springer
Miya Yusa
POLSINELLI
Three Embarcadero Center,
Suite 2400
San Francisco, CA 94111
cspringer@polsinelli.com
myusa@polsinelli.com
Utherverse-Epic@Polsinelli.com

Jonathan Spivey
POLSINELLI
1000 Louisiana Street, Suite 6400
Houston, TX 77002
jspivey@polsinelli.com

Melenie Van
POLSINELLI
2049 Century Park E., Ste 2900
Los Angeles, CA 90067
mvan@polsinelli.com

Mark T. Deming
POLSINELLI
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
mdeming@polsinelli.com

Jessica M. Andrade
Emily McNally
POLSINELLI
1000 Second Avenue, Suite 3500
Seattle, WA 98104
jessica.andrade@polsinelli.com
emcnally@polsinelli.com

*Attorneys for Plaintiff UTHERVERSE GAMING LLC*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 9, 2023, at San Francisco, California.

_____
Christina Ortega